**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | | |
|---|---|---|
| LEN STOLER, INC. d/b/a LEN STOLER AUDI, | ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | |
| | ) | Case No. 1:15CV1659-TSE/JFA |
| *v.* | ) ) | |
| VOLKSWAGEN GROUP OF AMERICA, INC. d/b/a AUDI OF AMERICA, INC., | ) ) ) | |
| Defendant/Counter-Plaintiff. | ) ) | |

---

**AUDI OF AMERICA'S OPPOSITION TO STOLER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

*Of Counsel*:

Richard Mark Dare (VSB No. 14146)
ISLERDARE PC
1945 Old Gallows road, Suite 650
Tysons Corner
Vienna, Virginia  22182
T: (703) 748-2690

James R. Vogler (*pro hac vice*)
Daniel R. Fine (*pro hac vice*)
Jack O. Snyder (*pro hac vice*)
Emily L. Gesmundo (*pro hac vice*)
BARACK FERRAZZANO
 KIRSCHBAUM & NAGELBERG LLP
200 West Madison Street, Suite 3900
Chicago, Illinois 60606
Tel.: (312) 984-3100

*Counsel for Volkswagen Group of America d/b/a Audi of America, Inc.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................... 1

FACTS ..................................................................................................................... 2

    I.    AoA's Responses to Stoler's Statements of Fact. ....................................... 2

    II.   AoA's Statements of Additional Fact. ......................................................... 8

LEGAL STANDARD ............................................................................................... 9

ARGUMENT ......................................................................................................... 10

    I.    Stoler Is Not Entitled to Summary Judgment On Its Transportation-Code
        Claims. .................................................................................................... 10

        A.    Stoler Cannot Establish Liability on Any of Its Transportation-Code
             Claims, Because It Did Not Suffer "Financial Injury or Other
             Damages." ..................................................................................... 11

             1.    Stoler Fails to Establish Injury as to Its "Offer" Claim Under
                 Section 15-207(h)(1)(i). ......................................................... 11

             2.    Stoler Fails to Establish Injury As to Its "Require[ment]" Claim
                 Under Section 15-207(h)(2)(i). .............................................. 12

             3.    Stoler Fails to Establish Injury As to Its "Benefit Generally
                 Available" Claim Under Section 15-207(h)(2)(i). ................. 12

             4.    Stoler Affirmatively Argues Lack of Injury As to Section 15-
                 207(h)(3)(i)-(ii), Which Deprives The Court of Jurisdiction. ............... 13

        B.    AoA "Offered" The Standards Bonus To All Dealers Within the
             Meaning of Transportation Code § 15-207(h)(1)(i). ....................... 14

        C.    AoA Did Not Unlawfully "Require" Stoler To Build An Exclusive
             Facility Within the Meaning of Transportation Code § 15-207(h)(2)(i). ....... 15

        D.    AoA Did Not Deny Stoler a "Benefit Generally Available" Within the
             Meaning of Transportation Code § 15-207(h)(2)(ii). ...................... 17

             1.    Stoler's Argument Rests On the False Premise That Stoler Was
                 Eligible For Any Bonus At the Time It Executed The Facility
                 Agreement. ............................................................................ 18

             2.    Under Transportation Code § 15-207(h)(2)(ii), "Benefits
                 Generally Available" Do Not Include Incentive Payments. .................. 18

E.      AoA Did Not "Reduce the Price of a Motor Vehicle Charged To a
        Dealer" Within the Meaning of Transportation Code § 15-207(h)(3)(i)-
        (ii)........................................................................................................ 21

II.     Stoler Breached the (Valid and Enforceable) Covenant Not to Sue That Is
        Contained in the Facility Agreement. ........................................................... 24

        A.      The Covenant Applies to Count I of the Complaint. ...................................... 25

        B.      Covenants Not to Sue Are Enforceable Under Maryland Law........................ 26

        C.      Transportation Code § 15-207(f) Does Not "Bar" the Covenant. .................. 27

                1.      The Plain Language of Section 15-207(f) Does Not Reach the
                        Covenant. ............................................................................................ 27

                2.      AoA's Damages Are Not Limited To Attorney's Fees. ........................ 28

III.    AoA's Liability Counterclaims Are Not Amenable To Summary Judgment................ 29

CONCLUSION....................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*100 Harborview Condominium Council of Unit Owners v. Clark,*
119 A.3d 87 (Md. Ct. Spec. App. 2015) ...............................................................................10

*Adams v. Manown,*
615 A.2d 611 (Md. 1992) .....................................................................................................30

*Barber & Ross Co. v. Lifetime Doors, Inc.,*
810 F.2d 1276 (4th Cir. 1987) ............................................................................................11

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)..........................................................................................................9, 13

*Chen v. State,*
803 A.2d 518 (Md. 2002) ....................................................................................................28

*Cook v. SCI Md. Funeral Servs., Inc.,*
Civil Case No. 14-3770-GLR, 2016 WL 890298 (D. Md. Mar. 9, 1998) .............................26

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006)..............................................................................................................13

*F.T.C. v. Anheuser-Busch, Inc.,*
363 U.S. 536 (1960)..............................................................................................................22

*Fangman v. Genuine Title, LLC,*
136 A.3d 772 (Md. 2016) .....................................................................................................26

*Felder v. Casey,*
487 U.S. 131 (1988)..............................................................................................................10

*Gordon Family P'ship v. Gar on Jer,*
702 A.2d 753 (Md. 1997) ...............................................................................................19, 24

*Hoover Color Corp. v. Bayer Corp.,*
199 F.3d 160 (4th Cir. 1999) ...............................................................................................24

*Hunt v. Cromartie,*
526 U.S. 541 (1999)................................................................................................................9

*Hydrite Chem. Co. v. Calumet Lubricants Co.,*
47 F.3d 887 (7th Cir. 1995) .................................................................................................11

*Libertarian Party of Va. v. Judd*,
   718 F.3d 308 (4th Cir. 2013) ............................................................13

*Lockshin v. Semsker*,
   987 A.2d 18 (Md. 2010) ...................................................................10

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..........................................................................13

*Maryland-Nat'l Capital Park & Planning Comm'n v. Anderson*,
   909 A.2d 694 (Md. 2006) ...........................................................10, 20

*McKinney v. Am. River Transp. Co.*,
   954 F. Supp. 2d 799 (S.D. Ill. 2013)..................................................9

*Montgomery Cnty. v. Deibler*,
   31 A.3d 191 (Md. 2011) ...................................................................10

*Ocean Petroleum Co., Inc. v. Yanek*,
   5 A.3d 683 (Md. 2010) .....................................................................25

*Santoro v. Accenture Fed. Servs., LLC*,
   748 F.3d 217 (4th Cir. 2014) ............................................................23

*Shirks Motor Express Corp. v. Forster Transfer & Rigging Co.*,
   133 A.2d 59 (Md. 1957) ...................................................................30

*State v. Ghajari*,
   695 A.2d 143 (Md. 1997) .................................................................20

*Stearman v. State Farm Mut. Auto. Ins. Co.*,
   849 A.2d 539 (Md. 2004) .................................................................21

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)............................................................................21

*Walzer v. Osborne*,
   911 A.2d 427 (Md. 2006) .................................................................28

*Ziemkiewicz v. R+L Carriers, Inc.*,
   996 F. Supp. 2d 378 (D. Md. 2014) ..................................................26

## STATUTES

15 U.S.C. § 13(a) .....................................................................................22

Md. Code, Commercial Law § 11-202 .....................................................23

Md. Code, Commercial Law § 11-204 .....................................................23

Md. Code, Transp. 15-201 et. seq. ......................................................................................... passim

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY 1189 (Bryan A. Garner, ed., 9th ed. 2009) ......................................15

*Charles Alan Wright et al.*, FEDERAL PRACTICE AND PROCEDURE § 2736 (3d ed.).......................11

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE
UNABRIDGED 1141 (Philip Babcock Gove, ed., 1993) ...........................................................15

**EXHIBITS**

Declaration of Cody Thacker (with Exhibits A-E).................................................................Ex. 1

Expert Report of Jay R. Lytle .................................................................................................Ex. 2

Responses to Stoler's Second Set of Interrogatories .............................................................Ex. 3

## INTRODUCTION

Under the Margin and Bonus Program that Defendant Audi of America, Inc. ("AoA") offered to its dealers, every Audi dealer had the opportunity to earn a "Standards Bonus." To earn the bonus, which was calculated as a percentage rebate on the previous month's new Audi sales, a dealer had to comply with its contractual facilities obligations, meet 85% or more of AoA's "Dealer Operating Standards" on a monthly basis, and achieve a passing score on a comprehensive yearly inspection of the dealership's facility and operations. Audi dealers who built and operated "exclusive" Audi dealerships—a multimillion dollar expense—were entitled to earn the Standards Bonus in higher amounts than those operating out of non-exclusive dealerships that cost less to build and operate.

