**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| LEN STOLER, INC. d/b/a LEN STOLER AUDI, | Case No. 1:15CV1659-TSE/JFA |
| Plaintiff, | |
| - against - | |
| VOLKSWAGEN GROUP OF AMERICA, INC. d/b/a AUDI OF AMERICA, INC., | |
| Defendant. | |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR
PARTIAL SUMMARY JUDGMENT**

In its opposition brief ("Opp."), Audi gins up a number of arguments that torture what is otherwise clear statutory language: Audi may not require, coerce, deny generally available benefits, or offer lower prices on vehicles in order to compel a dealer to build Audi an exclusive facility. As the undisputed facts demonstrate, Audi did all of these things. Audi's violations of the plain statutory language enacted by the Maryland Legislature to ensure that automobile manufacturers would not abuse their greater power to control dealers for the manufacturers' advantage are manifest. Accordingly, the motion for partial summary judgment of Plaintiff Len Stoler, Inc. ("Stoler") should be granted.

Since 1997, Stoler has been an authorized Audi dealer in Owings Mills, Maryland. From day-one, Audi authorized Stoler to operate its operations for Porsche (Audi's sister brand) from the same location as Stoler's Audi operations, a practice known as "dualling" in the industry. In January 2014, after 16 years of dualling with Porsche, Audi suddenly announced to Stoler (which had never sold more than 300 Audi automobiles in a calendar year) that its projected sales

1

opportunity in its market for 2014 – 2016 was 643 units.  According to Audi, that meant that Stoler must construct an exclusive Audi dealership facility in order to continue to receive certain dealer incentive payments.  In other words, Stoler would either have to move its Audi franchise to a new Audi-only location or kick Porsche from the existing location and find and new home for it.  Audi told Stoler that if it did not sign an agreement committing to construct an exclusive Audi facility by the end of 2015, Audi would cease paying Stoler facility-related incentive bonus payments, known as the Standards Bonus.  Stoler, like most Audi franchisees, would be rendered instantly unprofitable without the Standards Bonus.  Facing the loss of the Standard Bonus and instant unprofitability, Stoler signed an agreement with Audi to construct an exclusive Audi facility at a new location.  Stoler, which was already laboring under a detrimental pricing structure because it was not receiving the Exclusive Standards Bonus (awarded only to dealers who had exclusive Audi facilities), was put in an untenable and non-competitive situation – invest millions in a new Audi exclusive facility or lose any Standards Bonus whatsoever.  That is coercion.

Before 2009, automobile manufacturers like Audi could—and did—get away with this sort of oppressive conduct in the State of Maryland.  But in 2009, the Maryland Legislature enacted comprehensive amendments to Title 15 of the Maryland Transportation Code (the "Maryland Dealer Act"), which regulates the conduct and business practices of automobile manufacturers and distributors in the State of Maryland, including their dealings with their franchisees.  In particular, the Maryland Legislature enacted section 15-207(h), which broadly prohibits just the sort of onerous facility requirements that Audi imposed on Stoler here.  Section 15-207(h): (i) requires Audi to offer the same dealership incentives and price reductions to all its Maryland dealers; (ii) prohibits Audi from requiring its Maryland dealers to alter or replace its existing facility; (iii) prohibits Audi from denying, or even threatening to deny, a Maryland dealer any benefit generally

available to its other Maryland dealers for failing to alter or replace its existing facility; and (iv) prohibits Audi from reducing the prices its charges for new vehicle inventory in exchange for a dealer's agreement to maintain an exclusive facility or build or alter a facility.  In the 2009 amendments, the Maryland Legislature sought to foreclose all possible avenues by which a manufacturer like Audi might try to use its greater bargaining power unilaterally to impose onerous facility requirements on its Maryland dealers.

In its Opposition, Audi has offered no credible reason why the plain words of section 15-207(h) permit Audi to demand that Stoler build an exclusive Audi facility and to seek enforcement of the facility agreement Stoler entered into as a result of Audi's illegal coercion (the "Facility Agreement").  Instead, in an effort to avoid the application of the plain words of the statute, Audi has engaged in an extensive exercise in statutory misinterpretation.  Were Audi's interpretation to be adopted, the Maryland Legislature's manifest intent would be frustrated and section 15-207(h) would be rendered a nullity.  Such a patently absurd result should not be considered by this Court.

