**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| LEN STOLER, INC. d/b/a LEN STOLER AUDI, | ) |
| | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) Case No. 1:15CV1659-TSE/JFA |
| *v.* | ) |
| | ) |
| VOLKSWAGEN GROUP OF AMERICA, INC. d/b/a AUDI OF AMERICA, INC., | ) |
| | ) |
| | ) |
| Defendant/Counter-Plaintiff. | ) |

---

## AUDI OF AMERICA'S MEMORANDUM IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

---

*Of Counsel*:

R. Mark Dare (VSB No. 14146)
Micah E. Ticatch (VSB No. 83351)
ISLERDARE PC
1945 Old Gallows Road, Suite 650
Tysons Corner
Vienna, Virginia  22182
T: (703) 748-2690

James R. Vogler (*pro hac vice*)
Daniel R. Fine (*pro hac vice*)
Jack O. Snyder, Jr. (*pro hac vice*)
Emily L. Gesmundo (*pro hac vice*)
BARACK FERRAZZANO
 KIRSCHBAUM & NAGELBERG LLP
200 West Madison Street, Suite 3900
Chicago, Illinois 60606
Tel.: (312) 984-3100

*Counsel for Volkswagen Group of America d/b/a Audi of America, Inc.*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................2

LEGAL STANDARD.................................................................................................................4

ARGUMENT .............................................................................................................................5

I.     AoA Is Entitled to Summary Judgment on Stoler's 15-207(h)(1)(i) "Offer" Claim, Because Stoler Can Establish Neither Liability Nor Damages.................................................5

     A.    AoA Offered the Standards Bonus at the Exclusive Level to All Dealers. ..................6

     B.    Stoler Was Not Damaged By Its Failure to Earn the Standards Bonus at the Exclusive Level.........................................................................................................7

II.    AoA Is Entitled to Summary Judgment on Stoler's Section 15-207(h)(2)(ii) Claim Because the Standards Bonus Was Not a "Benefit Generally Available" to All Dealers. .........................................................................................................................8

III.   AoA Is Entitled to Summary Judgment on Stoler's Section 15-207(h)(3)(ii) "Price Reduction" Claim, Because Stoler Cannot Establish Damages.............................................10

IV.   AoA Is Entitled to Summary Judgment on Stoler's Section 15-207(b) "Coercion" Claim, Because Stoler was Not Coerced and Suffered No Damages. ................................11

     A.    Stoler's Theory Is Based on an Incorrect Interpretation of the Statute......................12

          1.    The Standards Bonus was Not a "Benefit," But an Incentive...........................12

          2.    A Contrary Conclusion Would Require this Court to Ignore the Structure of Section 15-207....................................................................................13

          3.    Stoler Admitted It Was Not Coerced Into Signing the Facility Agreement....................................................................................................14

     B.    Stoler Fails to Establish "Financial Injury or Other Damage." ..................................14

V.    AoA is Entitled to Summary Judgment on Stoler's Section 15-207(h)(2(i) "Requirement" Claim, Because Stoler was Not Required to Build a Facility and Suffered No Damages. ......................................................................................................15

     A.    Stoler Fails to Establish Liability...............................................................................15

          1.    Stoler's Theory Ignores the Statutory Definition of "Require." ........................15

          2.    Stoler's Facility Obligations Arose From Its Franchise Agreement..................15

i

3.    Stoler's Facility Obligations Arose from a Business Decision Uniformly
        Applied to All Maryland Dealers.........................................................................16

B.    Stoler Fails to Establish "Financial Injury or Other Damage." ...................................17

CONCLUSION.............................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*100 Harborview Drive Condominium Council of Unit Owners v. Clark*,
   119 A.3d 87 (Md. Ct. Spec. App. 2015) ..................................................................5

*Ass'n for Supervision & Curriculum Dev., Inc. v. Int'l Council for Educ. Reform & Dev.,
   Inc.*, No. 1:10CV74, 2011 WL 1225750 (E.D. Va. Mar. 14, 2011) ........................4

*Bennett v. State Dep't of Assessments & Taxation*,
   143 Md. App. 356 (2001) ........................................................................................8

*Cobey v. Geren*,
   424 F. App'x 209 (4th Cir. 2011) ...........................................................................4

*Felder v. Casey*,
   487 U.S. 131 (1988) ...............................................................................................5

*Gordon Family P'ship v. Gar on Jer*,
   702 A.2d 753 (Md. 1997) ......................................................................................13

*Lockshin v. Semsker*,
   987 A.2d 18 (Md. 2010) .........................................................................................5

*Maryland-Nat'l Capital Park & Planning Comm'n v. Anderson*,
   909 A.2d 694 (Md. 2006) .......................................................................................5

*Montgomery Cnty. v. Deibler*,
   31 A.3d 191 (Md. 2011) .........................................................................................5

*Shaw v. Stroud*,
   13 F.3d 791 (4th Cir. 1994) ................................................................................4, 5

*United States v. Lee*,
   943 F.2d 366 (4th Cir. 1991) ..................................................................................4

