# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| LEN STOLER, INC. d/b/a LEN STOLER AUDI, <br><br> Plaintiff/Counter-Defendant, <br><br> -against- <br><br> VOLKSWAGEN GROUP OF AMERICA, INC. d/b/a AUDI OF AMERICA, INC., <br><br> Defendant/Counter-Plaintiff. | Case No. 1:15CV1659-TSE/JFA <br><br> **JOINT STATEMENT OF UNDISPUTED FACTS** |

Pursuant to the request of this Court at the hearing on September 2, 2016, and the accompanying Order entered September 6, 2016 (ECF #49), the parties hereby submit a joint, expanded statement of undisputed facts in connection with Plaintiff's motion for partial summary judgment and Defendant's anticipated cross-motion for summary judgment.

The parties agree that the following facts are undisputed[1]:

1. Plaintiff Len Stoler, Inc. d/b/a Len Stoler Audi ("Stoler") is a corporation organized and existing under the laws of the State of Maryland, with a principal place of business in Owings Mills, MD (AC ¶ 7, AA ¶ 7)

2. Stoler was a licensed and authorized Audi dealer and franchisee, until May 2, 2016, when Stoler sold its Audi-related business assets (AC ¶ 7, AA¶ 3).

---

[1] This list of undisputed facts makes reference to the Amended Complaint ("AC"), the Amended Answer ("AA"), and Counterclaim ("CC"), the declarations submitted in support and opposition to Plaintiff's motion for partial summary judgment, documents produced in this matter by both parties, and testimony from depositions before trial. While the facts included herein are not in dispute, the parties may disagree, for legal reasons, on whether the facts should be deemed material at summary judgment. The parties reserve the right to stipulate to additional agreed upon facts at a later time.

Case 1:15-cv-01659-SEB-JFA Document 75-1 Filed 09/28/16 Page 2 of 13 PageID# 5142

3. Until May 2, 2016, Stoler was a "dealer" as defined in the Maryland Transportation Code (AC ¶ 7).

4. Defendant Volkswagen Group of America, Inc. d/b/a Audi of America, Inc. ("Audi"), is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in the Commonwealth of Virginia. Audi purchases Audi vehicles from corporate affiliates in Germany and then imports and sells these vehicles to franchised Audi dealers throughout the United States, including Len Stoler. (AC ¶ 8, AA ¶ 8)

5. Audi is a "distributor" as defined in the MD Transportation Code. (AA ¶ 8)

6. Audi and Stoler are parties to a Dealer Agreement. (AC ¶ 11, AA ¶ 11)

7. Audi maintains a Margin and Bonus Program that contains several incentives that offer a percentage of the adjusted manufacturer's suggested retail price (MSRP), paid as a cash bonus, on every new Audi vehicle sold by a dealer, provided certain criteria are met (AC ¶¶ 14-18).

8. One such bonus is the Standards Bonus. The Standards Bonus includes several qualifying criteria, including criteria related to the dealer's facilities. Specifically, to receive any Standards Bonus under the Margin and Bonus Program, a dealer must (1) have a facility that is compliant with its Market Opportunity Guide ("MOG"), (2) achieve 85% at the annual evaluation based on Audi Dealer Operating Standards Checklist, and (3) maintain monthly compliance with the Dealer Operating Standards Scorecard. (AoA0000154.) The Dealer Operating Standards Scorecard further sets forth a rubric of ten criteria that dealers must meet to obtain a Standards Bonus. (Pl. Compl. ¶ 14.) If dealers meet these criteria, they are paid a Standards Bonus on the following basis: "General" Audi dealers are not brand-compliant and receive no Standards bonus. "Universal" Audi dealers meet certain minimum requirements and

qualify for a 1% Standards bonus. "Brand-Dedicated" Audi dealers have exclusive customer touchpoints and qualify for a 2.35% Standards Bonus. "Exclusive" Audi dealers have completely exclusive facilities and staff and qualify for a 3.75% Standards Bonus. All Standards Bonuses are paid on a per-vehicle basis, as a percentage of Adjusted MSRP of each new car sold. (Thacker Depo Tr. at 17:9-19:9.). Adjusted MSRP takes into account option packages, prices, destination charges and other line-item additions and subtractions from base model MSRP.

