**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| LEN STOLER, INC. d/b/a LEN STOLER AUDI,<br><br>     **Plaintiff,**<br><br>   - against -<br><br>VOLKSWAGEN GROUP OF AMERICA, INC. d/b/a AUDI OF AMERICA, INC.,<br><br>     **Defendant.** | Case No. 1:15CV1659-TSE/JFA |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

ARENT FOX LLP
Barbara S. Wahl (VSB No. 24647)
Arent Fox LLP
1717 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 857-6000

*Of Counsel*:
Russell P. McRory (*pro hac vice*)
Michael P. McMahan (*pro hac vice*)
Arent Fox LLP
1675 Broadway
New York, NY 10019
Tel: (212) 484-3942

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENTS OF UNDISPUTED FACTS ........................................................................... 2

ARGUMENT ............................................................................................................................ 2

     I.     Audi Has Violated Maryland Dealer Act § 15-207(h) ........................................... 2

          A.     Audi Has Violated Maryland Dealer Act § 15-207(h)(1)(i) ....................... 3

          B.     Audi Has Violated Maryland Dealer Act § 15-207(h)(2)(i) ....................... 4

          C.     Audi Has Violated Maryland Dealer Act § 15-207(h)(2)(ii) ..................... 8

          D.     Audi Has Violated Maryland Dealer Act § 15-207(h)(3) ........................... 9

     II.     Audi's Counterclaim and Fifth Affirmative Defense Are Barred by
Maryland Law ..................................................................................................... 12

     III.     Audi's Equitable Affirmative Defenses Fail under Maryland Law as They
Are Based Solely on Contractual Rights .............................................................. 12

     IV.     If The Court Has Any Remaining Questions About Maryland Law,
Respectfully It Should Certify Those Questions to the Court of Appeals of
Maryland .............................................................................................................. 13

CONCLUSION ....................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Audi of Smithtown, Inc. v. Volkswagen of Am., Inc.*,
   100 A.D.3d 669 (N.Y. App. Div. 2012) ...............................................................11

*Audi of Smithtown. Inc. v. Volkswagen Grp. of Am., Inc.*
   924 N.Y.S.2d 773 (N.Y. Sup. Ct. 2011), *aff'd*, 100 A.D.3d 669 (N.Y. App.
   Div. 2012) ..............................................................................................................4

*Beck Chevrolet Co., Inc. v. General Motors LLC*,
   27 N.Y.3d 379 (2016) ....................................................................................6, 7, 14

*Dickerson v. Longoria*,
   414 Md. 419 (2010) ..............................................................................................13

*Gardner v. Ally Financial Inc.*,
   488 Fed. Appx. 709 (4th Cir. 2012), *aff'd*, 430 Md. 515 (2013) ..........................14

*Governor of Md. V. Exxon Corp.*,
   279 Md. 410, 370 A.2d 1102 (1977) .....................................................................11

*Grattan v. Bd. of Sch. Comm'rs of Baltimore City*,
   805 F.2d 1160 (4th Cir. 1986) ..............................................................................13

*Jack Daniels Motors, Inc. v. Audi of America, Inc.*, OAL Dkt. No. MFC 3673-14
   (N.J. Office of Admin. L., Sept. 26, 2016) ...........................................................12

*Lehman Brothers v. Schein*,
   416 U.S. 386 (1974).............................................................................................13

*Mathews Enter. Inc. v. Chrysler Grp. LLC*,
   No. 13-cv-04236-BLF, 2016 WL 4269998 (N.D. Cal Aug. 15, 2016) ...................11

*Paccar Inc. v. Elliott Wilson Capitol Trucks LLC*,
   905 F. Supp. 2d 675 (D. Md. 2012).................................................................6, 14

*Stahle v. CTS Corp.*,
   817 F.3d 96, 114 (4th Cir. 2016) ..........................................................................14

*Vienna Metro LLC v. Pulte Home Corp.*,
   786 F. Supp. 2d 1076 (E.D.Va. 2011) ..................................................................13

**Statutes**

2009 Maryland Laws Ch. 747 (S.B. 668) ........................................................................6

MD 90 Day Rep., 2009 Sess., Part G .............................................................................................6

Maryland Dealer Act § 15-207 .......................................................................................... passim