Plaintiff, Len Stoler, Inc. ("Stoler"), never built an exclusive Audi facility even though it was obligated to do so under its dealer agreement with AoA. Stoler nonetheless maintains that it should have received Standards Bonus payments in the same amounts as exclusive Audi dealers and that AoA was wrong to terminate Standards Bonus payments when Stoler no longer qualified for them. According to Stoler, supposed admissions in the pleadings establish that, within the meaning of Section 15-207(h) of the Maryland Transportation Code, AoA: (1) failed to "offer" exclusive level bonuses to Stoler; (2) unlawfully "required" Stoler to build an exclusive facility; (3) unlawfully withdrew a "benefit generally available" to all dealers when Stoler failed to qualify for the Standards Bonus; and (4) unlawfully "reduce[d] the price" on Audi cars charged *to Stoler* by paying Stoler the Standards Bonus. Stoler seeks summary judgment on the foregoing claims, which are distributed among Counts 1 to 3 of its Complaint, only as to the issue of liability.

Stoler's contentions fall flat and, as to one claim, deprive this Court of jurisdiction. As a threshold matter, Maryland Transportation Code § 15-213 required Stoler to establish at the

1

liability phase that it was injured by the code violations that it alleges.  Stoler has not even attempted to do so.  The lack of injury alone is fatal to Stoler's motion for partial summary judgment.  Further, as to the "reduce[d] price" claim, Stoler expressly argues that it received benefits rather than injuries.  Because Stoler's own theory is that it was not injured, Stoler lacks standing, and this Court lacks jurisdiction over the claim.

If Stoler had surmounted the injury threshold in Transportation Code § 15-213, its claims would still fail on the merits under Section 15-207(h).  Stoler's opening brief makes no attempt to grapple with the meaning of the various terms that the Maryland General Assembly deployed within Section 15-207(h)'s many subparagraphs.  Under well-established principles of statutory interpretation that Maryland courts regularly apply, Stoler's undefended assumptions about the meaning of the statute do not have merit.

Stoler fares no better with its attempt to eliminate AoA's counterclaim and affirmative defenses.  In briefing that is fact-free and devoid of supportive legal authority, Stoler maintains that the counterclaim and defenses may be fully adjudicated as matters of law.  But the spare authority on which Stoler relies fails to support Stoler's arguments and sometimes scotches them.

Therefore, Stoler's motion for partial summary judgment should be denied in its entirety.  And Stoler's claim that AoA violated Transportation Code § 15-207(h)(3)(i)-(ii) by lowering the price that AoA charged Stoler for new Audi vehicles should be dismissed for lack of jurisdiction.

## FACTS

**I.     AoA's Responses to Stoler's Statements of Fact.[1]**

1.     Plaintiff Stoler is a corporation organized and existing under the laws of the State of Maryland, with a principal place of business in Owings Mills, Maryland.

---

[1] Pursuant to the Court's Scheduling Order (Dkt. No. 24 at 3-4), Stoler's statements of fact are set forth below.  Unless noted, AoA does not dispute them for purposes of this Opposition.

2.     Stoler was a licensed and authorized Audi dealer and franchisee, until May 2, 2016, when Stoler sold its Audi-related business assets.

3.     Until May 2, 2016, Stoler was a "dealer" as defined in the Maryland Transportation Code.

4.     Defendant Volkswagen Group of America, Inc. d/b/a Audi of America, Inc. ("Audi"), is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in the Commonwealth of Virginia. Audi purchases Audi vehicles from corporate affiliates in Germany and then imports and sells these vehicles to franchised Audi dealers throughout the United States, including Len Stoler.

5.     Audi is a "distributor" as defined in the Maryland Transportation Code.

6.     Audi and Stoler are parties to a Dealer Agreement.

7.     Audi maintains a Margin and Bonus Program that contains several incentives that offer a percentage of the adjusted manufacturer's suggested retail price (MSRP), paid as a cash bonus, on every new Audi vehicle sold by a dealer, provided certain criteria are met.

8.     One such bonus, the Standards Bonus, is related to a dealer's facilities. (AC ¶¶ 14-18; CC ¶¶ 8-9.) Until at least January 4, 2016, the Standards Bonus at issue in this litigation had a two-tiered system: a lower tier, called Brand Dedicated Standards Bonus, and a higher tier, called Exclusive Standards Bonus.  (AA ¶¶ 15-16.)

**Disputed.**   The Standards Bonus has a facilities component, but is "related" to virtually every aspect of a dealer's operations.  (Ex. 1, Thacker Decl. ¶ 8.)  The pleadings that Stoler cites do not refer to a "two tiered system" and AoA rejects that characterization.  The amount of the Standards Bonus that a qualifying dealer received depended in part on the type of facility that the dealer had.  As pertinent here, those dealers who both qualified for the Standards Bonus and had

built exclusive facilities were entitled to bonus payments in higher amounts than those dealers who had facilities classified as either "Brand Dedicated" or "Universal."  (*Id.* ¶ 10.)

9.      A dealer who met the appropriate facility guidelines and other criteria, but who did not have an exclusive facility, qualified only for the Brand Dedicated Standards Bonus, which was equivalent to 2.35% of adjusted MSRP of each new car sold. Adjusted MSRP takes into account option package prices, destination charges, and other line-item additions and subtractions from base model MSRP.  (AA ¶ 15.)

**Disputed.**  Dealers without exclusive facilities could qualify for the Standards Bonus if the dealer was compliant with its facility obligations, met the other qualifying criteria, and had a facility classified as either Brand Dedicated or Universal.  (Thacker Decl. ¶¶ 8, 10.)

10.      An "exclusive" facility is one that is exclusive to the Audi brand and does not share facilities with any other franchise operations, including sister line-makes such as Porsche or Volkswagen.

11.      Dealers who met all of the criteria necessary to receive a Brand Dedicated Standards Bonus but also had an exclusive facility qualified for the Exclusive Standards Bonus, which was equivalent to 3.75% of the adjusted MSRP of every new car sold.  (AA ¶ 16.)

12.      Stoler has only ever received the Brand Dedicated Standards Bonus.

13.      Stoler has never received the Exclusive Standards Bonus because Stoler has never had an exclusive Audi facility, nor commenced construction of one.

14.      On September 21, 2011, Stoler (as well as all other Audi dealers) received a memorandum from Audi, explaining their newly announced "Grandfather Policy" and "Cure Policy." The memorandum explained updates to Audi's Dealer Operating Standards as of 2012, and also whether and when Audi would require a dealer to upgrade their facilities. (Stoler Decl.

¶ 2, Ex. A.)

**Disputed.** The referenced memorandum sets out a framework for allowing dealers to receive Standards Bonuses "during the investment phase of building a new, or substantially renovating an existing facility." The Grandfather Policy and Cure Policy allowed dealers who were otherwise no longer eligible to receive Standards Bonuses to continue receiving bonuses so long as they took certain steps to bring their facilities back into compliance with their dealer-agreement obligations. (Thacker Decl. ¶¶ 13-14.) By its terms, however, the document that Stoler cites does not provide "whether and when Audi would require a dealer to upgrade their facilities." (Stoler Decl. ¶ 2 & Ex. A.)

15. Audi requires its dealers with a market opportunity equal or greater to 400 units to have exclusive Audi facilities. (CC ¶ 6; Stoler Decl. Ex. A.)