### Response To Audi's Statement Of Additional Facts

1.      As of 2014, when Stoler's market opportunity rose above 400 new Audi vehicles per year, Stoler was no longer compliant with its facilities obligations under its Dealer Agreement with AoA. By the beginning of 2014, the dealer agreements of all Maryland dealers called for exclusive facilities. (Thacker Decl. ¶ 12; *see also id.* ¶¶ 2-4.)

**Disputed:** Stoler's Dealer Agreement was signed in 1997 and the Standard Provisions in effect at the time did not call for exclusive facilities.  (See Thacker Ex. A.).

2.      Because Stoler did not have a compliant facility, Stoler would not have been entitled to receive any Standards Bonus in 2014; having a compliant facility was one of the criteria a dealer had to meet to earn the Standards Bonus. (*Id.* ¶ 13.)

**Undisputed**.

3.      To ease facility-related burdens on its dealer network, however, AoA had implemented its Grandfather Policy and Cure Policy in 2011. The policies permitted dealers in once-compliant facilities up to three years to bring their facilities back into compliance with brand standards—all the while remaining eligible to receive Standards Bonus payments. (*Id.*)

Stoler takes no position as to the reasons for Audi's implementation of the

Grandfather Policy and Cure Policy, but otherwise this fact is **undisputed**.

4.      Under the Grandfather Policy and Cure Policy, Stoler would have continued to remain eligible for Standards Bonus payments for up to three years so long as it (1) executed an LOI to build a new facility within 12 months of being notified that it had a non-compliant facility, (2) obtained permits and began construction during the next 12 months, and (3) completed construction within the next 12 months. (*Id.* ¶¶ 13-14.)

**Undisputed.**

5.      Stoler executed the LOI (which the parties call the "Facility Agreement"), but neither broke ground on nor completed its exclusive facility. Therefore, Stoler no longer satisfied the terms of the Standards-Bonus-extension that AoA provided to all dealers under the Grandfather and Cure Policy. Accordingly, Stoler was no longer eligible to receive Standards Bonus payments as of January 1, 2016. (*Id.* ¶ 15.) Had Stoler commenced construction, its Standards Bonus eligibility would have been reinstated. (Facility Agreement ¶ 2.)

**Undisputed.**

6.      Exclusive Audi facilities cost several millions of dollars to build. Thacker Decl. ¶ 5.) Such facilities are more expensive to operate than Brand Dedicated or Universal facilities. The increased costs can—and in the case of Stoler's nearby exclusive competitors, do—outstrip the marginal increase in Standards Bonus payments that an exclusive Audi dealer can earn. (Ex. 2, Lytle Rpt. ¶¶ 20-21.)

**Disputed.**  Stoler's nearby exclusive competitors had a higher overall margin on

each new Audi they sell than Stoler did.  (See Mov. Br. at 11, Opp. at 9, 11)

7.      Obtaining the Standards Bonus at a brand dedicated level was costly, too, in terms of both financial and human resources. (Thacker Decl. ¶ 16.)

**Undisputed,** because all of Audi's facility requirements are "costly."

## ARGUMENT

## I.      The Maryland Dealer Act Terms Are Clear and Prohibit Audi's Conduct

In its Opposition, Audi expends many pages attempting to avoid the plain language of the

Maryland Dealer Act and the Maryland Legislature's stated intent to prohibit the exercise of

coercion by manufacturers over dealers.  Audi's efforts are unavailing, as demonstrated below.

**A.      The Maryland Legislature Intended to Prohibit Audi's Precise Conduct Here**

Section 15-201, *et seq.* of the Maryland Dealer Act is a remedial statute intended to protect Maryland motor vehicle dealers from unfair and oppressive business practices by manufacturers. The legislative history of the 2009 amendments to the statute highlight this clear legislative purpose:

> This bill adds and clarifies prohibitions for the *protection of motor vehicle dealerships from discriminatory or coercive business practices* by manufacturers, distributors and factory branches and otherwise strengthens various dealership franchise rights.

S.B. 668, Fiscal and Policy Note, 2009 Gen. Assemb., Dep't of Legis. Servs. (Md. 2009) (emphasis added); *see also Paccar Inc. v. Elliott Wilson Capitol Trucks LLC*, 905 F. Supp.2d 675, 685 (D. Md. 2012) ("The statute was amended in 2009 . . . to 'add and clarify the prohibitions for the protection of motor vehicle dealerships from discriminatory or coercive business practices'") (quoting 2009 Maryland Laws Ch. 747 (S.B. 668); MD 90 Day Rep., 2009 Sess., Part G)).