**STATUTES**

Md. Code, Transp. § 15-201, et seq. ............................................................... passim

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY 1189 (Bryan A. Garner, ed., 9th ed. 2009) ........................6

MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2003) ...................................9

**EXHIBITS**

JOINT STATEMENT OF UNDISPUTED FACTS ................................................................................ Ex. 1

AOA'S ADDITIONAL STATEMENT OF UNDISPUTED FACTS ........................................................ Ex. 2

## PRELIMINARY STATEMENT

Plaintiff Len Stoler, Inc. ("Stoler") is a former Audi dealer that seeks incentive monies it never earned for a facility it never built.  The Maryland Transportation Code neither requires nor permits that result.  Because Stoler fails to establish liability or damages (or both) as to each of its claims, this Court should grant summary judgment in favor of Defendant Audi of America, Inc. ("AoA").

This case arises out of Stoler's broken promise to build an "exclusive" Audi dealership. In 2015, Stoler signed a "Facility Agreement," whereby Stoler promised to build an exclusive Audi facility and to break ground on that facility by the end of 2015.  By inking the Facility Agreement, Stoler remained eligible to receive certain bonus payments under the terms of a bonus program that AoA offered to all of its dealers.  Stoler, however, never built the facility and elected to sell its dealership instead.  As a result, Stoler never incurred the millions of dollars in expenses that were shouldered by dealers who met their contractual commitments and built exclusive Audi facilities.  Stoler has now filed suit claiming that it was somehow injured by AoA and that it should be entitled to retroactive payments of exclusive level bonuses—for Stoler's non-exclusive facility.

The Maryland Transportation Code does not support this inequitable result.  Stoler's myriad arguments that AoA has violated the Transportation Code founder against the plain language of the statutory provisions it invokes.  What is more, because Stoler only benefited from its decision to sign the Facility Agreement, pocket incentive monies, and then sell its dealership, Stoler cannot establish a genuine issue of material fact as to damages.  Indeed, the summary judgment record demonstrates that Stoler was benefited rather than harmed by the supposed code violations it alleges.

1

Therefore, AoA's summary judgment motion should be granted.  Because Stoler has already abandoned certain other claims in its operative complaint, the case should be dismissed in its entirety.

## **BACKGROUND**

Pursuant to this Court's Order entered September 12, 2016 (Dkt. No. 51), the parties previously filed their Joint Statement of Undisputed Facts ("JSUF") on September 23, 2016 (*See* Ex. 1, JSUF), and AoA filed its Additional Statement of Undisputed Facts ("ASUF") on September 28, 2016.  (*See* Ex. 2, ASUF.)  Some of these statements of fact are particularly relevant to AoA's Motion for Summary Judgment and are set forth below.

Stoler's relationship with Audi was governed by its franchise agreement ("Dealer Agreement") that the parties signed in 1997.  (Ex. 1, JSUF ¶ 44.)  The Dealer Agreement incorporated several standards and guides by reference, including AoA's Standard Provisions and the Retail Capacity Guide.  (*Id.* at ¶ 45.)  AoA's Retail Capacity Guide sets forth detailed standards that all AoA dealers' premises must meet.  (Ex. 2, ASUF ¶ 1.)  Additionally, the Retail Capacity Guide calls upon dealers whose markets can support 400 or more new Audi sales per year to operate from exclusive facilities.  (Ex. 1, JSUF ¶ 14.)

Such buildings are costly.  (*Id.* at ¶¶ 30, 61.)  To assist dealers in meeting their contractual commitments, AoA offers to help all dealers meet their facility obligations in two ways.

*First*, AoA offers all dealers the Standards Bonus to help offset their facility-related costs.  To receive the Standards Bonus, a dealer must (1) have a facility that is appropriate to its market opportunity (called "MOG"), (2) achieve 85% at the annual evaluation based on Audi Dealer Operating Standards Checklist, and (3) maintain monthly compliance with the Dealer Operating Standards Scorecard.  (*Id.* at ¶ 8.)  During 2013-2015, if dealers met these criteria and

had compliant, exclusive facilities, they received a 3.75% Standards Bonus as a percentage of Adjusted MSRP of each new car sold.  (*Id.*)  Dealers that did not build or operate exclusive facilities were offered the Standards Bonus at various other levels.  (*Id.*)  As is relevant here, brand dedicated dealers were offered a Standards Bonus of 2.35% of Adjusted MSRP of each new car sold.[1]  (*Id.*)

*Second*, AoA offers all dealers whose facilities do not conform to the Retail Capacity Guide the opportunity to participate in a bonus-extension program under AoA's "Grandfather and Cure" Policies.  (*Id.* at ¶ 13.)  Under the terms of the Grandfather and Cure Policies, dealers whose facilities fall out of compliance with the Retail Capacity Guide based on their MOGs can still remain eligible to earn the Standards Bonus if they meet certain criteria.  (*Id.*)  Specifically, dealers can remain eligible to receive Standards Bonus payments if they (1) execute a letter of intent ("Facility Agreement") to build a new facility within 12 months of being notified that they have a non-complaint facility, (2) obtain permits and begin construction during the next 12 months, and (3) complete construction within the next 12 months after that.  (*Id.* at ¶ 28.)  Thus, AoA offers dealers the opportunity to continue earning the Standards Bonus, to which they are no longer entitled, if they meet specific deadlines for bringing their facilities back into compliance with the Retail Capacity Guide.  (*Id.* at ¶¶ 13, 28.)