9. An "exclusive" facility is one that is exclusive to the Audi brand and does not share facilities with any other franchise operations, including sister line-makes such as Porsche or Volkswagen. (CC ¶ 6)

10. Dealers who met all of the criteria necessary to receive a Brand Dedicated Standards Bonus but also had an exclusive facility qualified for the Exclusive Standards Bonus, which was equivalent to 3.75% of the adjusted MSRP of every new car sold. (AA ¶ 16)

11. Stoler has only ever received the Brand Dedicated Standards Bonus. (AC ¶ 17; Stoler Decl. ¶ 7)

12. Stoler has never received the Exclusive Standards Bonus because Stoler has never had an exclusive Audi facility, nor commenced construction of one. (AC ¶ 17; AA ¶ 22-23; Stoler Decl. ¶ 7)

13. On September 21, 2011, Stoler (as well as other Audi dealers) received a memorandum from Audi, explaining its newly announced "Grandfather Policy" and "Cure Policy." (Stoler Decl. Ex. A) The memorandum sets out a framework for allowing dealers to continue to receive Standards Bonuses "during the investment phase of building a new, or substantially renovating an existing facility." The Grandfather Policy and Cure Policy allowed dealers who were no longer eligible to receive Standards Bonuses because their MOGs exceeded

the threshold for exclusive facilities to continue receiving bonuses so long as they took certain steps to eventually operate from exclusive facilities. (Thacker Decl. ¶¶ 13-14).

14. Audi calculates each dealer's Market Opportunity Guide or "MOG," a projection that is used to determine whether the dealer is obligated to operate from an exclusive facility. Under Audi's Retail Capacity Guide, a Dealer with a MOG equal to or greater than 400 units must have an exclusive Audi facility. (AoA0000091-139).

15. At some point, according to Audi's calculations, Stoler's annual market opportunity grew to exceed the 400-unit level.

16. Audi's Margin and Bonus Program is set up so that every dealer's MOG is updated every three to four years. (Mathews Dep. 8:12-20.)

17. On January 10, 2014, Stoler received a letter from Audi explaining that, based upon Audi's MOG calculations for 2014-2016, Stoler's MOG increased from 375 to 643. Because the MOG was above the 400-unit threshold, Audi's Retail Capacity Guide provided that Stoler must operate from an exclusive Audi facility. (Stoler Decl. ¶ 3, Ex. B.)

18. On April 25, 2014, Stoler received a letter from Audi summarizing Stoler's scores on Audi's evaluation criteria for the Standards Bonus. The letter indicated that Stoler was eligible to receive Standards Bonuses, but noted that the eligibility was based in part on the Grandfather Policy and Cure Policy. The letter states further that Stoler would remain eligible for Standards Bonuses in accordance with "Audi of America's current Cure Policy." The document also states that "[a]s your dealership is affected by the Cure Policy, your AGM [area general manager] will be contacting you regarding your facility deficiencies and Cure Policy timelines." (Stoler Decl. ¶ 4, Ex. C).

4

19. On October 16, 2014, Stoler received a letter from Audi recapping the previous communications between the parties regarding the Grandfather Policy and Cure Policy. The letter stated that "in order to maintain Standards Bonus eligibility beyond 2014, Len Stoler Audi is required to enter a Facility Letter of Intent (LOI) by December 31, 2014. (Stoler Decl. ¶ 5, Ex. D.).

20. In mid-January 2015, Audi and Stoler entered into the Facility Agreement, pursuant to which Stoler agreed to construct an exclusive Audi facility, and Audi agreed to pay Stoler the Exclusive Standards Bonus once construction on the new facility commenced. (AC ¶¶ 19, 22-24; AA ¶¶ 19, 22-24; CC ¶¶ 9-10; see also Stoler Decl. Ex. E, Facility Agreement).

21. The Facility Agreement provides that, as of the time of the Facility Agreement, Stoler was entitled to receive Standards Bonus payments at a brand dedicated level. (Facility Agreement ¶ 2).