Md. Code Ann., Cts. & Jud. Proc. § 12-603 ...............................................................................14

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) .......................................................................................9

Merriam-Webster Dictionary (2008) .......................................................................................8, 9

Plaintiff Len Stoler, Inc. d/b/a Len Stoler Audi ("Plaintiff" or "Stoler"), by undersigned counsel, respectfully submits this supplemental memorandum in support of its motion against Volkswagen Group of America, Inc. d/b/a Audi of America, Inc. ("Defendant" or "Audi") for partial summary judgment on Stoler's First, Second, and Third Causes of Action and against Audi's Counterclaim.  This supplemental memorandum is being filed pursuant to the invitation of the Court at the hearing on September 2, 2016, and the accompanying Order entered September 6, 2016 (ECF No. 49).

## PRELIMINARY STATEMENT

On August 12, 2016, Stoler filed its motion for partial summary judgment based upon the pleadings and undisputed facts, as Audi has admitted sufficient facts to establish liability to Stoler under Maryland law.  After full briefing and a hearing, this Court requested that the parties expand the record so that the Court may have before it a fully developed record upon which to decide whether Audi's conduct has violated the Maryland Dealer Act.[1]  Upon review of that record, it should be undeniable that Audi's admitted and stipulated conduct has violated Stoler's rights under the Maryland Dealer Act and that Audi is liable to Stoler for those violations. Moreover, Audi's Counterclaim is void under Maryland law, and Audi's corporate representative has made admissions that defeat Audi's equitable affirmative defenses.  Accordingly, Stoler's motion for partial summary judgment should be granted.

In the alternative, should this Court have remaining questions regarding the interpretation or application of Maryland law, respectfully, Stoler agrees with the Court's indication at the

---

[1] Capitalized terms have the same meaning as they did in Stoler's initial Partial Motion for Summary Judgment and accompanying papers.  (ECF Nos.43, 44, 45.)

hearing on September 2, 2016 that those questions should be certified to the Maryland Court of Appeals.

## STATEMENTS OF UNDISPUTED FACTS

The parties have submitted a Joint Statement of Undisputed Facts (ECF No. 52) ("JS") and Stoler has submitted a Supplemental Statement of Materials Facts that Should Be Undisputed (ECF No. 62) ("SS").  Stoler respectfully refers the Court to those statements for a complete listing of all facts that either are, or should be, undisputed and relevant to this motion.

## ARGUMENT

The basic contours of Stoler's argument were laid out in Stoler's initial and reply briefs in support of its partial motion for summary judgment (ECF Nos. 45 & 47), and Stoler will forgo repeating those arguments verbatim here.  The purpose of this supplemental memorandum is to draw the Court's attention to two questions on the application of Maryland law applied to the newly prepared lists of undisputed facts: that is, (i) whether Audi's conduct violates Maryland Dealer Act § 15.270(h)(1), (2), or (3); and (ii) whether Audi's affirmative defenses and counterclaims violate or fail under Maryland law.  Both questions should be answered in the affirmative.

## I.     Audi Has Violated Maryland Dealer Act § 15-207(h)

Stoler's motion for partial summary judgment on its first three causes of action turns upon the application of Maryland Dealer Act § 15-207(h).  That section states, in relevant part:

> (h)(1)(i) Any consumer rebates, dealer incentives, price or interest rate reductions, or finance terms that a manufacturer, distributor, or factory branch offers or advertises, or allows its dealers to offer or advertise, shall be offered to all dealers of the same line make.
>
> (h)(2) …a manufacturer, distributor, or factory branch may not:
>
> > (i) Require a dealer to alter or replace an existing dealership facility; or

2

> (ii) Deny, or threaten to deny, any benefit generally available to all dealers for a dealer's failure to alter or replace an existing dealership facility.
>
> (h)(3) A manufacturer, distributor, or factory branch may not reduce the price of a motor vehicle charged to a dealer… in exchange for the dealer's agreement to:
>
>> (i) Maintain an exclusive sales or service facility;
>>
>> (ii) Build or alter a sales or service facility….

Md. Transp. Code § 15-207(h).  While Section 15-207(h) has multiple subparts, each of Stoler's first three causes of action incorporate each subpart listed above.  Therefore, Stoler can win summary judgment on each of its three causes of action as long as it can prove Audi violated <u>any</u> subpart of Section 15-207(h). This supplemental memorandum will examine each subpart in turn.