**Disputed.** Dealers agree in their dealer agreements and incorporated obligations to operate from exclusive facilities if their yearly market opportunity is 400 or more new Audi vehicles. (Thacker Decl. ¶¶ 2-4.)

16. At some point, according to Audi's calculations, Stoler's annual market opportunity grew to exceed the 400-unit level.

17. On January 10, 2014, Stoler received a letter from Audi explaining that, based upon Audi's new projections for 2014-2016, Stoler was now required to upgrade from a brand dedicated facility to an exclusive facility. (Stoler Decl. ¶ 3, Ex. B.)

**Disputed.** The referenced document does not state that Stoler was required to update "now." (Stoler Decl. ¶ 3 & Ex. B.)

18. On April 25, 2014, Stoler received a letter from Audi describing Stoler's scores on Audi's evaluation criteria. Stoler received a score of 100% on the "Gateway" Criteria, 86%

on the "Checklist" Criteria, and "Ongoing" on the Scorecard. The minimum requirements for bonus eligibility were 100% on Gateway, 85% on Checklist, and "Ongoing" on Scorecard. Despite Stoler's passing scores, the letter still informed Stoler that the dealership was "not eligible" to receive the Standards Bonus, and advised that even Stoler if [sic] achieved passing scores, "failure to make reasonable progress" on Stoler's dealership improvement plan may result in a denial of the bonus.  (Stoler Decl. ¶ 4, Ex. C.)

**Disputed.**  The cited document does not state that Stoler had a "passing" score and specifically states that Stoler should look elsewhere for complete results of AoA's review of Stoler's compliance with the Dealer Operating Standards.  Further, the document states that Stoler would remain eligible for Standards Bonuses in accordance with "Audi of America's current Cure Policy."  The document also states that "[a]s your dealership is affected by the Cure Policy, your AGM [area general manager] will be contacting you regarding your facility deficiencies and Cure Policy timelines."  (Stoler Decl. Ex. C at 1.)

19.    On October 16, 2014, Stoler received a letter from Audi recapping the previous communications between the parties regarding the Grandfather Policy and Cure Policy. The letter stated that "in order to maintain Standards Bonus eligibility beyond 2014, Len Stoler Audi is required to enter a Facility Letter of Intent (LOI) by December 31, 2014."

20.    Based upon the forgoing [sic] correspondence and Stoler's communications with Audi, in mid-January 2015, Audi and Stoler entered into the Facility Agreement, pursuant to which Stoler promised to construct an exclusive Audi facility, and Audi promised to pay Stoler the Exclusive Standards Bonus once construction on the new facility commenced.  (AC ¶¶ 19, 22-24; AA ¶¶ 19, 22-24; CC ¶¶ 9-10; see also Stoler Decl. Ex. E, Facility Agreement.)

**Disputed.** The cited matter does not support the proposition that Stoler entered into the Facility Agreement "[b]ased upon the forgoing [sic] correspondence and Stoler's communications with Audi."

21.   The Facility Agreement recognized that, at the time of execution, Stoler was still entitled to receive the Brand Dedicated Standards Bonus.  (Facility Agreement at ¶ 2.)

**Disputed.**  By its terms, the Facility Agreement *provided* that, as of the time of the Facility Agreement, Stoler was entitled to receive Standards Bonus payments at a brand dedicated level.  (Facility Agreement ¶ 2.)[2]  The Facility Agreement makes no representation of historical fact.  (*See also* Pl. Fact Statement ¶ 19, above.)

22.   The Facility Agreement required Stoler to break ground on the exclusive Audi facility by December 31, 2015, or else lose all facility-related bonus money, including the Brand Dedicated Standards Bonus. (CC ¶ 11; AC ¶ 22; AA ¶ 22.)

**Disputed.**  Under the terms of the referenced documents, Stoler would no longer be entitled to future Standards Bonus payments if Stoler failed to begin construction by December 31, 2015.  (Facility Agreement ¶ 5.)

23.   Stoler did not commence construction by December 31, 2015.

24.   As a result, on January 1, 2016, Audi ceased payment of the Brand Dedicated Standards Bonus because of Stoler's failure to commence construction of an exclusive facility.

25.   Stoler has brought three causes of action against Audi for violation of Dealer Act § 15-207(h).

26.   Stoler's First Cause of Action seeks damages for failure to pay any Standards Bonus beginning January 1, 2016.

---

[2] The Facility Agreement is appended to the Declaration of Barry Stoler as Exhibit E.  (*See* Dkt. No. 45-2.)

27.     Stoler's Second Cause of Action seeks damages going back at least three years for Audi's failure to ever pay Stoler the Exclusive Standards Bonus.  (AC ¶ 74; AA ¶ 74.)

**Disputed.**   The cited matter states that Stoler seeks damages only for "the last three years" and for "the Exclusive Bonus" that Stoler claims it should have received.

28.     Stoler's Third Cause of Action seeks a declaration that the Facility Agreement is null and void under Maryland law.

## II.     AoA's Statements of Additional Fact.

1.     As of 2014, when Stoler's market opportunity rose above 400 new Audi vehicles per year, Stoler was no longer compliant with its facilities obligations under its Dealer Agreement with AoA.  By the beginning of 2014, the dealer agreements of all Maryland dealers called for exclusive facilities.  (Thacker Decl. ¶ 12; *see also id.* ¶¶ 2-4.)

2.     Because Stoler did not have a compliant facility, Stoler would not have been entitled to receive any Standards Bonus in 2014; having a compliant facility was one of the criteria a dealer had to meet to earn the Standards Bonus.  (*Id.* ¶ 13.)

3.     To ease facility-related burdens on its dealer network, however, AoA had implemented its Grandfather Policy and Cure Policy in 2011.  The policies permitted dealers in once-compliant facilities up to three years to bring their facilities back into compliance with brand standards—all the while remaining eligible to receive Standards Bonus payments.  (*Id.*)

4.     Under the Grandfather Policy and Cure Policy, Stoler would have continued to remain eligible for Standards Bonus payments for up to three years so long as it (1) executed an LOI to build a new facility within 12 months of being notified that it had a non-compliant facility, (2) obtained permits and began construction during the next 12 months, and (3) completed construction within the next 12 months.  (*Id.* ¶¶ 13-14.)

5.     Stoler executed the LOI (which the parties call the "Facility Agreement"), but

neither broke ground on nor completed its exclusive facility.   Therefore, Stoler no longer satisfied the terms of the Standards-Bonus-extension that AoA provided to all dealers under the Grandfather and Cure Policy.   Accordingly, Stoler was no longer eligible to receive Standards Bonus payments as of January 1, 2016.   (*Id.* ¶ 15.)   Had Stoler commenced construction, its Standards Bonus eligibility would have been reinstated.   (Facility Agreement ¶ 2.)

6.   Exclusive Audi facilities cost several millions of dollars to build.   (Thacker Decl. ¶ 5.)   Such facilities are more expensive to operate than Brand Dedicated or Universal facilities. The increased costs can—and in the case of Stoler's nearby exclusive competitors, do—outstrip the marginal increase in Standards Bonus payments that an exclusive Audi dealer can earn.   (Ex. 2, Lytle Rpt. ¶¶ 20-21.)

7.   Obtaining the Standards Bonus at a brand dedicated level was costly, too, in terms of both financial and human resources.   (Thacker Decl. ¶ 16.)

## LEGAL STANDARD

A plaintiff seeking summary judgment on a claim (or part of a claim) for which it bears the burden of persuasion at trial "must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).   Thus, a summary judgment plaintiff must "establish all the essential elements of [its] claim" or the parts of a claim on which it moves.   *See McKinney v. Am. River Transp. Co.*, 954 F. Supp. 2d 799, 803 (S.D. Ill. 2013) (collecting authority).   Evidence offered by the non-moving party "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."   *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## ARGUMENT

Stoler's motion should be denied.  The motion fails to establish injury for any of Stoler's Transportation-Code claims, an essential ingredient for liability, and one such claim should be dismissed for lack of jurisdiction.  The motion also fails to establish that AoA violated Transportation Code § 15-207(h).  And because AoA's counterclaim and affirmative defenses withstand the conclusory and generally law-free arguments that Stoler advances in its opening brief, Stoler's motion should be denied in its entirety.