The legislative history for  section 15-207(h), which is primarily at issue here,  provides as follows:

> Bill Summary: The bill prohibits a manufacturer, distributors, or factory branch, or their agents or affiliates from: *varying a price or incentive for new vehicles*, or accessories or parts thereof, sold by a dealer on the basis of the *dealer's lack of agreement to maintain an exclusive facility [or] purchase, construct, relocate, remodel, renovate, or repair existing dealership facilities* . . . .

S.B. 668, Fiscal and Policy Note, 2009 Gen. Assemb., Dep't of Legis. Servs. (Md. 2009) (emphasis added).  The meaning of Section 15-207(h) is clear and the legislative history highlights that plain meaning.

In addition to adding subdivision (h), the 2009 amendments also greatly expanded the scope of the of the statute's definition of "coerce."  Today, section 15-207(a)(2) reads in its entirety as follows, the language in bold face having been added in the 2009 amendments:

5

> (2)   (i)   "Coerce" means to compel or attempt to compel by threat of harm, breach of contract, or other adverse consequences, **including the loss of any benefit made available to other dealers of the same line make in the State.**
> (ii)   **"Coerce" includes to act in a manner that violates § 15–206.1 of this subtitle.[1]**
> (iii)   "Coerce" does not include to argue, urge, recommend, or persuade.

As recognized by the United States District Court for the District of Maryland, "[t]his amendment obviously expanded the scope of prohibited 'coerc[ion].'" *Paccar Inc.*, 905 F. Supp.2d at 685.[2]

Remedial statutes like the Maryland Dealer Act are to be interpreted broadly and given a liberal construction. Statutes of a remedial nature "are to be liberally construed with a view toward the effective administration of justice." *Criminal Injuries Compensation Bd. v. Remson*, 282 Md. 168, 192, 384 A.2d 58, 72 (1978). "[T]he principle of liberal construction is a tool of statutory interpretation used to resolve ambiguities in remedial statutes in favor of the class the statute is intended to benefit, and that its use is unnecessary when the meaning of the statute is clear." *Elste v. ISG Sparrows Point, LLC*, 188 Md. App. 634, 653–54, 982 A.2d 938, 949 (2009). Courts are "mindful" of their duties "to construe remedial statutes… broadly in favor of claimants in order 'to suppress the evil and advance the remedy.'" *Washington Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 635, 994 A.2d 411, 428 (2010) (quoting *Haas v. Lockheed Martin Corp*., 396 Md. 469, 495, 914 A.2d 735, 750-51 (2007)). The narrow reading of Section 15-207(h) proposed by Audi would violate this basic principle.

---

[1] Section 206.1 defines "good faith" as " honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade" and prohibits manufacturers from failing to act in good faith "[i]n acting or purporting to act under the terms, provisions, or conditions of any franchise agreement; or . . . [i]n any transaction or conduct governed by this subtitle.

[2] The *Paccar* court noted that a whole line of earlier cases "are questionable precedent for interpreting the Maryland statute after the expansion of the concept of coercion in the 2009 amendments." *Id.*

B.        **Audi Purposefully Misinterprets the Maryland Dealer Act**

Audi attempts to pick apart the various subsections of the Maryland Dealer Act by focusing on a key word or phrase in each subsection and, taking that phrase out of context, standing its meaning on its head.  In section 15-207(h)(1)(i), Audi focuses on the phrase "offered to all dealers."  In section 15-207(h)(2)(i), Audi focuses on the word "require."  In section 15-207(h)(2)(ii), Audi focuses on the phrase "benefit generally available."  Finally, in section 15-207(h)(3), Audi focuses on the phrase "reduce the price of a motor vehicle."  Each of Audi's arguments about these phrases fail for the reasons set forth below.

### 1.        *There Is No Difference Between An Incentive "Offered to All Dealers" and a "Benefit Generally Available to All Dealers."*

Stoler cogently argued in its opening brief that Audi cannot have it both ways: if the Exclusive Standards Bonus is "offered to all dealers" as required under Maryland Dealer Act § 15-207(h)(1)(i), then the Exclusive Standards Bonus is necessarily a "benefit generally available to all dealers" that Audi cannot deny or threaten to deny for failure to alter or replace an existing dealership facility.  Maryland Dealer Act § 15-207(h)(2)(ii).  Conversely, if the Exclusive Standards Bonus is not a "benefit generally available to all dealers," than necessarily it is not "offered to all dealers."  (*See* Mov. Br. at 8.)