Until 2013, Stoler's MOG had always been below the 400-unit threshold.  (*Id.* at ¶ 17.) As such, Stoler was a "brand dedicated" dealer, receiving brand dedicated level bonuses.[2]  (*Id.* at ¶ 11.)  When Stoler's MOG grew to exceed the 400-unit level, like all other dealers similarly

---

[1] The Margin and Bonus Program was modified effective January 1, 2016.  Under the modified program, the payout percentages are slightly lower but the overall structure of the program is similar.

[2] Brand dedicated dealers have Audi-exclusive customer areas but share other parts of their facilities with at least one other brand.  (*Id.* at ¶ 8.)

situated, it was offered the opportunity to continue receiving the Standards Bonus while it built an exclusive facility under the Grandfather and Cure Policies.  (*Id.* at ¶¶ 17, 18.)

In accordance with the Grandfather and Cure Policies, Stoler signed its Facility Agreement in January 2015 and continued earning the Standards Bonus for the rest of the year. (*Id.* at ¶¶ 20, 53.)  However, by the end of 2015, Stoler had not begun construction on its exclusive facility.  (*Id.* at ¶ 23.)  As Stoler no longer satisfied the terms of the Grandfather and Cure Policies, AoA ceased paying Stoler the Standards Bonus in 2016.[3]  (*Id.* at ¶ 24.)  Stoler subsequently sold its Audi franchise and sued AoA for alleged violations of the Transportation Code.  (*Id.* at ¶¶ 25, 56.)

Stoler previously alleged certain other claims against AoA, but these claims have been abandoned.  (*Id.* at ¶ 64.)

## LEGAL STANDARD

"Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Cobey v. Geren*, 424 F. App'x 209, 210 (4th Cir. 2011).  Where, taken as a whole, the record could not lead a reasonable jury to find for the non-moving party, summary judgment must be granted.  *United States v. Lee*, 943 F.2d 366, 368 (4th Cir. 1991).  "The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

The nonmoving party must then demonstrate through admissible evidence that a triable issue of fact exists.  *Id.*; *Ass'n for Supervision & Curriculum Dev., Inc. v. Int'l Council for Educ.*

---

[3] The Standards Bonus was renamed the "Business Fundamentals Bonus" in 2016.  However, for consistency's sake, both the Standards Bonus and the Business Fundamentals Bonus will be referred to as the "Standards Bonus" throughout this memorandum.

*Reform & Dev., Inc.*, No. 1:10CV74, 2011 WL 1225750, at *3 (E.D. Va. Mar. 14, 2011).  "A mere scintilla of evidence supporting the case is insufficient."  *Shaw*, 13 F.3d at 798.

## ARGUMENT

The task of a Federal court exercising diversity jurisdiction is to ascertain and apply state law.  *E.g., Felder v. Casey*, 487 U.S. 131, 151 (1988) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).   The principal questions before the Court in this case relate to matters of interpretation regarding the Transportation Code.

The lodestar of statutory interpretation in Maryland is legislative intent.  *Montgomery Cnty. v. Deibler*, 31 A.3d 191, 194 (Md. 2011).  In discerning that intent, courts begin—and often end—with the plain language of the statute.  *Maryland-Nat'l Capital Park & Planning Comm'n v. Anderson*, 909 A.2d 694, 699 (Md. 2006).  Undefined words and phrases are given their ordinary meaning.  *100 Harborview Drive Condominium Council of Unit Owners v. Clark*, 119 A.3d 87, 102-03 (Md. Ct. Spec. App. 2015).  And because statutory interpretation is a holistic endeavor, the language of a statute is viewed in the overall context of the statutory scheme:  Courts "seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the subject's object and scope."  *Lockshin v. Semsker*, 987 A.2d 18, 29 (Md. 2010).

These well-entrenched principles of interpretation, when applied to the factual record before the Court, entitle AoA to summary judgment.

**I.      AoA Is Entitled to Summary Judgment on Stoler's 15-207(h)(1)(i) "Offer" Claim, Because Stoler Can Establish Neither Liability Nor Damages.**

Stoler alleges that, by not paying it the Standards Bonus at the brand dedicated level after January 1, 2016 and not paying it the Standards Bonus at the exclusive level for the three years prior to filing suit, AoA violated Transportation Code § 15-207(h)(1)(i).  (Dkt. No. 10, Compl.

5

¶¶ 56, 71.)   Section 15-207(h)(1)(i) provides that "[a]ny consumer rebates, dealer incentives, price or interest rate reductions, or finance terms that a manufacturer, distributor, or factory branch offers or advertises . . . shall be offered to all dealers of the same line make."   The crux of Stoler's theory is that Stoler was not "offered" the Standards Bonus at the exclusive level.