22. Under the terms of the Facility Agreement, Audi would cease paying Stoler any Standards Bonus payments if Stoler failed to begin construction of an exclusive facility by December 31, 2015. (Facility Agreement ¶ 5)

23. Stoler did not commence construction by December 31, 2015. (AC ¶ 23, AA ¶ 23).

24. As a result, on January 1, 2016, Audi ceased payment of the Brand Dedicated Standards Bonus because of Stoler's failure to commence construction of an exclusive facility. (AC ¶ 24, 54; AA ¶ 24, 54; Stoler Decl. ¶ 7).

25. Stoler has brought three causes of action against Audi for violation of the Dealer Act § 15-207(h). (AC ¶ 51-83).

Case 1:15-cv-01659-SEH-JFA Document 75-1 Filed 09/28/16 Page 5 of 13 PageID# 5195

26. Because Stoler did not have a compliant facility, Stoler would not have been entitled to receive any Standards Bonuses in 2014; having a compliant facility was one of the criteria a dealer had to meet to earn the Standards Bonus. (Id. ¶ 13).

27. Audi had implemented its Grandfather Policy and Cure Policy in 2011. The policies permitted dealers in once-compliant facilities up to three years to bring their facilities back into compliance with brand standards – all the while remaining eligible to receive Standards Bonus payments. (Id.).

28. Under the Grandfather Policy and Cure Policy, Stoler would have continued to remain eligible for Standards Bonus payments for up to three years so long as it (1) executed an LOI to build a new facility within 12 months of being notified that it had a non-complaint facility, (2) obtained permits and began construction during the next 12 months, and (3) completed construction within the next 12 months (Id. ¶ 13-14).

29. Stoler executed the LOI (which the parties call the "Facility Agreement"), but neither broke ground nor completed its exclusive facility. Therefore, Stoler no longer satisfied the terms of the Standards-Bonus-extension that Audi provided to all dealers under the Grandfather and Cure Policy. Accordingly, Stoler was no longer eligible to receive Standards Bonus payments as of January 1, 2016. (Id. ¶ 15). Had Stoler commenced construction, its Standards Bonus eligibility would have been reinstated. (Facility Agreement ¶ 2).

30. Obtaining the Standards Bonus at a brand dedicated level was costly in terms of both financial and human resources. (Thacker Decl. ¶ 16).

31. Audi calculates every dealer's Market Opportunity Guide ("MOG") with a "higher-of calculation." In the first method, Audi takes the number of "premium segment registrations" there are in a dealer's Primary Area of Influence ("PAI") and multiplies that by

6

Audi's segment level penetration on a national basis. It then "sums all of those segment-level calculations" to arrive at the dealer's MOG for a given year. In the second method, Audi takes a dealer's business planning objective ("BPO") and multiplies it by the same percentage increase that Audi is forecasting for its national sales growth in a given year, known as a "planning round." For example, if the "planning round" forecasts a 10% increase in Audi sales next year, this method takes a dealer's current BPO and increases it by 10% for next year's MOG. Whichever method—segmentation or BPO—results in a higher number, that higher number is used as a dealer's MOG. (Thacker Depo. Tr. at 20:12-21:20.)

32. The base margin a dealer receives—i.e., the percentage difference between the manufacturer's suggested retail price and the price listed on the dealer's invoice—is seven percent. (Thacker Depo. Tr. at 26:21-27:2.) Since around 2010, the Margin and Bonus Program as a whole represents fifteen percent of MSRP (7% Margin, 8% Bonuses). (Fischer 30(b)(6) Depo Tr. at 57:23-58:14.)

33. From 2010 through 2015, Stoler never sold more than 300 new vehicles. (Thacker Depo. Tr. at 111:11-13.)

34. From 2010 through 2015, Stoler's BPO was never higher than 400 units. (Thacker Depo. Tr. at 111:8-10.).

35. Stoler's MOG for the 2011-2013 period was 375 units. (Thacker 30(b)(6) Depo. Tr. at 19:14-21.)

36. Stoler's MOG for the 2014-2016 period was 643 units. (Thacker 30(b)(6) Depo. Tr. at 17:4-12.)

37. Stoler's MOG for the 2016 to 2018 Margin and Bonus Program period was 505 units. (Thacker 30(b)(6) Depo. Tr. at 21:7-21.)