**A.       Audi Has Violated Maryland Dealer Act § 15-207(h)(1)(i)**

Stoler proves that Audi violated Section 15-207(h)(1) if it can show that Audi failed to offer "to all dealers of the same line make" any "consumer rebates, dealer incentives, price or interest rate reductions" that Audi has offered or advertised to any of its dealers.

Audi has failed to offer the Exclusive Standards Bonus to all of its dealers on the same terms. ███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

3

██████████████████████████████████████████     ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

Since different dealers receive different offers to qualify for the Exclusive Standards

Bonus, Audi has not offered the same incentives "to all dealers of the same line make."

Md. Code Ann., Transp. § 15-207(h)(1)(i).  *See Audi of Smithtown. Inc. v. Volkswagen Grp. of*

*Am., Inc.* 924 N.Y.S.2d 773, 779 (N.Y. Sup. Ct. 2011), *aff'd*, 100 A.D.3d 669, 671 (N.Y. App.

Div. 2012) (Audi's CPO Purchase Bonus violated the New York Dealer Act even though the

plaintiff dealers actually earned the bonus because it was more difficult and more expensive for

them to earn the bonus compared to new dealers).

## B.      Audi Has Violated Maryland Dealer Act § 15-207(h)(2)(i)

Stoler proves that Audi has violated Section 15-207(h)(2)(i) if it can show that Audi

"required" Stoler to "alter or replace an existing dealership facility."  The statute defines

"require" as follows: "to impose upon a dealer a provision not required by law or previously

agreed to by a dealer in a franchise agreement, excluding business decisions by a manufacturer,

distributor, or factory branch which are uniformly applied to all Maryland dealers [of that line

make]…" Maryland Dealer Act § 15-207(a)(3).  Without question, Audi has "required" Stoler to

"alter or replace" its existing dealership facility.

First, Audi admits that Stoler was required under Audi's policies to build an exclusive

facility.  When Audi calculated Stoler's Market Opportunity Guide ("MOG") to exceed 400 new

units, Audi's policies dictated that Stoler "must have an exclusive facility."  (JS ¶ 14)  Audi

informed Stoler that its MOG had exceeded the 400-unit threshold in January 2014, going from

375 units to 643 units.  (JS ¶ 17)  ██████████████████████████████

██████████████████████████████████████████████

███████████████ *see also* JS ¶ 41 ("Exclusive is required for any dealership in a market with a market opportunity guide above 400 units annually."))

Audi's implementation of the MOG—and accompanying 400-unit threshold requirement to go exclusive—was to "impose upon [Stoler] a provision not required by law or previously agreed to by a dealer in a franchise agreement."  Stoler first signed a letter of intent with the Porsche Audi Division of Volkswagen in 1982, and a full Porsche Audi Dealer Agreement in 1983.  (JS ¶ 44; SS ¶ 28.)  Stoler was authorized to dual Audi with Porsche.  (JS ¶ 50.)  The current operative Dealer Agreement was signed by Audi and Stoler in 1997 with Stoler still authorized to dual with Porsche.  (JS ¶ 44.)  Neither the Dealer Agreement nor any of the referenced documents it incorporated at the time discussed the need for Stoler to have an exclusive facility.  (SS ¶ 4.)  ████████████████████████

███████████████████████████████████████████████

██████████████████████████████  To add insult to injury, the approved location for Stoler Porsche Audi could not have supported the grand "Exclusive" facility Audi envisioned, even if Stoler had kicked Porsche out and rebuilt the site.  (JS ¶ 39.)  Therefore, after Stoler had operated as an authorized dualled Porsche Audi facility with Audi's blessing for over 30 years at its approved location, Audi's insistence in 2014 that Stoler build a new, exclusive facility was to impose upon Stoler a provision not previously agreed to by Stoler in the franchise agreement.