## I.      Stoler Is Not Entitled to Summary Judgment On Its Transportation-Code Claims.

The task of a Federal court exercising diversity jurisdiction is to ascertain and apply state law.  *E.g., Felder v. Casey*, 487 U.S. 131, 151 (1988) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).  The principal questions before the Court in this case relate to matters of interpretation regarding the Maryland Transportation Code.

The lodestar of statutory interpretation in Maryland is legislative intent.  *Montgomery Cnty. v. Deibler*, 31 A.3d 191, 194 (Md. 2011).  In discerning that intent, courts begin—and often end—with the plain language of the statute.  *Maryland-Nat'l Capital Park & Planning Comm'n v. Anderson*, 909 A.2d 694, 699 (Md. 2006).  Undefined words and phrases are given their ordinary meaning.  *100 Harborview Condominium Council of Unit Owners v. Clark*, 119 A.3d 87, 102-03 (Md. Ct. Spec. App. 2015).  And because statutory interpretation is a holistic endeavor, the language of a statute is viewed in the overall context of the statutory scheme: Courts "seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the subject's object and scope."  *Lockshin v. Semsker*, 987 A.2d 18, 28-29 (Md. 2010).

These well-entrenched principles of interpretation, when applied to the factual record before the Court, disentitle Stoler to summary judgment.  For each of Stoler's Transportation-Code claims, Section 15-213 required Stoler to prove that it "suffer[ed] financial injury or other

damage." Stoler did not even make the attempt, which is fatal to its claims at this phase. If Stoler could surmount that obstacle, its claims would still fail because they are based on fundamental misunderstandings of Maryland law.

### A. Stoler Cannot Establish Liability on Any of Its Transportation-Code Claims, Because It Did Not Suffer "Financial Injury or Other Damages."

Stoler's summary judgment motion states that Stoler seeks judgment on the issue of liability only. However, "if there is no liability without damage and damages are in dispute, summary judgment should not be granted." 10B Charles Alan Wright *et al.*, FEDERAL PRACTICE AND PROCEDURE § 2736 (3d ed.); *see also Hydtrite Chem. Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 890-91 (7th Cir. 1995) (Posner, C.J.) ("[T]he fact of injury belongs in the first trial and the quantification of injury by means of assessment of damages in the second"); *Barber & Ross Co. v. Lifetime Doors, Inc.*, 810 F.2d 1276, 1280 n.2 (4th Cir. 1987) (jury correctly instructed that it had to find antitrust injury during the liability phase of trial).

Consistent with the above authorities, the Maryland Transportation Code does not permit liability without injury, providing that "if a person suffers financial injury or other damage as a result of a violation of this subtitle . . . the injured person may recover damages." Md. Code, Transp. § 15-213. That is, one must first cross the injury threshold to obtain damages under Maryland law. As to each of its statutory claims, however, Stoler fails to present any evidence of injury whatsoever.

#### 1. Stoler Fails to Establish Injury as to Its "Offer" Claim Under Section 15-207(h)(1)(i).

As to its claim under Transportation Code § 15-207(h)(1)(i), Stoler argues that it should have been offered the Standards Bonus at an exclusive level. (Pl. Mem. at 7-8.) But obtaining the bonus at an exclusive level required dealers to invest millions of dollars. (Thacker Decl. ¶ 5.) The summary judgment record establishes that obtaining the Standards Bonus at an exclusive

level did not offset the increased costs associated with earning the bonus.  (Lytle Rpt. ¶¶ 20-21.)
That is, the delta between the Standards Bonus at an exclusive level and the Standards Bonus at a
brand dedicated level is entirely consumed (and then some) by the costs associated with earning
the Standards Bonus at an exclusive level.  Therefore, Stoler suffered no injury from the code
violation it alleges.

> ### 2.   *Stoler Fails to Establish Injury As to Its "Require[ment]" Claim Under Section 15-207(h)(2)(i).*

As to its claim under Transportation Code § 15-207(h)(2)(i), Stoler claims that AoA
unlawfully "require[d]" Stoler to build an exclusive facility.  But, as Stoler acknowledges, it
"never had an exclusive Audi facility, nor commenced construction of one."  (Pl. Mem. at 3
¶ 13.)   And because Stoler signed the Facility Agreement, it was able to remain eligible for
Standards Bonus monies to which it was otherwise no longer entitled.  (Thacker Decl. ¶ 14.)
Thus, even if Stoler had been unlawfully "required" to build an exclusive facility, the only
evidence is that Stoler received benefits from that arrangement rather than injuries.

> ### 3.   *Stoler Fails to Establish Injury As to Its "Benefit Generally Available" Claim Under Section 15-207(h)(2)(i).*

The same defect defeats Stoler's claim that AoA allegedly denied a "benefit generally
available to all dealers" under Transportation Code § 15-207(h)(2)(i), by not making Standards
Bonus payments for which Stoler was no longer eligible beginning in 2016.  Stoler has failed to
offer any evidence related to the cost of obtaining incentive bonuses relative to the benefits
conferred by the Standards Bonus (at a brand dedicated level or any other).  Obtaining the bonus
was costly (Ltyle Rpt. ¶ 21; Thacker Decl. ¶ 16), and Stoler presents no evidence about the
amount of Standards Bonus monies it was previously receiving compared to the reduction in
costs that occurred once Stoler was no longer in the running to earn the bonus payments.
Because it was Stoler's burden to adduce evidence on each element of its claim in its opening

brief for summary judgment, *Celotex*, 477 U.S. at 330, the fact of injury cannot merely be assumed into the record.

4.    *Stoler Affirmatively Argues* Lack *of Injury As to Section 15-207(h)(3)(i)-(ii), Which Deprives The Court of Jurisdiction.*

The lack of injury is clearest of all with respect to Stoler's claim under Transportation Code § 15-207(h)(3)(i)-(ii) and raises a jurisdictional issue.  Stoler in fact argues that it received a *benefit* by AoA's alleged code violation: "[B]y entering into the Facility Agreement, Audi violated [the statute] by reducing the price paid by Stoler in exchange for Stoler's promise to maintain an exclusive sales or service facility."  (Pl. Mem. at 9.)  On Stoler's own theory, then, it was not harmed at all, because Stoler never built an exclusive facility or even broke ground on one.  (*See also* Pl. Mem. at 10 ("[N]or can [AoA] offer to give Stoler cheaper vehicles . . .").  Therefore, there is no "case or controversy" before the Court for constitutional purposes.

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The duty to establish standing persists throughout the life of the case, *id.* at 561, and requires Stoler to establish (among other requirements) both injury-in-fact and that a favorable ruling would redress an alleged injury.  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  Stoler itself argues that it received a benefit rather than an injury; because of that benefit, it has not been harmed and even a favorable ruling would not address the "injury" of having received "cheaper vehicles" (*see* Pl. Mem. at 9-10).  Because Stoler must establish constitutional standing for each of its claims, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352-53 (2006), and lack of standing creates a jurisdictional defect, *id.* at 342, Stoler's claim under Section 15-207(h)(3)(i) should be dismissed for want of jurisdiction.

In sum, the Court should deny Stoler's motion for partial judgment on liability for its Transportation-Code claims, because Stoler fails to establish injury.  Even if Stoler could surmount that obstacle, its claims would still fail under Transportation Code § 207(h).

**B.     AoA "Offered" The Standards Bonus To All Dealers Within the Meaning of Transportation Code § 15-207(h)(1)(i).**

In the first Transportation-Code claim on which Stoler seeks partial summary judgment, Stoler argues that AoA has violated Transportation Code § 15-207(h)(1)(i), which provides: "[a]ny consumer rebates, dealer incentives, price or interest rate reductions, or finance terms that a manufacturer, distributor, or factory branch offers or advertises . . . shall be offered to all dealers of the same line make."  (*See also* Dkt. No. 10, Compl. ¶ 56.)