Audi attempts to thread the statutory needle by arguing the semantics of "offer" vs. "benefit."  (Opp. at 18-21.)  Audi's attempts fail.

First, basic knowledge of English dooms Audi's argument.  Indeed, Merriam-Webster Dictionary defines the verb "offer" as "to make available."[3]  *Offer*, *Merriam-Webster Dictionary* (2008).  The Maryland Dealer Act thus requires Audi to "make available" any dealer incentives

---

[3] The Court should ignore Audi's reference to the Black's Law Dictionary definition of "offer," as Black's defines the formal noun form of a legal "offer," not the simple English verb "to offer" which the Maryland legislature used in § 15-207(h)(1)(i).

AFDOCS/13861643.3

to all dealers of the same line make.  Maryland Dealer Act § 15-207(h)(1)(i).  The Maryland Dealer

Act prohibits Audi from ceasing to make available "any benefit generally available to all dealers"

for that dealer's failure to alter or replace an existing dealership facility. *Id.* at § 15-207(h)(2)(ii).

And there is no doubt that the Exclusive Standards Bonus is a "benefit," as it equals 3.75% of

adjusted manufacturer's suggested retail price ("MSRP") of each new Audi sold, and Black's Law

Dictionary defines "benefit" as "profit or gain."  *Benefit*, *Black's Law Dictionary* (3d Pocket Ed.

2006).  Therefore, either the Exclusive Standards Bonus is a dealer incentive and benefit "made

available" to all Audi dealers, or it isn't.  Therefore, either the Exclusive Standards Bonus is a

dealer incentive and benefit "made available" to all Audi dealers, or it isn't.  If it is not made

available to all Audi dealers, it is not "offered" to all Audi dealers, and violates Maryland law.

Audi cannot have it both ways.

Second, as discussed above, the legislative history demonstrates that the Maryland

Legislature did not view such a sharp distinction between offers and benefits.  The legislative

history shows that the Legislature understood generally that section 15-207(h) "prohibits a

manufacturer, distributors, or factory branch, or their agents or affiliates from: varying a price or

incentive for new vehicles, or accessories or parts thereof, sold by a dealer on the basis of the

dealer's lack of agreement to maintain an exclusive facility [or] purchase, construct, relocate,

remodel, renovate, or repair existing dealership facilities."  S.B. 668, Fiscal and Policy Note, 2009

Gen. Assemb., Dep't of Legis. Servs. (Md. 2009). The Legislature intended section 15-207(h) to

be a cohesive whole and not as hinging upon the difference between a benefit "generally available"

and incentive "offered" to all.

Third, other courts interpreting similar Dealer Acts have held that if the cost of entry into

an incentive program differs from one dealer to another, that program is not "offered" equally to

8

both dealers. *Audi of Smithtown. Inc. v. Volkswagen Grp. of Am., Inc.* 924 N.Y.S.2d 773, 779 (Sup. Ct. 2011), *aff'd*, 100 A.D.3d 669, 671 (N.Y. App. Div. 2012).

Finally, Audi's concern about the loss of the safe harbor under Maryland Dealer Act section 15-207(i) is unfounded.  (Opp. at 20.)  Section 15-207(h) is the only provision at issue here, as it deals with a manufacturer's ability to require upgrades to or the building of an exclusive facility.  Facility requirements are precisely regulated in multiple ways.  Section 15-207(i) is a catchall provision applying to all <u>other</u> types of incentives that may be offered, not those that relate to a dealer's facility.

       **2.**      *Audi "Required" Stoler To Upgrade Its Facility In Violation of the Maryland Dealer Act*

Audi hangs its hat upon the definition of the word "require" found in section 15-207(a)(3), and Audi attempts to back off its own admission that Stoler was "required" to upgrade to an exclusive facility.  (Opp. at 15-17.)  Audi is attempting to distance itself from its admissions, arguing that Stoler was not statutorily "required" to upgrade.  But Audi misapplies the statutory definition.