Stoler's legal theory is deficient and, even were it colorable, Stoler fails to establish damages.

### A.   AoA Offered the Standards Bonus at the Exclusive Level to All Dealers.

There are no Maryland court cases interpreting this provision of the Transportation Code, but the plain meaning of the term "offer" is deeply seated in the law.   An offer is "[t]he act of presenting something for acceptance," often "conditioned on an act. . .or return promise being given in exchange."   BLACK'S LAW DICTIONARY 1189 (Bryan A. Garner, ed., 9th ed. 2009).

Here, AoA offered the Standards Bonus to all Audi dealers who met certain criteria. (Dkt. No. 10, Compl. ¶ 14) ("Audi offers all of its dealers a Standards Bonus for meeting certain benchmarks on a rubric of ten different criteria ('the Scorecard').")   The undisputed facts establish that AoA offered the Standards Bonus at the exclusive level to all dealers.   Any Audi dealer could construct an exclusive facility and receive the exclusive level bonus, even if its MOG was below 400.   (Ex. 2, ASUF ¶ 7.)   Indeed, some AoA dealers with MOGs below 400 did build exclusive facilities and obtained the Standards Bonus at the exclusive level.   (*Id.* at ¶ 8.)

Additionally, the Facility Agreement itself establishes that AoA offered the Standards Bonus at the exclusive level to Stoler.   Pursuant to the terms of the Facility Agreement, Stoler was to begin receiving the Standards Bonus at the exclusive level once it commenced construction on its exclusive facility.   (Ex. 1, JSUF ¶ 20.)   This is the same approach and timeline that AoA used for other Audi dealers pursuant to the Grandfather and Cure Policies. (*Id.* at ¶¶ 13, 28.)   The Facility Agreement provided, "[a]t such time that Dealer has satisfied its

obligations outlined in Paragraph 1(b) [begun construction], it shall be eligible for Exclusive Standards Bonus . . ."  (*Id.* at ¶ 57.)  Thus, the uncontroverted evidence in this case establishes that the Standards Bonus was offered at the exclusive level to all Maryland dealers, including Stoler.

If AoA was somehow forced to pay Stoler the exclusive level bonus, it would *create* a violation of § 15-207(h)(1)(i).  That is, if Stoler received the exclusive level bonus when it never had an exclusive facility (Ex. 1, JSUF ¶ 12), it would be receiving the Standards Bonus in a way that was not offered to any other Maryland Audi dealer.  (*Id.* at ¶ 8.)  As such, AoA should be granted summary judgment on Stoler's § 15-207(h)(1)(i) claim.

## B. Stoler Was Not Damaged By Its Failure to Earn the Standards Bonus at the Exclusive Level.

As Stoler's own expert has acknowledged, one would have to calculate both the costs and benefits of obtaining a bonus to calculate the economic impact of a bonus on a car dealership. (Ex. 2, ASUF ¶ 21.)  That is, to determine if Stoler was injured by not receiving the Standards Bonus at the exclusive level, the costs of obtaining the additional bonus must be less than the benefits.  The opposite is true.

Stoler has no evidence that the cost of obtaining the Standards Bonus at either the brand dedicated level or the exclusive level was more than the benefit conferred by the bonus.  (Ex. 2, ASUF ¶¶ 20, 22.)  Stoler concedes that obtaining the Standards Bonus at any level was costly. (Ex. 1, JSUF ¶¶ 30, 61.)  And, the summary judgment record establishes that obtaining the Standards Bonus at the exclusive level did not offset the increased costs associated with earning the bonus.  (Ex. 2, ASUF ¶ 23.)  That is, the delta between the Standards Bonus at an exclusive level and the Standards Bonus at a brand dedicated level is entirely consumed (and then some) by the costs associated with earning the Standards Bonus at an exclusive level.  Therefore, even

if Stoler was not "offered" exclusive level bonus payments (which is not the case), it suffered no damages from the code violation it alleges.

As a plaintiff, it was Stoler's obligation to establish that not receiving the Standards Bonus at the exclusive level caused it injury.  It has not done so, and the evidence runs the other way.  Stoler estimates that building an exclusive facility would have cost it at least $10 million. (Ex. 1, JSUF ¶ 61.)  However, Stoler estimates that the amount of Standards Bonus monies it did not receive was $784,935.  (Ex. 2, ASUF ¶ 19.)  In sum, even if the Court were to find that AoA did not "offer" Stoler the Standards Bonus, Stoler fails to demonstrate that it was harmed by this alleged code violation.

## II.     AoA Is Entitled to Summary Judgment on Stoler's Section 15-207(h)(2)(ii) Claim Because the Standards Bonus Was Not a "Benefit Generally Available" to All Dealers.