38. Audi's "Grandfather and Cure Policy" was described in a memorandum dated September 21, 2011 that was sent to all dealers. (Thacker 30(b)(6) Depo. Tr. at 10:1-11:7.)

39. The existing Stoler facility was incapable of being converted into an Exclusive Facility under Audi's standards. (Thacker 30(b)(6) Depo. Tr. at 36:8-37:25.)

40. Audi is not seeking repayment of the Brand Dedicated Standards Bonus paid to Stoler between January 1, 2015 and December 31, 2015.

41. "Exclusive is required for any dealership in a market with a market opportunity guide above 400 units annually." (Meyer Depo. Tr. at 24:14-25.)

42. A meeting was held on December 1, 2015 between Mark Del Rosso, Jeremey Meyer, Barry Stoler, and Leonard Stoler. In that meeting, Stoler's performance and facility obligations were discussed. Additionally, according to Jeremy Meyer, Mark Del Rosso wanted Stoler's principals to consider whether they'd like to sell at that point and take advantage of that or risk termination. (Meyer Depo. Tr. at 92:2-7; Plaintiff's Ex. 21.)

43. Audi executive Jeremy Meyer has seen multiples "run the gamut," anywhere from "eight to ten at the low end and much higher at the higher end." (Meyer Depo. Tr. at 92:8-12.)

44. Stoler and Audi entered into their first dealer agreement in 1982. The current operative Dealer Agreement in this matter was signed in 1997 and is a document bates-labeled AoA0000083-90.

45. The operative Dealer Agreement provides, in part, "[t]he Dealer Agreement Standard Provisions (the "Standard Provisions"), the Dealer Operating Plan (the "Operating Plan"), the Audi Business Basics (the "Business Basics"), the Audi Retail Capacity Guide (the "Retail Capacity Guide") and the Audi Business File are part of this Agreement." (AoA0000083-90.)

46. Stoler contends, and Audi stipulates for purposes of summary judgment only, that the operative Standard Provisions, incorporated by reference into the Dealer Agreement, are a document bates-labeled STOLER004256-4280. The Standard Provisions provide that the Operating Standards are incorporated by reference into the Standard Provisions (Art. 2, ¶ 3) and that the "Dealer's Premises will conform to the requirements of this Agreement, the Operating Standards and such other standards as Audi may prescribe from time to time, taking into consideration the number of Authorized Automobiles in operation in Dealer's Area and reasonably foreseeable future requirements." (Art. 3, ¶ 1)

47. The Facility Agreement provides, "Dealer and its legal counsel have reviewed the laws applying to dealer/manufacturer relations. Dealer agrees that the Facility requirements as expressed in this Agreement are reasonable and necessary in view of the need to service the public and further that the economic conditions in the industry and specifically in Dealer's relevant market area support this action." (AoA0000193-196 at ¶ 6(g).)

48. The Facility Agreement also provides that "[b]oth parties have had legal counsel of their choice review this Agreement and are fully advised as to the legal and binding nature of this Agreement." (AoA0000193-196 at ¶ 6(h)).

49. The Facility Agreement also provides that ""Dealer, by signing this Agreement, agrees and covenants not to sue AoA with respect to any alleged damages Dealer may suffer as a result of Dealer's loss of the right to receive any Standards Bonus...arising out of Dealer's failure to perform its obligations under this Agreement." (AoA0000193-196 at ¶ 5.)

50. Stoler's Audi franchise was authorized by Audi to operate dualled with Stoler's Porsche franchise in 1982.

51. In 2013, Audi paid Stoler $343,339.49 in Brand Dedicated Standards Bonuses. AOA0002033, 2038, 2042, 2046.

52. In 2014, Audi paid Stoler $340,554.47 in Brand Dedicated Standards Bonuses. AOA0002049, 2053, 2056, 2060.

53. In 2015, Audi paid Stoler $288,312.56 in Brand Dedicated Standards Bonuses. AOA0002062, 2066, 2069, 2073.

54. In 2016, Audi paid Stoler $0 in Business Fundamentals Bonuses, the successor to the Brand Dedicated Standards Bonus, because Stoler did not commence construction of its exclusive facility pursuant to the terms of the Facility Agreement. AOA0002077, 2079.