Audi will argue that, in the Dealer Agreement, Audi reserved to itself the right to update its policies and standards at will, whatever they may be (*see* JS ¶ 46), and that Stoler has therefore "agreed in a franchise agreement" to Audi's *sui generis* decisions, regardless of the effects of those decisions on Stoler or the impact on the franchise.  That is directly contrary to

the entire purpose of the Maryland Dealer Act, which is to right an imbalance in bargaining

power between dealer and manufacturer/distributor.  *See Paccar Inc. v. Elliott Wilson Capitol*

*Trucks LLC*, 905 F. Supp. 2d 675, 685 (D. Md. 2012) ("The statute was amended in 2009 . . . to

'add and clarify the prohibitions for the protection of motor vehicle dealerships from

discriminatory or coercive business practices'") (quoting 2009 Maryland Laws Ch. 747 (S.B.

668); MD 90 Day Rep., 2009 Sess., Part G)).   Indeed, earlier this year, New York's highest

court—on certified questions from the Second Circuit—held that similar provisions in a

Chevrolet dealer's agreement with GM did not save GM from the statute:

> [A] franchisor may not insulate itself from the requirements and
> proscriptions of [the Dealer Act] by contractually reserving in the
> standard dealer agreement the power to [modify], as GM did in this
> case. Otherwise, a franchisor with superior bargaining power could
> easily circumvent the purpose of the Dealer Act by reserving the
> right to change the franchise terms at will, even where a change
> results in significant adverse effects on the dealer.

*Beck Chevrolet Co., Inc. v. General Motors LLC*, 27 N.Y.3d 379, 396 (2016).

Because Stoler did not agree to Audi's mandate for dealers to become exclusive in its

Dealer Agreement in 1997 (since it would be over a decade until that mandate was created),

Audi has statutorily "required" Stoler to "alter or replace its existing franchise facility," in

violation of the Maryland Dealer Act.

Second, Audi's conduct does not fall under the safe harbor provision found in the

definition of "require" in Section 15-207(a)(3).  Audi has not "uniformly applied" its

requirement that Audi dealers become exclusive to all Maryland Audi dealers.  Indeed, whether

and when a Maryland Audi dealer must become "exclusive" is determined on a case-by-case

basis, depending on the calculation of that dealer's MOG (and if it exceeds 400 units).  However,

the MOG is highly variable, and the variables are all within Audi's control.

6

Audi calculates a dealer's MOG in one of two ways, and the higher number wins.  (JS ¶ 31.)  In the first method, Audi takes the number of luxury vehicles in a defined vehicle segment (such as sedan, hatchback, SUV, etc.) that have been registered in a dealer's Primary Area of Influence ("PAI") and then multiplies that by Audi's market share in that particular segment, nationwide.  (*Id.*)  For example, if there have been 1000 luxury sedans sold in Stoler's PAI in a given year, and Audi captures 10% of the market share of luxury sedans nationwide, Stoler is expected to sell 100 luxury sedans in a year.  Audi performs this calculation for each segment in which Audi competes, and then adds up all of those "segment-level calculations" to arrive at a total MOG.[2] (*Id.*)  In the second method, Audi takes a dealer's business planning objective (or "BPO"), a number set by Audi, and tacks on the percent increase that Audi is forecasting for sales growth nationally.  (*Id.*)  For example, if Audi has set a dealer's BPO at 350 units, and Audi forecasts a 20% increase in Audi sales nationally the following year, that dealer's MOG will be $350 + 70 = 420$ units.

Audi is in control of the formula for the MOG and the variables that go into it.  The MOG's arbitrariness is apparent from the wildly swinging fluctuations seen in Stoler's MOG. Audi calculated Stoler's MOG for year-end 2013 at 375 units.  (JS ¶ 35.)  Then Audi calculated Stoler's MOG for year-end 2016 at 643 units, a 71% increase.  (JS ¶ 36.)  Then, paradoxically, Audi calculated Stoler's MOG for year-end 2018 decreased at 505 units, a 21% decrease.  (JS ¶ 37.)  ███████████████████████████████████████████████████████

███████████████████  And none of these MOGs appear to have any basis in reality.  For example, in

---

[2] Notably, this method of calculating a dealer's "expected sales" was declared illegal in New York as a sales performance standard because it fails to take into account most local market conditions and consumer preferences. *Beck Chevrolet Co., Inc. v. General Motors LLC*, 27 N.Y.3d 379 (2016).  Here, Audi takes this same fatally flawed sales performance metric and then adds its own subjective "projection" of future sales increases and calls it a MOG. Then Audi forces dealers to build multi-million dollar facilities based on that MOG.