In its summary judgment motion, Stoler argues that AoA "has admitted it engaged in a two-tiered bonus program (AA ¶¶ 15-16), which by definition means that [AoA] offered rebates, incentives, or price reductions to only *some* of its Audi dealers."  (Pl. Mem. at 7.)  Stoler further contends that "[u]nder [AoA]'s volume planning standards, smaller volume dealers like Stoler can only receive the Brand Dedicated Standards Bonus."  (*Id.*)  Finally, Stoler appears to argue that the fact that it has never received the Standards Bonus at an exclusive level is proof that AoA "never offered Stoler the Exclusive Standards Bonus."  (*Id.* at 7-8.)

Stoler's arguments are not supported by the record and are incompatible with the plain language of the statute.  *First*, AoA simply has not admitted that it operated a "two tiered" bonus system, a characterization that AoA in all events rejects.  Stoler's tier-based construct blurs the distinction between offering a bonus and meeting the standards necessary to obtain a bonus.  The offer to earn the Standards Bonus at an exclusive level is open to all dealers.  (Thacker Decl. ¶ 11.)  Dealers accept the offer by building an exclusive facility and otherwise qualifying for the Standards Bonus.

14

*Second,* Stoler's contention that "smaller volume dealers like Stoler can only receive the Brand Dedicated Standards Bonus" (Pl. Mem. at 7) is not supported by any evidence. The evidence offered by AoA refutes Stoler's unsupported statement. (Thacker Decl. ¶ 11.)

*Third,* Stoler's intimation that an offer of a bonus is made to all dealers only if all dealers qualify for the bonus is at war with the concept of both offers and incentives. The plain meaning of the term "offer" is deeply seated in the law. An offer is "[t]he act of presenting something for acceptance," often "conditioned on an act . . . or return promise being given in exchange." BLACK'S LAW DICTIONARY 1189 (Bryan A. Garner, ed., 9th ed. 2009). In other words, the fact that Stoler did not work to obtain the Standards Bonus at an exclusive level shows only that Stoler did not accept the offer—not that one was never made. And because incentives are designed to spur changes to behavior, often by means of monetary payments, *e.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1141 (Philip Babcock Gove, ed., 1993) ("incentive," def. 1), Stoler's apparent gloss on the statute—that incentives can be offered only to those already eligible—would not allow distributors to spur change with regard to (*i.e.,* incentivize) anything.

Because the exclusive-level Standards Bonus was offered to all Audi dealers, Stoler's motion for summary judgment should be denied.

**C.     AoA Did Not Unlawfully "Require" Stoler To Build An Exclusive Facility Within the Meaning of Transportation Code § 15-207(h)(2)(i).**

In the second Transportation-Code claim on which Stoler seeks summary judgment, Stoler argues that AoA violated Section 15-207(h)(2)(i), which provides that, with exceptions not applicable here, a distributor may not "[r]equire a dealer to alter or replace an existing dealership facility." In its summary judgment motion, Stoler selectively quotes from the pleadings in this

lawsuit, arguing that AoA admitted in Paragraphs 6 and 7 of its Counterclaim that it "required" Stoler to build an exclusive facility.  (Pl. Mem. at 8.)

Stoler's argument fixates on the word "require," fails accurately to characterize the pleadings, and ignores the statutory definition of what makes a "require[ment]" unlawful in Maryland.  The Maryland legislature has provided a statutory definition of the word "require," which Stoler simply omitted from its opening brief to this Court.  That definition excludes from the meaning of the word "require" both preexisting franchise-agreement obligations and business decisions that a distributor applies uniformly to its dealers:

> "Require" means to impose upon a dealer a provision *not* required by law or *previously agreed to* by a dealer in a franchise agreement, *excluding business decisions* by a manufacturer, distributor, or factory branch *which are uniformly applied to all Maryland dealers in new vehicles of the manufacturer, distributor, or factory branch*.

Md. Code, Transp. § 15-207(a)(3).

The statutory definition of the word "require" razes the so-called admissions on which Stoler constructs its summary-judgment argument.  Paragraphs 6 and 7 of AoA's Counterclaim do not admit to liability: Paragraph 6 states that "[u]nder the terms of AoA's standard dealer agreement, dealers are obligated to comply with certain facility standards . . . Dealers whose market opportunity equals or exceeds 400 units are required to have facilities that are exclusive to the Audi brand."  Paragraph 7 merely states that "[b]ecause, over time, Stoler's annual market opportunity grew to exceed the 400-unit level, it was required to upgrade to an exclusive facility."  Accepted as true, these allegations would disentitle Stoler to relief, because the allegations refer to dealer-agreement obligations that are statutorily excluded from the definition of "require."  (*See also* Dkt. No. 37, Answer ¶ 80 (denying that AoA "violated Maryland Code § 15-207(h)(2) which prevents a manufacturer from requiring a dealer to alter its facility . . .").)

Further, the record evidence establishes that Stoler cannot prevail on its Section 15-207(h)(2)(i) claim because AoA made a uniform business decision under which all dealers in Maryland are called upon to operate out of exclusive facilities if their markets can support 400 or more new Audi car sales per year.  (Thacker Decl. ¶¶ 2-4.)  Since 2014, all Maryland dealers surpassed this threshold.  (*Id.* ¶ 12.)  Thus, on both the pleadings and the evidence, Stoler's Section 15-207(h)(2)(i) claim fails.

### D.   AoA Did Not Deny Stoler a "Benefit Generally Available" Within the Meaning of Transportation Code § 15-207(h)(2)(ii).

In the third Transportation-Code claim on which Stoler seeks summary judgment, Stoler argues that AoA's decision to cease making Standards Bonus payments to Stoler in January 2016 is "illegal" under Transportation Code § 15-207(h)(2)(ii).  (Compl. ¶ 55.)  That provision provides that, with exceptions not applicable here, a distributor may not "[d]eny, or threaten to deny, any benefit generally available to all dealers for a dealer's failure to alter or replace an existing dealership facility."  Md. Code, Transp. § 15-207(h)(2)(ii).

The precise argument that Stoler makes at summary judgment is difficult to decipher, and so we set it out in its entirety:

> Audi has admitted to violating Dealer Act § 15-207(h)(2)(ii).  Prior to the Facility Agreement, and as acknowledged by the Facility Agreement itself, Stoler had been and would continue to be eligible for the Brand Dedicated Standards Bonus.  (Facility Agreement ¶ 2 ("As of the date of this Agreement, Dealer is eligible for Brand Dedicated Standards Bonus. . . .").)  Audi has admitted that, under the terms of the Facility Agreement, Stoler "lost eligibility for certain bonus payments" after December 31, 2015, when Stoler had failed to begin construction on a new exclusive facility.  (AA ¶ 23.)  Therefore, Audi has plainly stated that it has denied to Stoler a benefit generally available to all dealers, *including Stoler itself*, because of Stoler's "failure to alter or replace an existing dealership facility," in violation of § 15-207(h)(2)(ii).

(Pl. Mem. at 8.)

To the extent Stoler's summary judgment motion is based on its factual premise, AoA disputes the material facts. To the extent Stoler's motion depends on a construction of the term "benefit generally available"—which Stoler does not attempt to provide—Stoler's summary judgment motion fails on the law.

1.    *Stoler's Argument Rests On the False Premise That Stoler Was Eligible For* Any *Bonus At the Time It Executed The Facility Agreement.*

The premise of Stoler's entire argument—that at the time of the Facility Agreement Stoler was already entitled to receive Standards Bonus payments—is both wrong and contradicted by the declaration that Stoler offers in support of its motion. An exhibit to the declaration shows that Audi advised Stoler in 2014 that Stoler was not going to be entitled to receive any Standards Bonus under AoA's Margin and Bonus Program in 2015. (Stoler Decl. Ex. D at 1.) Nonetheless, pursuant to AoA's "Cure Policy," Stoler was eligible to sign the Facility Agreement, which allowed Stoler to continue receiving bonus payments to which it was otherwise no longer entitled. (Thacker Decl. ¶¶ 13-14.) Thus, the proviso in the Facility Agreement stating that "[a]s of the date of this Agreement, Dealer is eligible for Brand Dedicated Standards Bonus payments" is a description of a contractual commitment rather than an historical fact.