First, contrary to Audi's suggestion, the parties' Dealer Agreement, executed in 1997, did not contain any obligation by which Stoler agreed to upgrade to an exclusive facility once it reached a Market Opportunity Guide ("MOG") of over 400 units (i.e., new vehicle sales) per year. (Opp. at 16.)  Audi's own submissions belie that suggestion.  Nowhere in the 1997 Dealer Agreement did Stoler agree to eventually create a stand-alone facility.  (*See* Thacker Decl., Ex. A to Opp.)  Even in the most-recent Standard Provisions (which were not in effect in 1997), there is no obligation for Stoler to upgrade to an exclusive facility.  (*See* Thacker Decl., Ex. B to Opp.) Nor is MOG mentioned or defined in either document.  (*See id*.)  While the Retail Capacity Guide submitted by Audi to this Court does contain a definition of MOG and the requirement to upgrade

9

to an exclusive facility, that document was released sometime this decade, as it refers to the "2013 Market Opportunity Guide." *See* Thacker Decl., Ex. C at AoA0000099.  Thus, the Retail Capacity Guide that Audi relies upon was not a provision "previously agreed to" by Stoler "in a franchise agreement" circa 1997, but rather was unilaterally imposed by Audi afterwards.  As a result, Audi's post-1997 rules and guidelines do not fall under the Dealer Agreement exception to the statutory definition of "require."  Maryland Dealer Act § 15-207(a)(3).

Second, Audi claims that its "requirement" that Stoler construct an exclusive facility falls under the "business decision" exception in the statute, namely, that Audi's facility requirements were "business decisions by a manufacturer, distributor, or factory branch which are uniformly applied to all Maryland dealers in new vehicles of the manufacturer, distributor, or factory branch." (Opp. at 16.)  This argument also fails because the exclusive facility requirement is not applied uniformly to all dealers in Maryland.  The MOG (referenced at Thacker Decl. Ex. C at AoA0000099) is an individualized calculation for each dealership, and only those individual dealerships whose calculation exceed 400 units are required to upgrade.  The remaining Maryland dealers are not required to upgrade.  (*See id.*)

Audi unilaterally determines when a dealer should go exclusive.  The calculation of the MOG is entirely within Audi's control.  The dealer has no input on the MOG, and thus whether a dealer is "required" to upgrade to an exclusive facility is something only Audi determines on a case-by-case basis.  This is not a "uniform" business decision as the Maryland Dealer Act envisions.  The Maryland Dealer Act envisions a rebranding of the entire franchise or a brand new design style for every dealer, such as adding a fifth-ring to the Audi logo.  Audi's dealer-by-dealer calculation is not a uniform business decision across Maryland, and therefore does not qualify for the exception.

Audi wants this Court to ignore the Maryland Legislature's intent and re-impose a narrow view of the term "require." (Opp. at 15-17.) Yet amendments to the statute in 1998 intended that "require" was meant to be broader than "coerce," as some previous court rulings had equated the two:

> **Small Business Effect:** Recent court cases have interpreted the current provision to mean that a manufacturer must intentionally and directly cause a dealer to materially change its methods of conducting business. The court decisions noted that only the term "coerce" is defined in statute and the court further interprets the term "require" to have the same meaning. By defining "require", the bill may make it easier for small business vehicle dealers to prove that manufacturers have caused substantial hardships on their businesses.

S.B. 408, Fiscal and Policy Note, 1998 Sess. (Md. 1998). In other words, the Maryland Legislature intended to negate prior court rulings adopting a narrow definition of "require" that conflated it with the older, narrower definition of "coerce," which itself was later expanded in 2009.

The flaw in Audi's position is illustrated in *Jaguar Land Rover North America, LLC v. Manhattan Imported Cars, Inc.*, 477 F. App'x 84 (4th Cir. 2012). In *Jaguar*, applying the **pre-2009** version of section 15-207, the Fourth Circuit addressed whether Jaguar Land Rover violated section 15-207(d) by requiring the dealer to relocate its Lincoln Mercury franchise and construct an exclusive Jaguar Land Rover facility, and by withholding incentive money when the dealer failed to do so. Since subdivision (h) was not available before 2009, the dealer proceeded only under subdivision (d), which provides as follows:

> A manufacturer [or] distributor . . . may not require or coerce a dealer, by franchise agreement or otherwise . . . to: (1) Exclude from the use of the dealer's facilities a dealership for which the dealer has a franchise agreement to utilize the facilities; or (2) Materially change the dealer's facilities or method of conducting business if the change would impose substantial financial hardship on the business of the dealer.