Stoler alleges that, by not paying it the Standards Bonus at the brand dedicated level after January 1, 2016 and not paying it the Standards Bonus at the exclusive level for the three years prior to filing suit, AoA violated Transportation Code Section 15-207(h)(2)(ii).  Section 15-207(h)(2)(ii) provides that, with exceptions not applicable here, a distributor may not "[d]eny, or threaten to deny, any benefit generally available to all dealers for a dealer's failure to alter or replace an existing dealership facility."  For Stoler's § 15-207(h)(2)(ii) claim, the key issue is whether the Standards Bonus is a "benefit generally available" to all dealers.  It was not.

Under the plain meaning of the statute, the Standards Bonus is not a "benefit generally available" to dealers.  Rather, the Standards Bonus is an incentive that had to be earned in accordance with its terms.  Dictionary definitions are useful tools for discerning the plain meaning of the statute, as neither the individual words nor the phrase "benefit generally available" are defined within the Transportation Code.  *See Bennett v. State Dep't of Assessments & Taxation*, 143 Md. App. 356, 368 (2001) (dictionaries can be consulted to determine the plain

meaning of a statute).  "Benefit" is defined as "a good or helpful result or effect."  *Benefit,* MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2003).  "Generally" is defined as "in a general way:  in a way that is not detailed or specific[.]"  *Generally,* MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2003).  "Available" is defined as "easy or possible to get or use[.]"  *Available,* MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2003).  Thus, for the Standards Bonus to qualify as a "benefit generally available" under § 15-207(h)(2)(ii), it would have to be (1) a good or helpful result that, (2) is easy or possible to receive, (3) in a way that is not detailed or specific.  The Standards Bonus does not qualify as a benefit generally available because the criteria to obtain the bonus were quite specific.

To illustrate this point, it is helpful to compare the benefits AoA makes generally available to all dealers with the Standards Bonus.  One of the benefits AoA makes generally available to all of its dealers is the "goodwill fund."  (Ex. 2, ASUF ¶ 9.)  From this goodwill fund, dealers can take up to $5,000 per repair to cover service costs for customers when the service is not covered by a warranty.  (*Id.* at ¶ 10.)  AoA also makes a program available to dealers whereby AoA will split the cost with dealers of mailing service advertisements to customers (called "service-mailers").  (*Id.* at ¶ 11.)  AoA also offers free next-day delivery on parts to all of its dealers.  (*Id.* at ¶ 12.)  AoA dealers also automatically receive access to iAudi, a suite of web-tools that provides information, support, and applications to help dealers sell and service vehicles.  (*Id.* at ¶ 13.)  There are several other examples.  (*E.g.*, *id.* at ¶¶ 14-18.)

In contrast to AoA's generally available benefits, the Standards Bonus was an incentive that could be obtained only by meeting detailed criteria.  (Ex. 1, JSUF ¶ 8.)  A dealer who wished to qualify for the Standards Bonus had to:  (1) have a facility that was compliant with its MOG, (2) achieve 85% at the annual evaluation based on Audi Dealer Operating Standards

Checklist, and (3) maintain monthly compliance with the Dealer Operating Standards Scorecard. (*Id.*)  To have a compliant facility, dealers had to meet detailed standards set forth in AoA's Retail Capacity Guide.  (Ex. 2, ASUF ¶ 1.)  The Dealer Operating Standards Scorecard further set forth a rubric of ten criteria that dealers had to meet to obtain a Standards Bonus at any level. (Ex. 1, JSUF ¶ 8.)  Thus, the Standards Bonus was an incentive that was available, if and only if, dealers satisfied several specific criteria on an ongoing basis, including meeting specific facilities standards.

Under the plain meaning of the statute, the Standards Bonus therefore does not qualify as a "benefit generally available" to dealers.

## III.   AoA Is Entitled to Summary Judgment on Stoler's Section 15-207(h)(3)(ii) "Price Reduction" Claim, Because Stoler Cannot Establish Damages.

Stoler asserts that by not paying it the Standards Bonus at the brand dedicated level after January 1, 2016 and by not paying it the Standards Bonus at the exclusive level for three years prior to filing the complaint, AoA allegedly violated Section 15-207(h)(3)(ii).  (Dkt. No. 10, Compl. ¶¶ 58, 68.)  Section 15-207(h)(3)(ii) provides that "[a]…distributor…may not reduce the price of a motor vehicle charged to a dealer or provide different financing terms to a dealer in exchange for the dealer's agreement to: . . . [b]uild or alter a sales or service facility."[4]

Stoler has neither alleged nor attempted to develop evidence that agreements between AoA and other Maryland dealers caused harm to Stoler.  (Had Stoler attempted to raise such claims, AoA would have asserted a statute of limitations defense.)  Indeed, Stoler recently explicitly explained its theory that "by entering into the Facility Agreement, Audi violated [the

---

[4] In Stoler's previously filed Motion for Partial Summary Judgment, Dkt. No. 45, Pl. Mem. at 9, Stoler alleges that AoA violated both §§ 15-207(h)(3)(i) and (h)(3)(ii).  However, in its Amended Complaint, Stoler does not allege a violation of 207(h)(3)(i).  (*See* Dkt. No. 10, Compl. 1-83.) Nonetheless, the same analysis of AoA's applies to both §§ 15-207(h)(3)(i) and (h)(3)(ii).

statute] by reducing the price paid by *Stoler* in exchange for *Stoler's promise* to maintain an exclusive sales or service facility."  (Dkt. No. 45, Pl. Mem. at 9 (emphasis added).)