55. If Stoler did not sign a letter of intent to build an exclusive facility in accordance with the Grandfather and Cure Policies, Audi would have ceased paying Stoler any Standards Bonus effective January 1, 2015. (Hamilton Depo. Tr. at 44:22-25, 45:1-5.)

56. Stoler sold its Audi franchise to Priority One in a deal that closed on May 2, 2016. Stoler sold its Audi franchise for $5 million in goodwill or "blue sky" value, plus an additional amount for its assets. (Len Stoler Dep. 169:9-18.)

57. Pursuant to the terms of the Facility Agreement, Stoler was to begin receiving the Standards Bonus at the exclusive level once it commenced construction on its exclusive facility. (AoA0000193-196, ¶ 3.) The Facility Agreement provided, "[a]t such time that Dealer has satisfied its obligations outlined in Paragraph 1(b) [begun construction], it shall be eligible for Exclusive Standards Bonus for a period not to exceed twelve (12) calendar months, beginning in the month in which Construction Start occurs." (*Id.*)

58. Audi charges all of its dealers the same invoice price for its motor vehicles. (L. Stoler Dep. 56:6-9); (Leibowitz Dep. 181:12-15.)

10

59. The Margin and Bonus Program applied to all Maryland dealers. (Thacker Decl. ¶ 4-8.)

60. All Audi dealers in Maryland are subject to the 400 vehicle threshold in the Retail Capacity Guide; namely, when an individual dealer's MOG exceeds 400 units, that dealer must operate out of an exclusive facility. (Thacker Decl. ¶ 4.)

61. It would have cost Stoler at least $10 million dollars to build an exclusive facility, including the cost of real estate. (Barry Stoler Dep. 257:14-258:15); (D. Leibowitz 151:6-10.)

62. The Standard Provisions and the Facility Agreement both provide that Maryland substantive law controls in this matter.

63. Stoler and Audi agreed in the Facility Agreement that, "[s]hould the performance of any obligation under this Agreement violate any law of [Maryland], then this Agreement shall be deemed modified to the minimum extent necessary to comply with such law." (AoA0000193-196, ¶ 6(e).)

64. Stoler is no longer pursuing its Fourth, Fifth, or Sixth Causes of Action. Additionally, Stoler is no longer pursuing injunctive relief.

11

DATED: September 23, 2016

| ARENT FOX LLP | ISLERDARE PC |
|---|---|
| By: /s/ Barbara S. Wahl | By: /s/ Richard Mark Dare |
|     Barbara S. Wahl |     Richard Mark Dare |

<table>
<tr><td>

1717 K Street, N.W.  
Washington, DC 20006  
Barbara.wahl@arentfox.com

Russell P. McRory, Esq. (*pro hac vice*)  
Michael P. McMahan, Esq. (*pro hac vice*)  
Arent Fox LLP  
1675 Broadway  
New York, NY 10019


*Counsel for Plaintiff*  
*Len Stoler, Inc.*  
*d/b/a Len Stoler Audi*

</td><td>

1945 Old Gallows road, Suite 650  
Tysons Corner  
Vienna, Virginia 22182  
T: (703) 748-2690  
F: (703) 748-2695  
mdare@islerdare.com

James R. Vogler ( *pro hac vice*)  
Daniel R. Fine ( *pro hac vice*)  
Jack O. Snyder, Jr. *( pro hac vice)*  
Emily L. Gesmundo (*pro hac vice*)  
Barak Ferrazzano Kirschbaum & Nagelberg LLF  
West Madison Street, Suite 3900  
Chicago, Illinois 60606

*Counsel for Defendant*  
*Volkswagen Group of America*  
*d/b/a Audi of America, Inc.*

</td></tr>
</table>