2014, when Audi calculated Stoler's MOG to be 643, triggering the exclusive facility

requirement and ultimately this litigation, Stoler had never sold more than 300 new vehicles in a

given year, and Stoler's BPO had never been 400 units or higher.  (JS ¶ 33-34.)

It is clear from the myriad ways in which a dealer's MOG can be calculated and fluctuate

that Audi's requirement of exclusive facilities is not "uniformly applied" to all Audi dealers in

Maryland.  Audi's conduct does not qualify for the safe harbor.  Accordingly, Audi has violated

Section 15-207(h)(2)(i).

### C.    Audi Has Violated Maryland Dealer Act § 15-207(h)(2)(ii)

Stoler proves that Audi has violated Section 15-207(h)(2)(ii) if it can show that Audi

denied or threatened to deny to Stoler "any benefit generally available to all dealers" for Stoler's

"failure to alter or replace an existing dealership facility."  Audi does not dispute in the slightest

that it denied Stoler first the Exclusive Standards Bonus—then in 2016, any Standards Bonus

whatsoever—for Stoler's failure to build an exclusive facility and replace its existing facility.

(JS ¶ 12, 19, 22-24, 26, 29.)  Therefore, if this Court determines that the Standards Bonus is a

benefit "generally available to all dealers" (which it plainly is) then this Court must find that

Audi violated Section 15-207(h)(2)(ii).

Audi is trapped by its own attempts to thread the needle.  Audi's response to the argument

regarding Section 15-207(h)(1) above is that the Exclusive Standards Bonus is, in fact, "offered"

to all Audi dealers.  Necessarily, Audi's denial of such a benefit to Stoler for failure to build an

exclusive facility violates Section 15-207(h)(2).  Vice versa, if Audi claims Section 15-207(h)(2)

does not apply to the Exclusive Standards Bonus because it is not "available" to all dealers, then

Audi necessarily admits liability under Section 15-207(h)(1).  Indeed, the dictionary definition of

"offer" sinks Audi here.  Merriam-Webster Dictionary defines the verb "offer" as "to make

available."[3] *Offer*, *Merriam-Webster Dictionary* (2008).   The Maryland Dealer Act thus requires Audi to "make available" any dealer incentives to all dealers of the same line make.

Therefore, either the Exclusive Standards Bonus is a dealer incentive and benefit "made available" to all Audi dealers, or it isn't.  If it is "made available" to all Audi dealers, Audi's denial of that benefit to Stoler for failure to build a new exclusive facility violates (h)(2)(ii).  If it is not made available to all Audi dealers, it is not "offered" to all Audi dealers, and violates (h)(1)(i).  Audi cannot have it both ways.

Finally, there is no dispute that Stoler had the Brand-Dedicated Standard Bonus available to it, at least until January 1, 2016.  (JS ¶ 11, 18, 21.)  There is also no dispute that, if Stoler had not signed the Facility Agreement promising to build an exclusive facility, Audi would have denied Stoler the Brand-Dedicated Standard Bonus starting January 1, 2015.  (JS ¶ 55.)  Therefore, Audi threatened to deny (and eventually did deny) Stoler from receiving a benefit that had been previously available to Stoler, for Stoler's failure to alter or a replace an existing dealership facility.

Audi's conduct has violated Section 15-207(h)(2)(ii).

### D.      Audi Has Violated Maryland Dealer Act § 15-207(h)(3)

Stoler proves that Audi has violated Section 15-207(h)(3) if it can show that Audi "reduced the price of a motor vehicle charged to" Stoler in exchange for Stoler's agreement to "maintain an exclusive sales or service facility," or "build or alter a sales or service facility."  Audi does not dispute that Audi continued to provide Stoler the Brand Dedicated Standards Bonus in exchange for Stoler's agreement to build an exclusive sales and service facility.  (JS

---

[3] The Court should ignore Audi's reference to the Black's Law Dictionary (10th ed. 2014) definition of "offer," as Black's defines the formal noun form of a legal "offer," not the simple English verb "to offer" which the Maryland legislature used in § 15-207(h)(1)(i).