Because the cornerstone of Stoler's summary-judgment argument is that Stoler was deprived of a benefit to which it was already entitled at the time it executed the Facility Agreement, Stoler's motion for summary judgment should be denied.

2.    *Under Transportation Code § 15-207(h)(2)(ii), "Benefits Generally Available" Do Not Include Incentive Payments.*

The unstated and undefended assumption of Stoler's summary judgment motion is that Standards Bonus incentive payments are "benefits generally available to all dealers" within the meaning of the Transportation Code. This assumption should be rejected for several reasons.

*First,* under the plain language of Section 15-207(h)(2)(ii), the Standards Bonus was not a benefit generally available to all dealers, but a benefit that was expressly conditioned on a dealer's compliance with numerous terms and conditions, including compliance with the dealer's facility obligations.  Thus, under the plain language of Section 15-207(h)(2)(ii), the Standards Bonus was not a "benefit generally available to all dealers" but a bonus offered to all dealers—a bonus that had to be earned.

*Second*, Stoler's interpretation of Section 15-207(h) ignores the structure of the Transportation Code and, indeed, the structure of paragraph (h) of Section 15-207.  Section 15-207(h) contains numerous subparagraphs that—in different places—regulate consumer rebates, rebates, dealer incentives, cash incentives, price or interest rate reductions, finance terms, generally available benefits, and promotions.[3]  These differences in language should be given effect.  *See Gordon Family P'ship v. Gar on Jer*, 702 A.2d 753, 757 (Md. 1997) ("[N]ot only are we required to interpret the statute as a whole, but, if appropriate, in the context of the statutory scheme of which it is a part.") (citation omitted).  The General Assembly chose not to regulate "incentive payments" or "rebates" in Section 15-207(h)(2)(ii).  That legislative judgment should be respected.

There is another structural problem with Stoler's apparent interpretation.  In addition to Transportation Code § 15-207(h)(1)(i), which provides that "[a]ny . . . dealer incentives . . . that a . . . distributor . . . offers . . . shall be offered to all dealers of the same line make," Section 15-

---

[3] *See, e.g.,* Transp. Code § 15-207(h)(1)(i) (rules applicable to "consumer rebates, dealer incentives, price or interest rate reductions, or finance terms"), (h)(1)(ii) (same), (h)(2)(ii) (rules applicable to a "benefit generally available to all dealers"), (h)(3) (rules applicable to "the price of a motor vehicle charged to a dealer" and "financing terms"); *id.* § 15-207(i) (rules applicable to "rebates, cash incentives, or other promotional items"); *id.* § 15-207(j) (rules applicable to "any program that provides assistance to its dealers, including Internet listings, sales leads, warranty policy adjustments, marketing programs, and dealer recognition programs").

207(i) contains an explicit safe harbor for incentives.   Under the safe harbor provision a distributor "*may* offer . . . rebates, cash incentives, or other promotional items, for the sale of a vehicle by its dealers if * * * [t]he same rebate, cash incentive, or promotion is offered to all its dealers of the same line make."  Md. Code, Transp. § 15-207(i).[4]

Stoler's view of the statute would fill the safe harbor with shoals: an incentive program related to facilities could surmount the hurdle contained in Section 15-207(h)(1)(i), satisfy the statutory safe harbor in Section 15-207(i) and yet still create distributor liability as soon as the dealer lost eligibility to receive the bonus.  Such an interpretation injects discord into the statute and runs counter to the admonition that "the Legislature intends its enactments to operate together as a consistent and harmonious body of law." *Johnson*, 2 A.3d at 373.  And because the incentive-payment provisions are "more specific," those provision would take precedence over any more general provision related to "benefits generally available" in any event. *State v. Ghajari*, 695 A.2d 143, 149 (Md. 1997) ("[W]hen two statutes, one general and one specific, are found to conflict, the specific statute will be regarded as an exception to the general statute.").

*Third*, Stoler's apparent take on Section 15-207(h)(2)(ii) would lead to a construction that is "illogical, unreasonable, [and] inconsistent with common sense." *Anderson*, 909 A.2d at 700. Under the Stoler interpretation of the Transportation Code, a distributor would be free as an initial matter to condition incentives on meeting facilities obligations, so long as incentives were offered to all dealers (*see* Md. Code, Transp. §§ 15-207(h)(1)(i), 207(i)), but the distributor would be unable to withdraw those incentives if a dealer fell out of compliance, because withdrawing incentives would violate Section 15-207(h)(2)(ii).  As a practical matter, under such circumstances, distributors would never offer facilities-related incentives to their dealers,

---

[4] Section 15-207(i) also provides the circumstances under which bonuses may be increased for meeting a performance standard, but the provision is inapplicable here.

because distributors would be forced down a one-way street: they would be unable to stop paying the incentives to dealers who lose eligibility.

There is no good reason to suppose that Maryland's Generally Assembly intended to enact this result. After all, facilities-related incentives assist automobile dealers, help franchisors implement brand standards, and provide the consuming public with superior outlets at which to purchase motor vehicles. And had the legislature for some reason wished to outlaw the offering of facilities-related incentives altogether (the bizarre result that would occur if Stoler's apparent interpretation gained acceptance), there would have been far simpler ways for the legislature to have said so. *Cf. Stearman v. State Farm Mut. Auto. Ins. Co.*, 849 A.2d 539, 547 (Md. 2004) (legislature "would have said so" had it intended result broader than statutory text).

### E.  AoA Did Not "Reduce the Price of a Motor Vehicle Charged To a Dealer" Within the Meaning of Transportation Code § 15-207(h)(3)(i)-(ii).

Stoler's final Transportation-Code claim is that AoA has violated Section 15-207(h)(3)(i)-(ii). That provision provides that, in exchange for an agreement to maintain or build a sales or service facility, a "manufacturer, distributor or factory branch may not reduce the price of a motor vehicle charged to a dealer."[5]

In its summary judgment brief, Stoler argues that AoA has admitted that "Stoler qualified for [Brand Dedicated] bonus monies to which it was otherwise ineligible" in exchange for "Stoler's agreement to build an exclusive Audi facility." (Pl. Mem. at 9.) Stoler maintains that such conduct violates Section 15-207(h)(3)(i)-(ii), because bonus monies "are paid on a per-car basis as a percentage of adjusted MSRP" and "[c]ourts have found that such per-car bonuses or

---

[5] For the reasons set forth in Part I.A.4 of AoA's Argument, the Court lacks jurisdiction over this claim and should therefore not reach the merits of it: When jurisdiction "ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

rebates, regardless of whether they are paid at the time of wholesale or at a later date, have the *effect* of 'reducing the price' paid by the dealer for the vehicle."   (Pl. Mem. at 9 (emphasis added).)

Stoler's summary judgment brief is (yet again) built on an undefended assumption: that the Transportation Code regulates devices that have an "indirect" impact on price.   The courts to which Stoler refers in its opening brief were interpreting the Federal Robinson-Patman Act and a New York price-discrimination law.   (*See* Pl. Mem. at 9).   Both statutes regulate devices that "either directly or indirectly" affect the price of commodities or services.   15 U.S.C. § 13(a); N.Y. Veh. & Traffic L. § 463(2)(g) (unlawful to charge one dealer "a lower actual price" than others).   The statutes also contain defenses, for not all price discrimination is harmful.   *E.g., F.T.C. v. Anheuser-Busch, Inc.*, 363 U.S. 536, 551 (1960) ("[T]he statute itself spells out the conditions which make a price difference illegal or legal"); N.Y. Veh. & Traffic L. § 463(2)(g) (safe harbor for incentives or discounts "reasonably available to all franchised motor vehicle dealers in this state on a proportionately equal basis").

The double-barreled conceit of Stoler's summary judgment motion is that (1) Transportation Code § 15-207(h)(3) is a price-discrimination law that applies to incentives that "have the effect" (Pl. Mem. at 9) of reducing the "price of a motor vehicle charged to a dealer" and (2) unlike other price discrimination statutes, Transportation Code § 15-207(h)(3) is not susceptible to any defenses.   These are lofty propositions, and there are strong reasons why the Court should reject them.