11

Md. Code Transp. § 15-207(d) (2006).  The Fourth Circuit noted that "[u]nder the plain language of Code § 15-207(d), . . . a distributor many not 'require' an existing dealer…to remove from its facilities another distributor's vehicles, a practice commonly known as 'de-dualing.'" *Jaguar*, 477 F. App'x at 90.  While the dealer ultimately lost in *Jaguar* because it did not have the existing contractual relationship with the manufacturer to which the statute applied, the case nonetheless makes clear that the statute prohibits the exact conduct that Audi has engaged in here – "requiring" or "coercing" a dealer to de-dual and build an exclusive facility for a specific manufacturer.

Here, Stoler's pre-existing franchise relationship with Audi authorized Stoler to dual its Audi franchise with its Porsche franchise.  Stoler operated as a dualled dealer with Porsche for many years.  One day Audi decided Porsche had to go.  Although the parties' Dealer Agreement made no reference to de-dualling, in 2014 Audi unilaterally changed the franchise relationship and required Stoler to separate the Audi and Porsche operations under the threat of losing payment of the Standards Bonus.  This is a patent violation of section 15-207(d) and (h).

### 3.  *Courts Have Held That Post-Sale Incentives or Rebates Reduce the Price Charged at Wholesale*

Audi weakly argues that because the per-car incentives paid by Audi are only paid after a car is sold, those incentives do not "reduce the price of a motor vehicle charged to a dealer" within the meaning of Maryland Dealer Act § 15-207(h)(3).  (Opp. at 21-24.)  This argument is without merit, as has been previously recognized when Audi argued it to another court.  The timing of the rebate, whether before or after the purchase, does not control whether the incentive offered reduces the price charged to a dealer.  Rather, the court looks to the effect of the rebate to reduce the price of each new vehicle sold by Audi to Stoler.

In *Audi of Smithtown, Inc.*, Audi, through present counsel, argued that the provisions of the New York Dealer Act did not apply to a dealer incentive under Audi's Margin and Bonus Program

because the incentive was not offered at the time of purchase. *Audi of Smithtown, Inc.*, 924 N.Y.S.2d at 777. Reviewing and affirming the trial court, the New York appellate court rejected Audi's argument, holding "[c]ontrary to Audi's contention, it is not relevant that the discount was not offered at the time of purchase, since the rebates, although made at a later time, resulted in a lower actual price." *Audi of Smithtown, Inc. v. Volkswagen of Am., Inc.*, 100 A.D.3d 669, 671 (N.Y. App. Div. 2012). *See also Mathews Enter. Inc. v. Chrysler Grp. LLC,* No. 13-cv-04236-BLF, 2016 WL 4269998 at 6-8 (N.D. Cal Aug. 15, 2016) (dealer survives summary judgment motion where it was undisputed that the dealer's failure to earn Chrysler's incentives resulted in a $700 per-vehicle price disparity).

Here, every incentive paid under the Standards Bonus Program is calculated as a percentage of adjusted MSRP on each new car sold. The method of calculation serves to reduce the price of each motor vehicle upon which the standard is earned. Audi cannot avoid the proscriptions of the Maryland Dealer Act simply by altering or delaying the delivery of the price delta.

## II.     <u>Stoler Has Proven It Has Suffered Injury</u>

### A.     **Injury-In-Fact Is A Low Burden Easily Met Here**

Audi argues that Stoler has not asserted a "financial injury or other damage" as required by Maryland Dealer Act section 15-213, and that on that basis the Court is deprived of jurisdiction. (Opp. at 11-14.) Specifically, Audi contends that because Stoler did not construct the expensive exclusive facility that Audi demanded, Stoler was spared the outlay of funds required by Audi, which would have totaled more than the bonuses that Stoler could have received. (*Id*. at 11-12.) That argument is entirely without merit. Audi is improperly conflating injury-in-fact (a concept that goes to the Court's subject matter jurisdiction), with the damages suffered by the plaintiff.

Stoler has satisfied proof of injury-in-fact necessary for standing.  As well established case law in this Circuit holds, "[t]he standard to show an injury-in-fact is admittedly low . . . ; 'the claimed injury need not be large, an identifiable trifle will suffice.'" *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 242 (4th Cir. 2008) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000)).  Stoler has suffered more than a trifle as a result of Audi's actions.