Put simply, Stoler argues that it received a financial benefit as a result of AoA's alleged code violation: "[B]y entering into the Facility Agreement, Audi violated [the statute] by reducing the price paid by Stoler in exchange for Stoler's promise to maintain an exclusive sales or service facility."  (*Id.*)  Because Stoler never built an exclusive facility or even broke ground on one (*See* Ex. 1, JSUF ¶ 12 ("Stoler has never had an exclusive Audi facility, nor commenced construction of one.")), there was no harm at all.  Indeed, by signing the Facility Agreement, Stoler received some $288,312.56 in bonuses in 2015 that it otherwise would not have been eligible to receive.  (*Id.* at ¶¶ 13, 28-29, 53.)

The Maryland Transportation Code explicitly provides that a person may recover for code violations only if they have suffered "financial injury or other damages[.]"  Md. Code, Transp. § 15-213.  If anything, Stoler profited from the code violation it alleges; it was not injured.

## IV.   AoA Is Entitled to Summary Judgment on Stoler's Section 15-207(b) "Coercion" Claim, Because Stoler was Not Coerced and Suffered No Damages.

Stoler seeks a declaratory judgment that the Facility Agreement is unlawful and unenforceable under Transportation Code § 15-207(b).  (Dkt. No. 10, Compl. ¶ 83.)  Section 15-207(b) provides, in relevant part, that a "distributor…may not coerce any dealer to make any agreement with the. . . distributor . . . "  Under § 15-207(a)(2)(i) "'[c]oerce' means to compel or attempt to compel by threat of harm, breach of contract, or other adverse consequences,

including the loss of any benefit made available to other dealers of the same line make in the State."[5]

Stoler's claim fails because it can establish neither liability nor damages.

### A.      Stoler's Theory Is Based on an Incorrect Interpretation of the Statute.

The crux of Stoler's argument is that AoA "coerced" it into signing the Facility Agreement by threatening to take away the Standards Bonus for failure to do so.  That is, Stoler suggests that AoA "coerced" Stoler by threatening to take away a benefit.  This claim fails for several reasons.

### 1.      The Standards Bonus was Not a "Benefit," But an Incentive.

Stoler asserts that AoA coerced it into signing the Facility Agreement "in order to continue to receive its Standards Bonus."  (Dkt. No. 10, Compl. ¶¶ 77-79.)  For this to be coercion under § 15-207(b), the Standards Bonus would have to be a "benefit" made available to other dealers.  It was not.  The Standards Bonus was an *incentive* that was expressly conditioned on a dealer's compliance with numerous criteria, including compliance with the dealer's facility obligations.  (Ex. 1, JSUF ¶ 8.)

Thus, under the plain language of § 15-207(b), the Standards Bonus was not a benefit available to all other dealers but an incentive used to persuade dealers to upgrade their facilities in a timely manner.  Indeed, the Transportation Code explicitly excludes from the definition of "coercion" such efforts at persuasion.  Md. Code, Transp. § 15-207(a)(2)(iii).

---

[5] "Coerce" also means, "to act in a manner that violates § 15-206.1 of this subtitle."  *Id.* at § 15-207(a)(2)(ii).  Section § 15-206.1 requires dealers to act in good faith, meaning with "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."  Stoler has not attempted to argue that AoA violated this provision of the Transportation Code.

### 2. A Contrary Conclusion Would Require this Court to Ignore the Structure of Section 15-207.

Stoler's theory at bottom is that enforcing the terms of an "incentive" is the same as taking away a "benefit" for purposes of Section 15-207(b). This theory has little to commend it.

Section 15-207(h) contains numerous subparagraphs that—in different places—regulate consumer rebates, rebates, dealer incentives, cash incentives, price or interest rate reductions, finance terms, generally available benefits, and promotions. However, the General Assembly chose not to regulate "incentive payments" or "rebates" in § 15-207(b). These differences in language should be given effect. *See Gordon Family P'ship v. Gar on Jer*, 702 A.2d 753, 757 (Md. 1997) ("[N]ot only are we required to interpret the statute as a whole, but, if appropriate, in the context of the statutory scheme of which it is a part.") (citation omitted).

Moreover, in Section 15-207(i), the Maryland Legislature explicitly regulated when incentives are allowed to be offered. Under Section 15-207(i), a distributor "*may* offer rebates, cash incentives, or other promotional items for the sale of a vehicle by its dealers if . . . [t]he same rebate, cash incentive, or promotion is offered to all its dealers of the same line make[.]" Md. Code, Transp. § 15-207(i)(1). Notably, in Section 15-207(i), the Maryland Legislature did not prohibit incentives from being offered to dealers to build facilities or enter into agreements with distributors.