¶ 55.)  Nor does Audi dispute that Audi offered to provide Stoler the Exclusive Standards Bonus if Stoler had commenced construction on that exclusive sales and service facility.  (JS ¶ 9-12.) What Audi does dispute is that its bonuses have the effect of "reducing the price of a motor vehicle charged" to Stoler.  Audi's argument defies common sense, and the testimony of Audi's own employees and executives.

Audi pays its bonuses, including the Standards Bonuses at issue here, as a percentage of adjusted MSRP on each new car sold.  (JS ¶ 7.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████   ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Audi cannot and should not dispute that receipt of bonus money

"reduces the price" of a motor vehicle bought by Stoler.

Audi operates and encourages its dealers to operate as if bonuses lower the price of the

vehicles sold to dealers (*i.e.,* lowers their cost of goods sold).  Thus it is unsurprising that courts

consistently find that post-sale rebates have the effect of lowering the price of the goods sold.

*Audi of Smithtown, Inc. v. Volkswagen  of Am., Inc.*, 100 A.D.3d 669, 671 (N.Y. App. Div. 2012)

("[c]ontrary to Audi's contention, it is not relevant that the discount was not offered at the time

of purchase, since the rebates, although made at a later time, resulted in a lower actual price.");

*Mathews Enter. Inc. v. Chrysler Grp. LLC*, No. 13-cv-04236-BLF, 2016 WL 4269998 at *6-8

(N.D. Cal Aug. 15, 2016) (dealer survives summary judgment motion where it was undisputed

that the dealer's failure to earn Chrysler's post retail sale incentives resulted in a $700 per-

vehicle price disparity); *Governor of Md. V. Exxon Corp.*, 279 Md. 410, 445-446, 370 A.2d

1102, 1121 (1977) (discussing discriminatory effect on price by "voluntary allowances," which

were simply rebates offered on "a portion of the otherwise uniform… wholesale price" paid by

gasoline dealers).

Further, the receipt of the Standards Bonuses have a significant impact on the

profitability of Audi dealers.  (SS ¶ 26.)  For example, in 2014, Stoler Porsche Audi had a net

operating loss for its operations of $166,086, before bonuses and other income.  (SS ¶ 17.)  In

2014, Audi paid Stoler $340,554.57 in Brand Dedicated Standards Bonuses.  (JS ¶ 52.)

Therefore, receipt of the Brand Dedicated Standards Bonuses in 2014 took Stoler's books from

red to black.  Indeed, in administrative proceedings pending in New Jersey, Audi has agreed that

"receipt of Audi bonuses is crucial to the profitability" of Audi dealers.  See Jack Daniels

Motors, Inc. v. Audi of America, Inc., OAL Dkt. No. MFC 3673-14 at *3 (N.J. Office of Admin.

L., Sept. 26, 2016) (Sanders, C.A.L.J.) (a copy of which is attached to this memorandum as

Exhibit A.)  Audi therefore cannot deny the same proposition here.

Audi admits that it offered the Standards Bonuses in exchange for Stoler's promise to

build a new, exclusive facility.  Audi internally treats those Bonuses as if they lower the

wholesale price of a new car (and in fact, they do) and instructs its dealers to treat them the same

way.  Therefore, Audi has violated Section 15-207(h)(3).

## II.     Audi's Counterclaim and Fifth Affirmative Defense Are Barred by Maryland Law

Stoler previously briefed the many reasons under Maryland law that Audi's Counterclaim

and Fifth Affirmative Defense, based upon the Covenant Not to Sue found in the Facility

Agreement, are void under Maryland law.  (*See* ECF No. 45.)  As Audi's Counterclaim and Fifth

Affirmative Defense are based entirely upon the provisions of the Facility Agreement, which are

undisputed, no further material facts are required to elucidate these arguments.  Therefore, Stoler

respectfully refers the Court to its previous arguments here.  (*See id*.)

## III.    Audi's Equitable Affirmative Defenses Fail under Maryland Law as They Are Based Solely on Contractual Rights

Audi's Sixth Affirmative Defense seeks to bar Stoler based upon the doctrine of unclean

hands or *in pari delicto*.  Stoler believes that the statutory scheme established by the Maryland

Legislature precludes the use of these defenses, as discussed in its opening brief.  (ECF No. 45 at

15).  However, even if Maryland law did not preclude these claims, Audi's affirmative defenses

simply fail in light of the admissions of its corporate representative.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████  Since contractual provisions cannot be the basis of equitable defenses, Audi's

affirmative defenses fail.  *See Dickerson v. Longoria*, 414 Md. 419, 455 (2010) (some sort of

"fraudulent or illegal conduct" is "required before a court may apply the doctrine of unclean

hands"); *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1079 (E.D.Va. 2011)

(granting summary judgment motion on unclean hands defense because "uncleans hand is

inapplicable to breach of contract actions").