*First*, Stoler's assumption ignores the plain language of the statute.   The statute makes it ulawful to "reduce the price of a motor vehicle charged to a dealer."   Md. Code, Transp. § 15-207(h)(3).   Stoler's entire argument is premised on the notion that the Court should read into the

statute additional words that do not appear, making it unlawful to engage in conduct that "has the effect" of reducing the price of a motor vehicle charged to a dealer.   But a basic canon of statutory interpretation is that courts do not add to the plain language enacted by the legislature. *Johnson*, 2 A.3d at 373.

*Second*, Stoler again ignores the structure of Section 15-207(h).  The General Assembly showed, in the specific context of Section 15-207(h)'s many subparagraphs, that it was perfectly capable of picking and choosing whether to regulate incentives, rebates, price reductions, generally available benefits, and so forth.  Had the legislature intended to regulate incentives or rebates in Section 15-207(h)(3)—something that the legislature did in neighboring subparagraphs—it would have said so.

*Third*, Stoler's argument violates the presumption that legislators do not "hide elephants in mouse holes"—that is, they do not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."  *Santoro v. Accenture Fed. Servs., LLC*, 748 F.3d 217, 223 (4th Cir. 2014).  Maryland, like many other states, already has an antitrust statute that addresses price discrimination and is modeled on the Federal Robinson-Patman Act.  *See* Md. Code, Commercial Law § 11-204.   Unlike Transportation Code § 15-207(h)(3)(i), Maryland's price discrimination statute is worded so as to include devices that have the "effect" of reducing price. Commercial Law § 11-204(a)(3) (providing that a person may not "[d]irectly or indirectly discriminate in price among purchasers of commodities or services of like grade and quality"). But even then, Maryland law permits price discrimination in certain circumstances, *id.*, and directs Maryland courts to interpret state law in a manner that is consistent with federal antitrust law.  Commercial Law § 11-202(a)(2).  And, critically, federal law provides that a rebate that is "functionally available"  to all purchasers prevents a person from making out a  price

discrimination claim. *E.g., Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 163 (4th Cir. 1999).

Against this backdrop, Stoler's favored interpretation is particularly difficult to accept. Without any textual analysis, Stoler wishes the Court to accept the notion that the Transportation Code enacts a price-discrimination statute that regulates indirect price discrimination even though (1) the Transportation Code does not use the phrase "price discrimination;" (2) the Transportation Code is worded dissimilarly to Maryland's price discrimination statute, the Federal Price discrimination statute, and the New York price discrimination statute that Stoler cites in its brief[6]; and (3) Stoler's interpretation of the Transportation Code would ignore the General Assembly's directive to construe Maryland antitrust law in a manner that is consistent with federal antitrust law.

Courts applying Maryland law are directed to examine "related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose" on the issues before the Court. *Gar on Jer*, 702 A.2d at 757. In light of the language and principles that Maryland enacted in its antitrust laws, and the evident care with which the General Assembly chose its words in Section 15-207(h), the Court should reject Stoler's implicit argument that the vague and mousy language of subparagraph (h)(3) enacts an elephant-like price-discrimination statute.

## II. Stoler Breached the (Valid and Enforceable) Covenant Not to Sue That Is Contained in the Facility Agreement.

The only party who should face liability is Stoler. In the Facility Agreement, Stoler made the following promise:

---

[6] New York Veh. & Traffic L. § 463(2)(g) provides that it is unlawful "[t]o sell or offer to sell any new motor vehicle to any franchised motor vehicle dealer at a lower actual price offered to any other motor vehicle dealer . . . This Paragraph shall not be construed to prevent the offering of incentive programs . . . provided [they are] reasonably available to all franchised motor vehicle dealers in this state on a proportionately equal basis."

> Repayment and Covenant Not to Sue.  Dealer, by signing this Agreement, agrees and covenants not to sue AoA *with respect to any alleged damages Dealer may suffer as a result of Dealer's loss of the right to receive any Standards Bonus* or requirement to repay AoA any Standards Bonus monies *arising out of Dealer's failure to perform its obligations under the Agreement*.

(Facility Agreement ¶ 5 (emphasis added).)

AoA filed its counterclaim based on this provision because Count I of Stoler's Complaint seeks to recover damages proscribed by the covenant not to sue.  Stoler advances several reasons why summary judgment should be granted in its favor.  None is convincing.

### A.      The Covenant Applies to Count I of the Complaint.

Stoler contends that, as a textual matter, the covenant not to sue does not apply to Stoler's claims.  According to Stoler, the covenant would apply only if "Audi breached [a] contractual claim arising under the Facility Agreement."  (Pl. Mem. at 11.)  The Facility Agreement says no such thing.  It says the opposite.

Maryland courts apply an objective standard of contract interpretation and enforce the plain language of contracts where that language is clear.  *Ocean Petroleum Co., Inc. v. Yanek*, 5 A.3d 683, 690 (Md. 2010).  Under the Facility Agreement, Stoler promised that it would not file suit if it lost eligibility for Standards Bonus monies arising out of "Dealer's"—not AoA's— "failure to perform its obligations under the Agreement."   And the allegations of Stoler's Complaint fall squarely within the territory covered by the covenant not to sue.  The Complaint alleges that the January 1, 2016, cessation in bonus payments was "because [Stoler] did not meet its construction start deadline of December 31, 2015."   (Compl. ¶ 54.)   That deadline for continued bonus eligibility was included in the Facility Agreement, and Count I seeks damages based on Stoler's loss of eligibility to receive Standards Bonus for failing to meet the deadline. (Compl. ¶¶ 51-64.)  Thus, Count I is within the ambit of the covenant not to sue.

**B.**    **Covenants Not to Sue Are Enforceable Under Maryland Law.**

Stoler next argues that the covenant not to sue is "void as against public policy," but the case law that Stoler cites does not support Stoler's position.  The case of *Ziemkiewicz v. R+L Carriers, Inc.*, 996 F. Supp. 2d 378, 397 (D. Md. 2014), holds only that under New Jersey and Maryland law, a waiver of a right to sue does not apply to "intentional or reckless misconduct." Stoler has not presented argument or offered evidence that would make the holding applicable here.  *See also Cook v. SCI Md. Funeral Servs., Inc.*, Civil Case No. 14-3770-GLR, 2016 WL 890298, at *6 (D. Md. Mar. 9, 1998) (damages for breach of prospective agreement not to sue "may properly" be awarded).

In a similar vein, Stoler provides a misleading characterization of *Wolf v. Ford*.  In that case, the Maryland Court of Appeals explicitly held that "In the absence of legislation to the contrary, exculpatory clauses are generally valid, and the public policy of freedom of contract is best served by enforcing the provisions of the clause." 644 A.2d 522, 525 (1994).  (The opinion also discusses invalidity based on grossly unequal bargaining power, as Stoler's motion notes, but Stoler has not attempted to introduce record evidence on that issue.)

Stoler points to no provision of Maryland law that invalidates the covenant not to sue; it points only to Section 15-213, which generally provides a right of action.  (Pl. Mem. at 12.)  But a right of action is an essential ingredient of *all* lawsuits.  *Fangman v. Genuine Title, LLC*, 136 A.3d 772, 779 (Md. 2016) (citing *Cort v. Ash*, 422 U.S. 66, 78 (1975))).  Unlike other provisions of the Transportation Code that evidence a legislative intent to trump contractual language, Section 15-213 neither provides that covenants not to sue are unenforceable nor that a statutory right to sue for violations of the Transportation Code persists "notwithstanding any agreement between the parties."  *Accord* Md. Code, Transp. § 15-214 (right to hearing before state agency

to resolve disputes, as opposed to right to sue in court, applies "notwithstanding any provisions of the franchise agreement to the contrary").