Stoler did not receive the higher Exclusive Bonus throughout 2015 and did not receive any Standards Bonus at all in 2016.   The remedy for Audi's illegal conduct is an award of automatic monetary  damages (*i.e.* the amount of the bonus monies withheld by Audi) and also lost profits on lost sales, diminution in franchise value and the costs incurred in attempting to comply with Audi's unlawful demands. Stoler has asserted that its damages are at least $480,000. (Am. Compl. ¶ 74.)  That Stoler did not spend money to perform under an illegal contract to construct an exclusive Audi facility does not mean that Stoler "saved" that money and that it should be offset against the bonuses that Stoler should have received from Audi.  No case law supports Audi's specious argument and Audi cites none.  *Id.* at 11-14.[4]

### B.    Audi Cannot Use The Expenses Incurred by Dealers Who Have Given into Audi's Coercion as Evidence of Stoler's Lack of Damages

Audi argues that Stoler has not been damaged because, unlike the other Audi dealers in Maryland that Audi has coerced into building an exclusive facility, Stoler has not done so.  (Opp.

---

[4] To the contrary, established case law holds that a manufacturer's efforts to unilaterally control and manipulate a dealer's operations constitutes an injury in –fact.  *See, e.g., Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286 (3d Cir. 2005) (plaintiffs suffered cognizable injuries-in-fact due to their "loss of control over day-to-day dealership activities); *Metro Motors, LLC v. Nissan Motors Corp. in USA*, 170 F. Supp. 2d 888, 891 (D. Minn. 2001) ("The injury to plaintiff lies in the mere violation of the Act as well as the fact that plaintiff is forced to operate with the proverbial 'sword of Damocles' hanging over its head, never knowing when, or if, Nissan will decide to terminate the Franchise Agreement.").  These holdings are consistent with binding United States Supreme Court authority.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) ("the actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing").

14

at 11-12.)  Audi's argument fails because it attempts to offset Stoler's actual damages with the cost of complying with illegal activity.

Audi is prohibited under Maryland law from requiring any dealer to upgrade its facility, or from offering incentives designed to lessen the cost of new cars in exchange for a promise to upgrade.  (*See* Mov. Br. at 1).  The fact that those dealers who have been successfully persuaded to comply with Audi's illegal scheme have to outlay millions of dollars to do so only proves the reason for the existence of the statute.  It is not a defense to Stoler's Dealer Act claims here.  *See DeSimone v. VSL Pharm., Inc.*, 133 F. Supp. 3d 776, 801 (D. Md. 2015) ("people should not profit from their bad acts"); *Albert v. Mayor & City Council of Baltimore*, 2 Md. 159, 172 (1852) ("If what the bank did was illegal, no valid defense can be deduced from it against the party who has been injured by its acts.").

Instead, Stoler is entitled to be put in the position it would be in if there had never been a statutory violation.  *See Milliman, Inc. v. Maryland State Ret. & Pension Sys.*, 421 Md. 130, 179–80, 25 A.3d 988, 1017 (2011) ("courts endeavor to put the parties in the position that they would have been").   Stoler is entitled to receive the amount of money it would have received if it had been earning the Exclusive Standards Bonus.

## III.   Audi's Attempts to Save Its Covenant Counterclaim Fail

Audi's Counterclaim is based upon the Facility Agreement and seeks attorneys' fees and other litigation expenses.  Audi thus attempts to back into something the Maryland Dealer Act expressly prohibits – a contract between dealer and distributor that requires the dealer to pay the distributor's attorneys' fees.  Maryland Dealer Act § 15-207(f).  Audi's efforts to pump up a damage claim by alleging that it has incurred expert fees and possibly other unidentified additional damages, (Opp. at 28), is similarly without merit.  Expert fees are not reimbursable costs and are not damages.  Unidentified additional damages are too speculative for the Court to consider.

15

**IV.**     **Audi's Affirmative Defenses Rely Upon the Terms of the Contract Which Stoler Has Proven Is Void Under Maryland Law, and Therefore Fail**

Audi claims that Stoler has unclean hands or is at equal fault at Audi, because Stoler made representations in the Facility Agreement that Stoler now claims are void under Maryland law. (Opp. At 29-30.)  Audi is wrong.

Unclean hands cannot result from the representations and warranties contained within a contract.  Even assuming that Stoler breach the Facility Agreement (which it did not), the breach would not bar its claims under the unclean hands doctrine.  "A party is not guilty of fraudulent or illegal conduct by merely breaking a contractual obligation. …[F]or purposes of applying the unclean hands doctrine, a party does not act 'wrongfully' simply by breaching a contract." *Greentree Series V, Inc. v. Hofmeister*, 222 Md. App. 557, 571, 114 A.3d 230, 238-239 ( 2015).