Additionally, Section 15-207(a)(2)(iii) provides that "coerce" "does not include to . . . persuade." Thus, through Sections 15-207(i) and 15-207(a)(2)(iii), the General Assembly acknowledged that distributors could offer incentives or rebates to persuade dealers to enter into agreements. A contrary interpretation would do violence to the structure of the Maryland Transportation Code and should be rejected. If a distributor could face liability for withdrawing incentives pursuant to their terms, no distributor would offer incentives in the first place. The

structure of Section 15-207 does not suggest that Maryland's General Assembly intended this bizarre result.

### 3. Stoler Admitted It Was Not Coerced Into Signing the Facility Agreement.

The Chairman of Stoler (and the only signatory from Stoler to the Facility Agreement) admitted he was not coerced into signing this Agreement.  (Ex. 2, ASUF ¶¶ 4-5.)  He testified as follows:

> Question:  And this is, again, the document I'm going to refer to as the "facility agreement."  Okay?  Sir, were you coerced into signing this document?
>
> Answer:  No.

(*Id.* at ¶ 5.)  Stoler should not now be permitted to argue that it was coerced into signing the Facility Agreement when it has admitted otherwise.

### B. Stoler Fails to Establish "Financial Injury or Other Damage."

Stoler's lack of damages under Section 15-207(b) is self-evident.  Stoler claims that it was coerced because "Audi threatened that unless Len Stoler signed the Facility Agreement, it would terminate the payment of the Standards Bonus . . ."  (Dkt. No. 10, Compl. ¶ 77.)  It is undisputed, however, that Stoler signed the Facility Agreement and received the Standards Bonus throughout 2015.  (Ex. 1, JSUF ¶¶ 20-21, 53.)  But Stoler never built the facility or even broke ground on it.  (*Id.* at ¶ 12.)  To the extent Stoler alleges it incurred costs preparing to build an exclusive facility, Stoler has no evidence that these costs exceeded the $288,312.56 in Standards Bonus money AoA paid Stoler in 2015.[6]  (*See id.* at ¶ 53.)  Thus, the undisputed evidence demonstrates that Stoler was enriched, not injured, as a result of signing the Facility Agreement.  Because § 15-213 of the Transportation Code permits a party to bring suit only if it

---

[6] Nor could Stoler seek damages based on any such "building costs," as Stoler admitted in its answers to AoA's First Set of Interrogatories that this is not a category of damages it is claiming.

"suffers financial injury or other damage as a result of a violation of this subtitle[,]" Stoler's

coercion claim fails. *See* Md. Code, Transp. § 15-213.

**V.     AoA is Entitled to Summary Judgment on Stoler's Section 15-207(h)(2(i)
"Requirement" Claim, Because Stoler was Not Required to Build a Facility and
Suffered No Damages.**

Stoler seeks a declaratory judgment that the Facility Agreement is unlawful and

unenforceable under § 15-207(h)(2)(i).   (Dkt. No. 10, Compl. ¶ 80.)   Section 15-207(h)(2)(i)

provides that, with exceptions not applicable here, a distributor may not "[r]equire a dealer to

alter or replace an existing dealership facility."    Stoler's claim should be rejected because

Stoler's theory ignores the statutory definition of the word "require," and Stoler was not

damaged by the code violation it alleges.

**A.     Stoler Fails to Establish Liability.**

**1.     Stoler's Theory Ignores the Statutory Definition of "Require."**

Under § 15-207(a)(3), "require" has a statutorily defined meaning:   "to impose upon a

dealer a provision not . . . previously agreed to by a dealer in a franchise agreement, excluding

business decisions by a . . . distributor . . . which are uniformly applied to all Maryland

dealers . . ."   In other words, the Maryland General Assembly acknowledged that distributors

may require dealers to build new facilities if the obligation to do so arises from (1) the dealer's

franchise agreement or (2) a business decision uniformly applied to all dealers.   Here, Stoler's

obligation to build a new facility arose both from its franchise agreement and a business decision

by AoA that was uniformly applied to all Maryland dealers.

**2.     Stoler's Facility Obligations Arose From Its Franchise Agreement.**

The operative franchise agreement (the "Dealer Agreement") was signed by Stoler and

AoA in 1997.   (Ex. 1, JSUF ¶ 44.)   Stoler's Dealer Agreement incorporated several of AoA's

standards and guides by reference, including the Retail Capacity Guide.   (*Id.* at ¶ 45.)   Under the

15

Retail Capacity Guide, a dealer with a MOG equal to or greater than 400 had to build an exclusive facility.  (*Id.* at ¶ 14.)  At some point, Stoler's MOG grew to exceed the 400-unit level.  (*Id.* at ¶ 15.)  As such, according to the standards laid out in the Retail Capacity Guide, Stoler was obligated to build an exclusive facility.  (*Id.* at ¶ 17.)  Thus, AoA did not unlawfully require Stoler to build an exclusive facility under § 15-207(h)(2)(i), as Stoler previously agreed to comply with the Retail Capacity Guide in its Dealer Agreement.