## IV.    If The Court Has Any Remaining Questions About Maryland Law, Respectfully It Should Certify Those Questions to the Court of Appeals of Maryland

Stoler believes that the statutory scheme at work here is quite clear and that it

unambiguously prohibits Audi's conduct.  If, however, the Court has questions about the

interpretation or application of Maryland law, respectfully, the Court should certify those

questions to the Court of Appeals of Maryland, as the Court indicated it might do at the hearing

on September 2, 2016 (ECF No. 49).

The case at hand presents an ideal candidate for certification, as the issues before the

Court are both novel and there is no reported case law.  *Grattan v. Bd. of Sch. Comm'rs of*

*Baltimore City*, 805 F.2d 1160, 1164 (4th Cir. 1986).  Whenever there is doubt as to the local

law, certification will "in the long run save time, energy, and resources and helps build a

cooperative judicial federalism.  Its use in a given case rests in the sound discretion of the federal

court."  *Lehman Brothers v. Schein*, 416 U.S. 386, 390-391 (1974).  Otherwise, when the issue

13

presented is not settled by local law, a court must "in a sense, trade our judicial robes for the garb

of prophet." *Stahle v. CTS Corp.*, 817 F.3d 96, 114 (4th Cir. 2016) (Thacker, J., concurring).

Maryland law allows its highest court, the Court of Appeals, to answer "a question of law

certified to it by a court of the United States, if the answer may be determinative of an issue in

pending litigation in the certifying court and there is no controlling appellate decision,

constitutional provision, or statute of this State."  Md. Code Ann., Cts. & Jud. Proc. § 12-603.

While Stoler believes that the statute at issue here is clear and determinative, if there is a

question of interpretation of that statute, Maryland's certification statute allows a court to certify

that interpretation question.  *See Gardner v. Ally Financial Inc.*, 488 Fed. Appx. 709 (4th Cir.

2012) (certifying questions regarding interpretation of statutory terms), *aff'd*, 430 Md. 515

(2013) (answering certified questions).

It is critical that the provisions at issue in this case be given their proper interpretation

and effect.  Dealer Acts are counterintuitive to traditional contract principles, but that is precisely

because they have been specifically enacted by state legislatures to correct an imbalance in

contractual bargaining power between dealers and manufacturers and counteract abusive

business practices by manufacturers.  *See, e.g., Paccar*, 905 F. Supp.2d at 685.  Without the

benefit of state appellate authority interpreting those statutes, district courts can be led down the

primrose path by manufacturers playing to those courts' traditional contract-law sympathies.  *See

Beck Chevrolet*, 27 N.Y.3d at 379 (answering certified questions of Second Circuit, *de facto*

reversing the holding of district court which interpreted the New York Dealer Act too narrowly).

If this Court has any doubt about the meaning and scope of the Maryland Dealer Act, we

respectfully urge the Court to obtain the input of Maryland's highest court.

## **CONCLUSION**

Audi has violated Maryland statute, as it has admitted in its pleadings, and therefore summary judgment on the issue of liability on Stoler's First, Second, and Third Causes of Action, and against Audi's Counterclaim, should be granted.

Respectfully submitted,

DATED:  September 30, 2016

*/s/ Barbara S. Wahl*
Barbara S. Wahl (VSB No. 24647)
Arent Fox LLP
1717 K Street, N.W.
Washington, D.C. 20006
202.857.6000 (Phone)
202.857.6395 (Fax)
barbara.wahl@arentfox.com

*Counsel for Plaintiff Len Stoler, Inc.*
*d/b/a Len Stoler Audi*

Of Counsel:

Russell P. McRory (*pro hac vice*)
Michael P. McMahan (*pro hac vice*)
Arent Fox LLP
1675 Broadway
New York, NY 10019
Tel: (212) 484-3942
Fax: (212) 484-3990