### C. Transportation Code § 15-207(f) Does Not "Bar" the Covenant.

Finally, Stoler attempts to rely upon Section 15-207(f) to "bar" AoA's counterclaim.  (Pl. Mem. at 11, 13.)  Section 15-207(f) provides that "[a] franchise agreement or other contract offered to a dealer by a manufacturer, distributor or factory branch may not contain any provision requiring a dealer to pay the attorney's fees of the manufacturer, distributor, or factory branch related to disputes involving the franchise."  This provision is inapplicable and—even were Stoler's interpretation correct—could not operate to completely bar AoA's counterclaim.

#### 1. The Plain Language of Section 15-207(f) Does Not Reach the Covenant.

Section 15-207[f] applies only  to (1) fee-shifting provisions—"provision[s] requiring a dealer to pay the attorney's fees"—that are contained in (2) contracts offered to dealers by distributors.  The covenant satisfies neither condition.

The Covenant is not a provision requiring a dealer to pay attorney's fees of AoA; it is a provision in which a now-former dealer promised that it would not sue AoA for specified reasons.  By its terms, the provision does not require Stoler to pay attorney's fees.  It is merely the case that, as a result of Stoler's breach of the covenant, AoA has suffered damages that include attorney's fees, among other damages listed below.

Thus, Stoler's observation that "[c]ontract terms that are in derogation of Maryland statutory law are unenforceable" (Pl. Mem. at 13) is inapposite; Stoler (yet again) fails to analyze the language of the statute.   The statute does not state that covenants-not-to-sue are unenforceable, or that damages for breach of a covenant-not-to-sue cannot be calculated by reference to attorney's fees.

Moreover, by its terms, Section 15-207(f) applies only to a "contract offered to a dealer by a . . . distributor." That is, contracts that are offered by a dealer or contracts that are jointly negotiated are permitted to contain provisions "requiring a dealer to pay the attorney's fees" of a distributor. *Chen v. State*, 803 A.2d 518, 521-22 (Md. 2002) (courts should give effect to all parts of a statute, "rendering no part of the law surplusage"). The Facility Agreement provides at the outset that "Dealer has proposed to construct an Exclusive Audi facility" (Facility Agreement at 1), that the Facility Agreement was entered into "[i]n furtherance of Dealer's proposal" (*id.*), and specifies that "[b]oth parties have negotiated regarding the terms of this Agreement, and both have participated in the drafting and editing of this Agreement" (*id.* ¶ 6(f)).

As noted above, Maryland common law generally enforces freedom of contract where covenants not to sue are concerned. Statutes in derogation of the common law are strictly construed, *Walzer v. Osborne*, 911 A.2d 427, 433 (Md. 2006) ("[T]he maxim *expressio unius est exclusio alterius* has been extensively employed to avoid the repeal of the common law. . ."), and Maryland courts caution against adding words into a statute under the guise of interpretation, *Johnson*, 2 A.3d at 373. Because the plain language of Section 15-207(f) does not purport to govern covenants not to sue and the Facility Agreement was not merely offered by AoA, Stoler's invalidity arguments should be rejected.

## 2. *AoA's Damages Are Not Limited To Attorney's Fees.*

Even if Stoler's interpretation of Section 15-207(f) were convincing (it is not), the interpretation would be no silver bullet. As AoA advised Stoler during the course of discovery, AoA also has incurred expert fees as a result of Stoler's breach of the Covenant. Further, AoA would suffer additional damages "to the extent Stoler is able to obtain damages based on the Dealer's loss of the right to receive any Standards Bonus from on or after January 1, 2016." (Ex.

3, AoA Interrogatory Responses at 3-4.)  Thus, even were the Court to hold that Section 15-207(f) applies in part to the covenant not to sue, AoA would still be entitled to seek other relief.

**III.    AoA's Liability Counterclaims Are Not Amenable To Summary Judgment.**

Stoler argues in its summary judgment motion that AoA's affirmative defenses cannot defend against liability.  Although AoA agrees that its Second and Third Affirmative Defenses (which relate solely to damages) do not defend against liability, Stoler has not offered legal authority that supports its other arguments.[7]  For this reason alone, its motion should be denied.

The defect is particularly pronounced as to AoA's Fifth Affirmative Defense, which is that Stoler's claims are in part barred by the covenant not to sue.  Stoler offers a one-sentence argument that opines, without citation, that the covenant not to sue is "void."  This argument should be rejected.  Even if the covenant not to sue were not enforceable as a font of affirmative relief, Stoler has not cited a single provision of the Transportation Code that would render the covenant unenforceable for defensive purposes (where no money damages are sought).  What is more, Stoler has offered no reason to suppose that even if certain aspects of the Facility Agreement were held unenforceable, other (legal) provisions of the agreement could not continue to exist.  (*See, e.g.,* Facility Agreement ¶ 6(e) (calling for modification rather than voiding [s]hould the performance of any obligation under this Agreement violate any law of [Maryland]").)

The same result should apply to AoA's Sixth Affirmative Defense, unclean hands and *in pari delicto*.  Stoler has failed to cite a single case holding that *in pari delicto* is not available in the context of statutory violations of Maryland's Transportation Code.  For good reason: Maryland's highest court has held that a plaintiff who knowingly enters into an illegal contract

---

[7] AoA also does not dispute that its Fourth Affirmative Defense and Seventh Affirmative Defense no longer apply.

"must take the consequences." *Shirks Motor Express Corp. v. Forster Transfer & Rigging Co.*, 133 A.2d 59, 65 (Md. 1957). If the Court were to determine that the Facility Agreement is unlawful, this defense would therefore remain available to AoA. *See also Adams v. Manown*, 615 A.2d 611, 616 (Md. 1992) ("The clean hands doctrine is not applied for the protection of the parties nor as a punishment to the wrongdoer; rather, the doctrine is intended to protect the courts from having to endorse or reward inequitable conduct.").

Thus, Plaintiff's purely legal argument that *in pari delicto* cannot apply, which is supported by little more than Stoler's gloss on the Transportation `is deficient.

## CONCLUSION

For the foregoing reasons, Stoler's Motion for Partial Summary Judgment (Dkt. No. 43) should be denied, and Stoler's claim under Transportation Code § 15-207(h)(3) should be dismissed for lack of jurisdiction.

Dated: August 26, 2016                          Respectfully submitted,

/s/                                             /s/
James R. Vogler (*pro hac vice*)                Richard Mark Dare (VSB No. 14146)
Daniel R. Fine (*pro hac vice*)                 ISLERDARE PC
Jack O. Snyder, Jr. (*pro hac vice*)            1945 Old Gallows road, Suite 650
Emily L. Gesmundo (pro hac vice)                Tysons Corner
BARACK FERRAZZANO KIRSCHBAUM                     Vienna, Virginia  22182
   & NAGELBERG LLP                T: (703) 748-2690
200 West Madison Street, Suite 3900             F: (703) 748-2695
Chicago, Illinios 60606                         mdare@islerdare.com
T: (312) 984-3100
F: (312) 984-3150
Jim.Vogler@bfkn.com
Dan.Fine@bfkn.com
Jack.Snyder@bfkn.com
Emily.Gesmundo@bfkn.com

*Counsel for Defendant Volkswagen Group of America d/b/a Audi of America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of August, 2016, I served a true and accurate copy of the foregoing by filing it electronically with the Clerk of the Court using CM/ECF system, which will send a notification of such filing (NEF) to the following:

> Barbara S. Wahl, Esq.
> Arent Fox LLP
> 1717 K Street, N.W.
> Washington, DC  20006
> Barbara.wahl@arentfox.com
>
> Russell P. McRory, Esq.
> Arent Fox LLP
> 1675 Broadway
> New York, NY 10019
> Russell.mcrory@arentfox.com
>
> Sean Nicholas Clerget, Esq.
> Arent Fox LLP
> 1717 K Street NW
> Washington, DC 20036-5344
> sean.clerget@arentfox.com

_____/s/_____
R. Mark Dare, Va. Bar No. 14146
ISLERDARE PC
1945 Old Gallows Road, Suite 650
Vienna, VA 22182
(703) 748-2690
(703) 748-2695 (fax)
mdare@islerdare.com
*Counsel for Defendant*
*Volkswagen Group of America, Inc.*
*d/b/a Audi of America, Inc.*