Nor can Audi rely on the affirmative defense of *in pari delicto*, as the Maryland legislature has sought fit to protect dealers like Stoler from Audi's abusive conduct.  Stoler cannot be at equal fault with the class of actors the Maryland Legislature has sought to regulate.  *See Messick v. Smith*, 193 Md. 659, 669, 69 A.2d 478, 481 (1949) ("When the plaintiff is one of a class for whose protection or benefit the statute was enacted, he may be regarded as not *in pari delicto*.").

In claiming that the covenant not to sue is enforceable, Audi completely ignores the well-settled principle that such covenants are void as against public policy when the parties share grossly unequal bargaining power.  *See:  Ziemkiewicz v. R+L Carriers, Inc.,* 996 F.Supp.2d 378, 397 (D. Md. 2014) ("Public Policy dictates that a plaintiff cannot prospectively contract to be willfully injured by another in the future."); *Wolf v. Ford*, 335 Md. 525, 531-32, 644 A.2d 522, 525-26 (1994)  ("There are circumstances, however, under which the public interest will not permit an exculpatory clause in a contract . . . [T]he contract cannot be the product of grossly unequal bargaining power.").  Audi holds grossly unequal bargaining power over Stoler, both in terms of

16

its original franchise agreement and the Facility Agreement.  The Maryland Dealer Act seeks to level this playing field by prohibiting manufacturers from taking certain actions against its dealers. Besides the Audi franchise agreement, which is basically a contract of adhesion, Audi admitted it held grossly unequal bargaining power over Stoler.  Audi gave some dealers more incentives than it gave Stoler.  (Opp. 11.)  In order to get critical incentives to remain competitive, Stoler had to sign the Facility Agreement and agree to its terms.  (Opp. 22.)  Audi left Stoler with a "take it or leave it proposition;" either take the incentives in return for building a costly facility, or lose all facility-related incentives, including those it previously received.  Audi's bargaining power over Stoler with regard to its franchise agreement and the Facility Agreement fit squarely within the case law cited above, and render the covenant not to sue void as to public policy.

Audi's affirmative defenses are no bar to summary judgment here.

## CONCLUSION

For the reasons set forth herein, as well as in Stoler's opening brief, the Court should grant Stoler summary judgment as to Audi's liability on Counts I, II, and III.

Respectfully submitted,


DATED:  September 1, 2016

     /s/ Barbara S. Wahl
Barbara S. Wahl (VSB No. 24647)
Arent Fox LLP
1717 K Street, N.W.
Washington, D.C. 20006
202.857.6000 (Phone)
202.857.6395 (Fax)
barbara.wahl@arentfox.com
*Counsel for Plaintiff Len Stoler, Inc.*
*d/b/a Len Stoler Audi*

Of Counsel:

Russell P. McRory (*pro hac vice*)
Michael P. McMahan
Arent Fox LLP
1675 Broadway
New York, NY 10019
Tel: (212) 484-3942
Fax: (212) 484-3990

AFDOCS/13861643.3

<u>CERTIFICATE OF SERVICE</u>

I, Barbara S. Wahl, hereby certify that on this 1st day of September, 2016, I served a true

and correct copy of the foregoing by filing it electronically with the Clerk of the Court using the

CM/ECF system, which will send a notification of such filing to the following:

> Richard Mark Dare
> Islerdare PC
> 1945 Old Gallows Road, Suite 650
> Tysons Corner
> Vienna, Virginia 22182
> mdare@islerdare.com
>
> James R. Vogler
> Daniel R. Fine
> Jack O. Snyder, Jr.
> Emily L. Gesmundo
> Barack Ferrazzano Kirschbaum & Nagelberg LLP
> 200 West Madison Street, Suite 3900
> Chicago, IL 60606
> Jim.volger@bfkn.com
> Dan.fine@bfkn.com
> Jack.snyder@bfkn.com
> Emily.gesmundo@bfkn.com

> /s/ Barbara S. Wahl
> Barbara S. Wahl (VSB No. 24647)
> Arent Fox LLP
> 1717 K Street, N.W.
> Washington, D.C. 20006
> 202.857.6000 (Phone)
> 202.857.6395 (Fax)
> barbara.wahl@arentfox.com
>
> *Counsel for Plaintiff Len Stoler, Inc.*
> *d/b/a Len Stoler Audi*