### 3. Stoler's Facility Obligations Arose from a Business Decision Uniformly Applied to All Maryland Dealers.

AoA made a business decision under which all Maryland dealers are obligated to operate out of exclusive facilities if their MOGs meet or exceed 400 vehicles.  The Retail Capacity Guide and the 400-unit threshold contained therein apply to all Maryland dealers.  (Ex. 1, JSUF ¶ 60.)  AoA also calculates every dealer's MOG in the same way.[7]  (*Id.* at ¶ 31.)  The Margin and Bonus Program, which provides the Standards Bonus to dealers if they meet their facility obligations and other criteria, also applies to all Maryland Audi dealers.  (*Id.* at ¶¶ 8, 59.)  Moreover, every dealer in Maryland was subject to the Grandfather and Cure Policies, which laid out timelines for complying with dealers' facility obligations.  (*Id.* at ¶ 13.)  Therefore, there can be no legitimate dispute that Stoler's obligation to build an exclusive facility arose out of a business decision that was uniformly applied to all dealers.

This uniformity is not abstract:  under AoA's business decision, *every* Maryland Audi dealer has been called upon to operate out of an exclusive facility.  (*See* Dkt. No. 46-1, Thacker Decl. ¶ 12.)  Because operating out of an exclusive facility was a "business decision[] . . .

---

[7] AoA uses a "higher-of calculation" in which it calculates every Maryland dealer's MOG in the same two ways.  (*Id.* at ¶ 31.)  One calculation is based on premium segment registrations in a dealer's Primary Area of Influence and the other calculation is based on a dealer's individual Business Planning Objective.  (*Id.*)  Every dealer's MOG is selected based on whichever calculation results in the higher number.  (*Id.*)

uniformly applied to all Maryland dealers[,]" it was not an unlawful requirement under Maryland law.  *See* Md. Code, Transp. § 15-207(a)(3).

**B.**     **Stoler Fails to Establish "Financial Injury or Other Damage."**

Here, too, Stoler has suffered no damages.  Stoler "never had an exclusive Audi facility, nor commenced construction of one."  (Ex. 1, JSUF ¶ 12.)  And because Stoler signed the Facility Agreement, it was able to remain eligible for Standards Bonus monies to which it was otherwise no longer entitled.  (*Id.* at ¶¶ 13, 29.)  As with Stoler's "coercion" claim, to the extent Stoler alleges it incurred costs preparing to build an exclusive facility, Stoler has no evidence that these costs exceeded the $288,312.56 in Standards Bonuses AoA paid Stoler in 2015 because Stoler signed the Facility Agreement.  (*See id.* at ¶ 53.)  Thus, Stoler has no evidence that it was damaged by AoA's alleged violation of § 15-207(h)(2)(i).

For this reason, too, AoA's summary judgment motion should be granted.

<u>CONCLUSION</u>

For the foregoing reasons, AoA's Motion for Summary Judgment should be granted, and Stoler's lawsuit should be dismissed in its entirety.

Dated:  September 30, 2016

    /s/             
James R. Vogler (*pro hac vice*)
Daniel R. Fine (*pro hac vice*)
Jack O. Snyder, Jr. *(pro hac vice)*
Emily L. Gesmundo (*pro hac vice*)
BARACK FERRAZZANO
   KIRSCHBAUM & NAGELBERG LLP
200 West Madison Street, Suite 3900
Chicago, Illinois 60606
T: (312) 984-3100
F: (312) 984-3150
jim.vogler@bfkn.com
dan.fine@bfkn.com
jack.snyder@bfkn.com
emily.gesmundo@bfkn.com

Respectfully submitted,

    /s/             
R. Mark Dare (VSB No. 14146)
Micah E. Ticatch (VSB No. 83351)
ISLER DARE PC
1945 Old Gallows Road, Suite 650
Tysons Corner
Vienna, Virginia  22182
T: (703) 748-2690
F: (703) 748-2695
mdare@islerdare.com
mticatch@islerdare.com

*Counsel for Defendant Volkswagen Group of America d/b/a Audi of America, Inc.*

18

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of September, 2016, I served a true and accurate copy of the foregoing by filing it electronically with the Clerk of the Court using CM/ECF system, which will send a notification of such filing (NEF) to the following:

Barbara S. Wahl, Esq.
Arent Fox LLP
1717 K Street, N.W.
Washington, DC  20006
Barbara.wahl@arentfox.com

Russell P. McRory, Esq.
Arent Fox LLP
1675 Broadway
New York, NY 10019
Russell.mcrory@arentfox.com

Sean Nicholas Clerget, Esq.
Arent Fox LLP
1717 K Street NW
Washington, DC 20036-5344
sean.clerget@arentfox.com


                                        /s/
                              Micah E. Ticatch (VSB No. 83351)
                              ISLER DARE PC
                              1945 Old Gallows Road, Suite 650
                              Vienna, VA 22182
                              (703) 748-2690
                              (703) 748-2695 (fax)
                              mticatch@islerdare.com
                              *Counsel for Defendant*
                              *Volkswagen Group of America, Inc.*
                              *d/b/a Audi of America, Inc.*