**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **LEN STOLER, INC., d/b/a LEN STOLER AUDI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:15-cv-1659** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **VOLKSWAGEN GROUP OF AMERICA, INC., d/b/a AUDI OF AMERICA, INC.,** | ) | |
| | ) | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

This diversity action is a dispute between plaintiff, Len Stoler, Inc., d/b/a Len Stoler Audi ("Stoler"), a former car dealership, and defendant, Volkswagen Group of America, Inc., d/b/a Audi of America ("AoA"), Stoler's former distributor. Stoler contends that AoA violated several provisions of Maryland Transportation Code ("MTC") § 15-207 in the course of their business relationship.

Following full discovery, the parties filed cross motions for summary judgment. As those motions have been fully briefed and twice argued orally, the matter is now ripe for disposition.

## I.

The following are the undisputed material facts derived from the parties' statements of undisputed facts, including a joint stipulation of undisputed facts ("JS").

- Stoler is a corporation organized and existing under the laws of Maryland, with a principal place of business in Owings Mills, Maryland.

- From 1982 until May 2, 2016, Stoler was a licensed and authorized Audi franchisee in the business of buying and selling Audi vehicles. Stoler sold its Audi-related assets in May 2016.

- AoA is a corporation organized and existing under the laws of New Jersey, with its principal place of business in Virginia.

- AoA purchases Audi vehicles from corporate affiliates in Germany and then imports and sells these vehicles to franchised Audi dealers throughout the United States.

- AoA and Stoler signed their operative franchise agreement (the "Dealer Agreement") in 1997.

- The Dealer Agreement incorporated several other provisions, including, but not limited to, "[t]he Dealer Agreement Standard Provisions (the "Standard Provisions"), the Dealer Operating Plan (the "Operating Plan"), [and] the Audi Retail Capacity Guide (the "Retail Capacity Guide")[.]" JS ¶ 45.

- Beginning in 2008, the Retail Capacity Guide implemented a Market Opportunity Guide ("MOG"), which is a projection of Audi sales for that dealer as calculated by AoA.

- The Standard Provisions, which were incorporated by reference into the Dealer Agreement, state that Stoler's dealership premises "will conform to the requirements of this Agreement, the Operating Standards and such other standards as [AoA] may prescribe from time to time, taking into consideration the number of Authorized Automobiles in operation in [Stoler]'s Area and reasonably foreseeable future requirements." JS ¶ 46.

- AoA maintains a Margin and Bonus Program, which includes dealer incentives. Such incentives include cash bonuses, provided that the dealer meets certain criteria.

- The Margin and Bonus Program applies to all Maryland dealers.

- One of the bonuses in the Margin and Bonus Program is the "Standards Bonus."

- The Standards Bonus is paid as a percentage of Adjusted MSRP[1] of each new car the dealer sells.

- Eligible Audi dealers are paid a Standards Bonus on the following basis:

  o "Universal" Audi dealers meet minimum requirements and qualify for a Standards Bonus worth 1% of a vehicle's adjusted MSRP.

  o "Brand Dedicated" Audi dealers meet additional criteria and standards, yet may share facilities with other franchises. Brand Dedicated Audi dealers qualify for a Standards Bonus worth 2.35% of adjusted MSRP.

---

[1] MSRP stands for "manufacturer's suggested retail price." Adjusted MSRP takes into account different vehicle options, destination charges, and other additions to (or subtractions from) the base model's MSRP.

- o "Exclusive" Audi dealers meet the same standards as a "Brand Dedicated" dealer, but also have exclusive Audi facilities and staff. "Exclusive" Audi dealers qualify for a Standards Bonus worth 3.75% of adjusted MSRP.

- To receive any Standards Bonus, a dealer must meet the following minimum qualifying criteria: (i) the dealer must have a facility that complies with that dealer's MOG, (ii) the dealer must achieve a score of 85% at the annual evaluation based on the Audi Dealer Operating Standards Checklist, and (iii) the dealer must maintain monthly compliance with the Dealer Operating Standards Scorecard, which sets forth additional criteria.

- If a dealer's MOG exceeds 400 units, that dealer must operate out of an exclusive facility to qualify for a Standards Bonus.

- AoA updates each dealer's MOG every three to four years.

- In calculating a dealer's MOG, AoA uses two separate formulas. The formula yielding the higher sales projection provides the dealer's MOG.

- By the beginning of 2014, all Maryland dealers' MOGs exceeded 400, and thus the dealer agreements and incorporated obligations of every Maryland Audi dealer called for each dealer to operate out of exclusive facilities.

- During all times relevant to this case, the only Standards Bonus Stoler has ever received is the Brand Dedicated bonus, worth 2.35% of adjusted MSRP. Stoler has never received the Exclusive Standards Bonus because Stoler has never had an exclusive Audi facility, nor had Stoler ever commenced construction of one.

- In addition to offering dealer incentives such as the Standards Bonus program, AoA makes several benefits available to all Maryland Audi dealers, regardless of the type of facility any such dealer operates, including:

  - o a "goodwill fund," from which dealers can take up to $5,000 per repair to pay for service costs not covered by a warranty;

  - o a "service-mailers" program whereby AoA splits with dealers the cost of mailing service advertisements to customers;

  - o free, next-day delivery on parts;

  - o access to "iAudi," AoA's suite of web-tools providing information, support, and applications to help dealers sell and service vehicles; and

  - o several training-related benefits.

3

- On September 21, 2011, Audi dealers, including Stoler, received a memorandum from AoA, explaining AoA's newly announced "Grandfather Policy" and "Cure Policy."

- The Grandfather Policy and Cure Policy allowed non-exclusive dealers whose MOGs exceeded 400—and thus needed exclusive facilities to qualify for a Standards Bonus—to continue receiving Standards Bonuses so long as those dealers took certain steps to operate from exclusive facilities.

- The Grandfather and Cure Policies gave dealers three years to bring their facilities back into compliance with their MOGs and brand standards and to continue receiving Standards Bonus payments.

- On January 10, 2014, Stoler received a letter from AoA explaining that, based upon AoA's MOG projections for 2014-2016, Stoler's MOG now exceeded 400.

- Given that Stoler's MOG was above the 400-unit threshold, AoA's Retail Capacity Guide provided that Stoler must operate from an exclusive Audi facility.

- Because Stoler's Audi facility was not exclusive—and thus not compliant with the terms of Stoler's MOG or Retail Capacity Guide—Stoler would not have been entitled to receive any Standards Bonuses in 2014 without the Grandfather and Cure Policies.

- On April 25, 2014, Stoler received a letter from AoA summarizing Stoler's scores on AoA's evaluation criteria for the Standards Bonus. The letter indicated that Stoler was eligible to receive Standards Bonuses, but noted that the eligibility was based in part on the Grandfather Policy and Cure Policy. The letter also stated that Stoler would remain eligible for Standards Bonuses in accordance with AoA's Cure Policy, advising that "[a]s your dealership is affected by the Cure Policy, your [area general manager] will be contacting you regarding your facility deficiencies and Cure Policy timelines." JS ¶ 18.

- On October 16, 2014, Stoler received a letter from AoA reviewing the previous communications between the parties regarding the Grandfather Policy and Cure Policy. The letter stated that "in order to maintain Standards Bonus eligibility beyond 2014, Len Stoler Audi is required to enter a Facility Letter of Intent (LOI) by December 31, 2014." JS ¶ 19.

- It was impracticable to convert Stoler's existing facility into an exclusive Audi facility.

- In mid-January 2015, AoA and Stoler entered into a "Facility Agreement," in which Stoler agreed to construct an exclusive Audi facility, and AoA agreed to pay Stoler the Exclusive Standards Bonus once construction on the new facility commenced.

- Negotiations of the Facility Agreement spanned approximately one month. Stoler's counsel negotiated the Facility Agreement on Stoler's behalf. Some of the changes that Stoler's counsel requested were incorporated into the final draft of the contract.

- The Facility Agreement provides, "[Stoler] and its legal counsel have reviewed the laws applying to dealer/manufacturer relations. [Stoler] agrees that the Facility requirements as expressed in this Agreement are reasonable and necessary in view of the need to service the public and further that the economic conditions in the industry and specifically in [Stoler]'s relevant market area support this action." JS ¶ 47.

- The Facility Agreement also represents that "[b]oth parties have had legal counsel of their choice review this Agreement and are fully advised as to the legal and binding nature of this Agreement." JS ¶ 48.

- In signing the Facility Agreement, Stoler "agree[d] and covenant[ed] not to sue AoA with respect to any alleged damages [Stoler] may suffer as a result of [Stoler]'s loss of the right to receive any Standards Bonus . . . arising out of [Stoler]'s failure to perform its obligations under this Agreement." JS ¶ 49.

- The Facility Agreement further contemplates that Stoler would remain eligible to receive Standards Bonus payments at a Brand Dedicated level, worth 2.35% of adjusted MSRP; but AoA would cease paying Stoler any Standards Bonus payments if Stoler had not begun constructing an exclusive facility by December 31, 2015.

- If Stoler had not signed a letter of intent to build an exclusive facility in accordance with the Grandfather and Cure Policies, AoA would have ceased paying Stoler the Standards Bonus as of January 1, 2016.

- On December 1, 2015, nearly a year after Stoler signed the Facility Agreement, a meeting between Stoler and AoA representatives occurred. During that meeting, the parties discussed Stoler's performance and facility obligations. Additionally, AoA representatives asked Stoler's principals to consider whether Stoler would like to sell its Audi franchise or risk termination of the Dealer Agreement.

- Stoler did not commence construction on a new facility by December 31, 2015. Therefore, Stoler no longer satisfied the terms of the Grandfather and Cure Policies. Accordingly, as of January 1, 2016, Stoler was ineligible to receive any Standards Bonus.

- As a result, on January 1, 2016, AoA ceased paying Stoler the Brand Dedicated Standards Bonus. Had Stoler commenced construction, Stoler's Standards Bonus eligibility would have been reinstated.

- It would have cost Stoler at least $10 million dollars to build an exclusive facility, including the cost of real estate.

- On May 2, 2016, Stoler sold its Audi franchise to a third party for $5 million, plus an additional amount for Stoler's assets, including inventory.[2]

- In 2013, AoA paid Stoler $343,339.49 in Brand Dedicated Standards Bonuses. In 2014, AoA paid Stoler $340,554.47 in Brand Dedicated Standards Bonuses. In 2015, AoA paid Stoler $288,312.56 in Brand Dedicated Standards Bonuses.

AoA now moves for summary judgment on the remaining claims[3] in Stoler's amended complaint, which claims invoke the following MTC provisions:

- § 15-207(h)(1)(i) (the "Offer Claim");

- § 15-207(h)(2)(i) (the "Require Claim");

- § 15-207(h)(2)(ii) (the "Benefit Claim");

- §§ 15-207(h)(3)(i) & (ii) (the "Price Reduction Claim"); and

- § 15-207(b) (the "Coercion Claim").

Stoler, in its cross motion, seeks summary judgment on four of Stoler's MTC claims: (i) the Offer Claim, (ii) the Require Claim, (iii) the Benefit Claim, and (iv) the Price Reduction Claim. Stoler also seeks summary judgment on AoA's sole counterclaim and three affirmative defenses, which invoke a covenant not to sue and the doctrines of *in pari delicto* and unclean hands.

---

[2] Although the record does not appear to disclose the amount that Stoler received for its assets, including inventory, such information is not material to the resolution of the cross motions for summary judgment.

[3] Stoler's complaint originally alleged six Counts and included a demand for injunctive relief. At this stage, however, Stoler is no longer pursuing its Fourth, Fifth, and Sixth Counts, nor is Stoler seeking injunctive relief. Presently, Stoler alleges three Counts against AoA for violations of MTC §§ 15-207(b) & (h).

## II.

To begin with, it is useful to rehearse the familiar and uncontroversial summary judgment standard. Pursuant to Rule 56, Fed. R. Civ. P., summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial," and summary judgment is properly awarded to the movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted). The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the non-moving party, to defeat the motion, must set forth specific facts showing that there is a genuine issue for trial. *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party and all reasonable inferences from the evidence must be drawn in favor of that party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). And where, as here, the parties have filed cross motions for summary judgment, each motion must be reviewed "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotation marks omitted).

## III.

The parties correctly agree that Maryland law governs the resolution of the issues presented on summary judgment.[4] It is therefore useful to summarize the general Maryland principles of statutory interpretation, particularly because there is a dearth of decisional law interpreting MTC § 15-207(h), the principle provision at issue.[5]

In Maryland, "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 273 (2010). Analysis must "look first to the language of the statute, giving it its natural and ordinary meaning." *Dept. of Assessments & Taxation v. Md.-Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 13 (1997). When "the meaning of that plain language is clear and unambiguous," the interpretative task goes no further. *Montgomery Cnty. v. Deibler*, 423 Md. 54, 61 (2011) (quotation marks omitted). In this regard, "in deciding what a term's ordinary and natural meaning is, [courts] may, and often do, consult the dictionary." *Dept. of Assessments*, 348 Md. at 14. If, however, "the meaning of the plain language is ambiguous or unclear," it is necessary "to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based." *Breitenbach v. N.B. Handy Co.*, 366 Md. 467, 473 (2001). Importantly, Maryland law requires that the construction or interpretation of a statute not be "unreasonable, illogical, or inconsistent with

---

[4] The parties also agree that Stoler is a "dealer" and that AoA is a "distributor," as those terms are defined in the MTC. *See* MTC § 15-101(c)(2)(i)(1) (defining a "dealer"); *id.* § 15-201(b)(1) (defining a "distributor").

[5] Federal district courts may certify a novel question of Maryland law to the Maryland Court of Appeals if the answer may be dispositive of an issue in pending litigation. Md. Code, Cts. & Jud. Proc. § 12-603; *see also* Rule 8-305, Md. Rules (setting forth procedure for certifying questions). Neither party has sought certification of any question.

common sense." *Stoddard v. State*, 395 Md. 653, 663 (2006) (quoting *Blake v. State*, 395 Md. 213, 224 (2006)).[6]

Analysis now turns to the parties' motions for summary judgment.[7]

## IV.

### A. The Offer Claim, § 15-207(h)(1)(i)

The first claim on which the parties' summary judgment motions focus is Stoler's allegation that AoA violated MTC § 15-207(h)(1)(i). Section 15-207(h)(1)(i) states in pertinent part that "[a]ny consumer rebates, dealer incentives, price or interest rate reductions, or finance terms that a . . . distributor . . . offers . . . shall be offered to all dealers of the same line make." MTC § 15-207(h)(1)(i). Here, summary judgment on Stoler's Offer Claim is properly awarded to AoA, because the undisputed record evidence demonstrates that Audi's Standards Bonus program was indeed offered to all dealers of the same line make.

Stoler, in its motion for summary judgment, confirms that its Offer Claim is that AoA illegally implemented a "two-tiered bonus program," through which AoA allegedly "offered" one incentive (the Exclusive Standards Bonus) only to dealers with exclusive Audi facilities, and a less remunerative incentive (the Brand Dedicated Standards Bonus) to dealers with non-

---

[6] Stoler urges that because § 15-207 is a "remedial statute," the statutory text should be construed liberally. *See, e.g.*, *Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606 (2010); *Elste v. ISG Sparrows Point, LLC*, 188 Md. App. 634 (2009). Assuming without deciding that § 15-207(h) is remedial, it is important to note that the "principle of liberal construction . . . is unnecessary when the meaning of the statute is clear." *Elste*, 188 Md. App. at 653 (citing *Design Kitchen & Baths v. Lagos*, 388 Md. 718, 724 (2005)). Moreover, the principle of liberal construction does not obviate the prohibition on constructions that are "unreasonable, illogical or inconsistent with common sense." *See Stoddard*, 395 Md. at 663.

[7] As the parties have correctly noted, it is appropriate to resolve the cross motions for summary judgment on Stoler's § 15-207 claims by isolating each applicable statutory subsection.

9

exclusive facilities. Indeed, the amended complaint, fairly read, is limited to this claim of liability based on AoA's alleged implementation of a "two-tiered bonus program."[8]

This claim fails. The essential flaw in Stoler's § 15-207(h)(1)(i) claim is that Stoler focuses on the disparate *results* of the incentive program offer—an offer that some dealers accepted, and others did not—rather than on the scope of the offer, which was made to all Maryland Audi dealers. Indeed, the undisputed factual record discloses that AoA's Standards Bonus program was "offered to all dealers of the same line make," as all dealers were offered the same terms, criteria, and conditions under that program. MTC § 15-207(h)(1)(i); *see also Offer*, Black's Law Dictionary 1189 (an "offer" is "[t]he act of presenting something for acceptance" often "conditioned on an act . . . or return promise being given in exchange."). In response to AoA's offer, each dealer could choose which conditions to satisfy and, by extension, which bonus to receive. Thus, in offering the Standards Bonus, AoA offered a *dealer incentive*, which is expressly permitted by the MTC. *See* MTC § 15-207(h)(1)(i). And it is inherent in an incentive payment that the recipient must do something to be paid.[9] In fact, it is undisputed that Stoler, like

---

[8] *See* Am. Compl. ¶ 1 (alleging that AoA "fail[ed] to pay Plaintiff the full amount of bonus monies on the ground that Plaintiff does not have an exclusive Audi facility"); *id.* ¶ 17 ("Up until now, [AoA] has only been paying Len Stoler the lower level of these two bonuses . . . because Len Stoler Audi is housed in the same facility with [Stoler's Porsche franchise]. Only if dealers maintain an Exclusive Audi facility does Audi pays [sic] dealers the higher Exclusive Standards Bonus."); *id.* ¶ 30 (alleging that AoA "breached the [MTC] by only making reduced levels of the Standards Bonus available to Len Stoler than are available to other Audi franchisees on the ground that Len Stoler does not have an exclusive Audi facility"); *id.* ¶ 66 ("[AoA] has refused to pay Len Stoler the higher Exclusive Bonus equal to 3.75% of MSRP . . . on the ground that Len Stoler does not have an exclusive facility . . . ."). Indeed, Stoler, throughout the amended complaint, alleges that AoA's use of bonus "tiers" is violative of the MTC. *See id.* ¶¶ 17, 20, 21, 23, 52, 54-55, 57, 59, 64.

[9] *See Incentive*, Webster's Third New International Dictionary of the English Language Unabridged (Philip Babcock Gove, ed., 1993) (defining "incentive" as "something that incites or has a tendency to incite to determination or action: something (as fear or hope of reward) that constitutes a motive or spur").

any Maryland Audi dealer, would have received the higher bonus had Stoler chosen to meet the incentive's conditions. Therefore, AoA is entitled to summary judgment on Stoler's Offer Claim.

Seeking to avoid this result, Stoler, in a supplemental summary judgment brief, introduced for the first time a new § 15-207(h)(1)(i) claim. Indeed, Stoler seems to have recognized the defect in its original claim that AoA treated *exclusive* Audi dealers differently from *non-exclusive* Audi dealers; now, Stoler contends that AoA violated § 15-207(h)(1)(i) by treating *new* dealers differently from *established* dealers, a claim not present in the amended complaint. According to this new claim, dealers that recently bought an Audi franchise were allegedly offered the Exclusive Standards Bonus merely upon agreeing to build an exclusive facility, whereas established dealers were offered the Exclusive Standards Bonus only upon breaking ground on an exclusive facility. Yet, because this new claim is neither stated nor forecasted in the amended complaint, Stoler's new claim is not cognizable at this stage and not properly a subject for summary judgment. In this respect, it is well-settled that "a plaintiff may not raise new claims after discovery has begun without amending his complaint." *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (affirming grant of summary judgment against plaintiff).[10] Thus, Stoler's novel claim of liability will not be reached or decided unless Stoler again amends its complaint.

In sum, AoA is entitled to summary judgment on Stoler's Offer Claim based on the alleged "two-tiered bonus program."[11]

---

[10] *See also Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998) ("[A] plaintiff must at least set forth enough details . . . to provide defendant and the court with a fair idea of the basis of the complaint and the legal grounds claimed for recovery." (quotation marks omitted)).

[11] AoA also contends that it is entitled to summary judgment because Stoler failed to establish damages arising from the alleged § 15-207(h)(1)(i) violation. This argument need not be reached.

## B. The Require Claim, § 15-207(h)(2)(i)

The parties have also filed cross motions for summary judgment on Stoler's § 15-207(h)(2)(i) claim that AoA unlawfully "required" Stoler to have an exclusive Audi facility. In relevant part, § 15-207(h)(2)(i) provides that a vehicle distributor may not "[r]equire a dealer to alter or replace an existing dealership facility." MTC § 15-207(h)(2)(i). This claim also fails, because the undisputed record discloses that AoA did not "require" Stoler to alter or replace Stoler's facility, within the meaning of § 15-207.

Importantly, the MTC defines the term, "require," as:

impos[ing] upon a dealer a provision not required by law or previously agreed to by a dealer in a franchise agreement, excluding business decisions by a . . . distributor . . . which are uniformly applied to all Maryland dealers in new vehicles of the . . . distributor[.]

*Id.* § 15-207(a)(3). As this statutory definition makes clear, there are two circumstances in which AoA cannot be said to have "required" a Maryland Audi dealer to alter or replace its dealership facilities: (i) if the dealer "previously agreed . . . in a franchise agreement" to alter or replace the facility, or (ii) if AoA made a "uniform[]" "business decision" to have "all Maryland dealers in new [Audi] vehicles" alter or replace their dealership facilities. *See id.* The undisputed facts demonstrate that both circumstances are present here. Thus, AoA is entitled to summary judgment on Stoler's Require Claim.

First, the undisputed factual record shows that Stoler "previously agreed," within the meaning of § 15-207(a)(3), to build an exclusive facility. Importantly, it is undisputed that the parties' Dealer Agreement incorporated the Standard Provisions and Retail Capacity Guide, which explicitly provided that AoA could prescribe new facility standards "from time to time," "taking into consideration . . . reasonably foreseeable future requirements." JS ¶ 46. Indeed, those prescribed standards—specifically, the Retail Capacity Guide and MOG calculation—

12

eventually prescribed that Stoler build an exclusive facility. Thus, because Stoler had "previously agreed" to the obligation to build an exclusive facility, AoA did not "require" Stoler to alter or replace Stoler's facility. *See* MTC § 15-207(a)(3).

In opposition to this conclusion, Stoler contends that although the parties signed the Dealer Agreement in 1997, the Retail Capacity Guide did not implement an MOG requirement until 2008, and thus Stoler's obligation to build an exclusive facility was not previously agreed to. This argument fails for the simple reason that the parties had previously agreed, in 1997, to a provision permitting AoA to prescribe new facility standards from time to time based on reasonably foreseeable future requirements. *See* JS ¶ 46. And the undisputed record evidence discloses that it was reasonable to anticipate that a dealership, over the course of two decades, may need to become exclusive. In fact, Stoler itself represented in the Facility Agreement that exclusive facilities were "reasonable and necessary" given the "need to service the public" and "economic conditions in the industry and . . . in [Stoler]'s relevant market area[.]" *Id.* ¶ 47.[12]

Also unavailing is Stoler's reliance on *Beck Chevrolet Co. v. Gen. Motors LLC*, 27 N.Y.3d 379 (2016). Put simply, the *Beck* decision is inapposite, because the *Beck* court analyzed whether a distributor's decision to alter a dealer's area of responsibility complied with a New York law prohibiting a distributor from modifying a franchise agreement. *See* N.Y. Veh. &

_____

[12] Importantly, the parties executed the Dealer Agreement before § 15-207(h) was enacted. Thus, if Stoler is correct that § 15-207(h)(2)(i) operates retroactively to prohibit AoA from exercising its pre-existing, contractual right to prescribe new facility standards, then this statutory provision would raise a question under the Contract Clause of the federal Constitution. *See, e.g.*, U.S. Const. art. I, § 10, cl. 1; *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400 (1983) (setting forth a three-part test under the Contract Clause); *City of Charleston v. Pub. Serv. Comm'n of W. Va.*, 57 F.3d 385 (4th Cir. 1995) (applying the three-part test). This constitutional question, however, need not be answered here because AoA is entitled to summary judgment on Stoler's Require Claim.

Traffic L. § 463. No such provision has been invoked in the instant case. Thus, AoA is entitled to summary judgment on Stoler's Require Claim, because the parties "previously agreed" in their Dealer Agreement to alter or replace Stoler's facility. *See* MTC § 15-207(a)(3).

Second, and independently, AoA is entitled to summary judgment on Stoler's Require Claim because AoA made a "business decision" that was "uniformly applied" to all Maryland dealers, and thus AoA cannot be said to have "required" Stoler to alter or replace a dealership facility. *See id.* §§ 15-207(a) & 15-207(h)(2)(i). Indeed, the undisputed factual record reflects (i) that Stoler used a uniform process—the MOG calculations—to determine whether any Maryland Audi dealer must operate out of exclusive facilities, and (ii) that in practice, all Maryland dealers' MOGs exceed 400, and thus all Maryland Audi dealers have been called upon to operate from exclusive facilities. These are uniform business decisions that foreclose Stoler's Require Claim.

Seeking to avoid this result, Stoler contends that AoA did not uniformly apply its decisions whether a dealer must operate out of exclusive facilities, because AoA, in applying its MOG formulas, had unique inputs and outputs for each Audi dealer. This argument fails because Stoler overlooks the fact that AoA uses the same MOG formulas and calculation methods for each dealer. Moreover, Stoler does not contest that, as a factual matter, AoA has called upon all Maryland dealers to operate out of exclusive facilities. Indeed, this undisputed fact is dispositive, as it pellucidly demonstrates the uniformity of AoA's business decision, and thus AoA cannot be said to have "required" Stoler to alter or replace its facility. *See id.* § 15-207(a)(3).

Stoler further asserts that this reading of "require" is too narrow. In making this argument, Stoler relies on *dictum* in *Jaguar Land Rover North America, LLC v. Manhattan Imported Cars, Inc.*, 477 F. App'x 84 (4th Cir. 2012). Specifically, the Fourth Circuit in *Jaguar*

14

observed that "a distributor may not 'require' an existing dealer . . . to remove from its facilities another distributor's vehicles[.]" *Id.* at 90 (citing MTC § 15-207(d)). Simply put, Stoler's reliance on this *dictum* is misplaced, because Stoler has simply begged the question. No doubt AoA is prohibited from "requir[ing]" Stoler to remove a competitor's vehicles from Stoler's facilities, just as AoA is prohibited from "requir[ing] Stoler to alter or replace a facility—the MTC says as much. *See* MTC §§ 15-207(d) & (h)(2)(i). But the Fourth Circuit in *Jaguar* did not—indeed, could not—interpret what the statutory term, "require," means in the context of § 15-207(h)(2)(i), because *Jaguar* dealt with a version of the MTC that predated the enactment of subsection (h). In fact, the *Jaguar* court held, in relevant part, that § 15-207 was inapplicable to the facts of that case. 477 F. App'x at 90. Thus, the *Jaguar* decision is inapposite.

In sum, because AoA's conduct does not meet the statutory definition of "require," MTC § 15-207(h)(2)(i), summary judgment on Stoler's Require Claim is properly awarded to AoA.

## C. The Benefit Claim, § 15-207(h)(2)(ii)

Next, analysis turns to the parties' cross motions for summary judgment on Stoler's Benefit Claim, § 15-207(h)(2)(ii). This statutory provision prohibits a distributor from "[d]eny[ing] or threaten[ing] to deny any benefit generally available to all dealers for a dealer's failure to alter or replace an existing dealership facility." MTC § 15-207(h)(2)(ii). In essence, Stoler contends that AoA violated § 15-207(h)(2)(ii) because the Standards Bonus was a "benefit generally available" that AoA withdrew based on Stoler's failure to operate out of an exclusive facility. *See id.*

This claim fails because the Standards Bonus was a dealer *incentive*, not a "benefit generally available to all dealers." *Id.* As stated above, an incentive necessarily includes conditions or criteria that the recipient must meet; indeed, that is how an incentive program

*incentivizes* specific acts.[13] By contrast, a "benefit generally available" is a useful aid[14] that is accessible to, or may be obtained and used by,[15] every member of a group, not confined by specialization or careful limitation.[16] In other words, a "benefit generally available" within the meaning of the MTC is a useful aid that each Audi dealer receives simply by being an Audi dealer. And the undisputed record discloses several examples of such benefits: AoA's "goodwill fund," service-mailers, next-day parts delivery program, online iAudi applications, and trainings, to name a few. By contrast, the Standards Bonus program is not a "benefit generally available" because although all Audi dealers of the same line make must be *offered* the incentive, *see* MTC § 15-207(h)(1)(i), being an Audi dealer is insufficient to receive incentive payments. Rather, as one would expect with any incentive, a dealer must satisfy certain conditions to earn a Standards Bonus.

A common-sense reading of the MTC also dictates the conclusion that the Standards Bonus program was not a "benefit generally available" within the meaning of § 15-207(h)(2)(ii). Indeed, to accept Stoler's position, which equates an incentive and a benefit generally available, is to conclude that the MTC permits a distributor to offer an incentive program, but prohibits that

---

[13] *See supra* note 9 and accompanying text.

[14] *See Benefit*, Webster's Third New International Dictionary of the English Language Unabridged (Philip Babcock Gove, ed., 1993) (defining "benefit" as a "useful aid"). Importantly, the MTC does not define a "benefit generally available," so it is appropriate to consult the dictionary. *See Dept. of Assessments*, 348 Md. at 14.

[15] *See Available*, Webster's Third New International Dictionary of the English Language Unabridged (Philip Babcock Gove, ed., 1993) (defining "available" as "capable of use," "accessible," and "may be obtained").

[16] *See General*, Webster's Third New International Dictionary of the English Language Unabridged (Philip Babcock Gove, ed., 1993) (defining "general" as "involving or belonging to every member of a class, kind, or group," and "not confined by specialization or careful limitation"); *Generally*, *id.* (defining "generally" as "in a general manner").

distributor from implementing the incentive program's conditions. In other words, Stoler's construction of the MTC creates the absurd result that the statute allows an incentive program so long as that program does not incentivize. Such an interpretation is "unreasonable, illogical, [and] inconsistent with common sense." *Stoddard*, 395 Md. at 663.

In essence, Stoler's argument in opposition to this result is that no set of facts could establish a § 15-207(h)(2)(ii) violation—and thus the Maryland Legislature accomplished nothing by enacting this subsection—if Stoler's Benefit Claim does not obtain here. This argument is unpersuasive, because there are several "benefits generally available," listed *supra*, that AoA likely could not deny based on a dealer's refusal to alter or replace a dealership facility. MTC § 15-207(h)(2)(ii). Moreover, the conclusion reached on Stoler's Benefit Claim does not mean that the offering of an incentive program immunizes a distributor from § 15-207 liability. Indeed, whereas § 15-207(h)(1)(i) permits distributors to offer dealer incentives, § 15-207(h)(3) prohibits a distributor from "reduc[ing] the price of a motor vehicle charged to a dealer . . . in exchange for the dealer's agreement" to build or alter a sales facility, or to maintain an exclusive facility. MTC § 15-207(h)(3); *see also infra* Part IV.D (discussing § 15-207(h)(3)). Similarly, § 15-207(b) prohibits a distributor from "coerc[ing] any dealer to make any agreement with the . . . distributor[.]" *See* MTC § 15-207(b); *see also infra* Part IV.E (discussing § 15-207)(b)).

In summary, AoA is entitled to summary judgment on Stoler's § 15-207(h)(2)(ii) claim.

### D. The Price Reduction Claim, §§ 15-207(h)(3)(i) & (ii)

Also at issue are the parties' cross motions for summary judgment on Stoler's Price Reduction Claim arising under §§ 15-207(h)(3)(i) & (ii). These subsections provide that a distributor may not "reduce the price of a motor vehicle charged to a dealer or provide different financing terms to a dealer in exchange for the dealer's agreement to (i) [m]aintain an exclusive

sales or service facility; or (ii) [b]uild or alter a sales or service facility[.]" MTC §§ 15-207(h)(3). Here, the cross motions for summary judgment must be denied, as there exist genuine disputes of material fact precluding the award of summary judgment to either party.

First, a threshold jurisdictional question must be addressed, as AoA has challenged Stoler's standing to raise the Price Reduction Claim.[17] Specifically, AoA argues that Stoler cannot show an injury in fact likely to be redressed by a favorable judicial decision, on the ground that any price reductions in vehicles sold to Stoler would have *benefitted*, not injured, Stoler. This argument is unpersuasive. To establish standing at the summary judgment stage, Stoler must set forth specific facts—which are taken as true—demonstrating that Stoler suffered (i) an injury in fact, (ii) fairly traceable to the challenged conduct of the defendant, and (iii) likely to be redressed by a favorable judicial decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Stoler has met this burden by pointing to record evidence (i) that Stoler sold its franchise in part because of the Facility Agreement, and (ii) that, when Stoler sold its Audi business, Stoler suffered millions of dollars in damages due to lost sales and diminution in franchise value.[18] Because this alleged, concrete harm arising from AoA's conduct could be redressed by a damages award, Stoler has met its burden to establish standing. *See Lujan*, 504 U.S. at 561; *Spokeo*, 136 S. Ct. at 1547.

Regarding the merits of Stoler's Price Reduction Claim, Stoler contends that AoA violated § 15-207(h)(3) because (i) AoA conditioned continued Standards Bonus payments on

---

[17] Of course, this issue must be resolved first, because without subject matter jurisdiction there is no power to adjudicate Stoler's Price Reduction Claim. *See, e.g.*, *S. Walk at Broadlands Homeowner's Assoc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175 (4th Cir. 2013) ("[A] court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits.").

[18] *See, e.g.*, P. Br. (Doc. 93) Ex. 2 ¶ 17 (declaration noting Stoler's lost sales and diminution in value of Stoler's Audi business); D. Supp. Br. (Doc. 83) Ex. 1 at 5, 8 (Stoler's interrogatory answer claiming, *inter alia*, diminished franchise value).

Stoler's agreement to build an exclusive dealership facility, and (ii) AoA allegedly *treats* the bonuses as reducing the price of vehicles by purportedly "track[ing] all bonuses earned by a dealer on a vehicle by vehicle basis[.]"[19] Importantly, however, there is a genuine dispute of material fact that precludes the award of summary judgment to either party. This is so because AoA has pointed to record evidence (i) that the Standards Bonus payments did not reduce the price of vehicles sold to Stoler,[20] and (ii) that AoA does not treat the bonuses as reducing the price of vehicles because AoA *can*, but does not always, "track" bonuses on a vehicle-by-vehicle basis.[21] In this respect, there is a genuine factual dispute whether the Standards Bonus payments reduced the price of each vehicle sold to Stoler within the meaning of § 15-207(h)(3). In addition, as stated above, there is also a genuine dispute of material fact regarding Stoler's alleged damages.[22]

Accordingly, neither party has shown that it is entitled to summary judgment, and thus the parties' cross motions on Stoler's Price Reduction claim must be denied.

### E. The Coercion Claim, § 15-207(b)

Only AoA has moved for summary judgment on Stoler's Coercion Claim, arising under MTC § 15-207(b). Section 15-207(b) provides, in pertinent part, that a distributor "may not coerce any dealer to make any agreement with the . . . distributor[.]" MTC § 15-207(b). The term, "coerce," is statutorily defined as "compel[ling] or attempt[ing] to compel by threat of

---

[19] *See* P. Supp. Br. (Doc. 77) at 11; P. Supp. Stmt. of Facts (Doc. 62-1) ¶ 27.

[20] *See, e.g.*, D. Supp. Stmt. of Facts (Doc. 65-9) Ex. 9 ¶¶ 20-21, 23; *id.* (Doc. 65-10) at A-9 (noting that the Exclusive Standards Bonus program may have *increased* the price of vehicles due to the costs a dealer must incur to satisfy applicable incentive conditions).

[21] *See* D. Br. (Doc. 81) ¶ 27; D. Supp. Br. (Doc. 83) at 2 n.2.

[22] *See supra* note 18 and accompanying text; *see also* D. Supp. Stmt. of Facts (Doc. 65) ¶ 20 (noting Stoler's costs in obtaining a Standards Bonus).

harm, breach of contract, or other adverse consequences, including the loss of any benefit made available to other dealers of the same line make in the State." *Id.* § 15-207(a)(2)(i). Yet, the statutory definition of coercion "does not include to argue, urge, recommend, or persuade." *Id.* § 15-207(a)(2)(iii). In essence, Stoler has alleged that AoA coerced Stoler into signing the Facility Agreement by threatening to deny future Standards Bonus payments. For the reasons that follow, there is a genuine dispute of material fact precluding the award of summary judgment on Stoler's Coercion Claim.

AoA contends that Stoler's Coercion Claim fails on the grounds (i) that Stoler did not suffer any damages by signing the Facility Agreement; (ii) that AoA's threat to deny Standards Bonus payments cannot constitute "coercion" within the meaning of § 15-207 because the bonus program was an "incentive," not a "benefit"; and (iii) that permitting Stoler's Coercion Claim to proceed would flout § 15-207(h)(1)(i), which permits distributors to offer incentive programs.

AoA's motion for summary judgment on the Coercion Claim must be denied. Regarding AoA's first argument, there is a genuine dispute of material fact concerning Stoler's damages, which potentially include millions of dollars in lost franchise value.[23] As to AoA's second argument—that denying or threatening to deny Standards Bonus payments cannot constitute "coercion" because the bonuses were not a "benefit"—AoA reads the text of § 15-207(b) too narrowly. Indeed, § 15-207(b) broadly prohibits threats of "*harm . . . or other adverse consequences*[.]" MTC. § 15-207(b) (emphasis added). And the loss of Standards Bonus payments is certainly a "harm" or "adverse consequence" to which § 15-207(b) could apply. *Id.*

Finally, the record is not ripe for summary judgment with respect to AoA's third argument—that AoA merely attempted to "persuade," not "coerce," Stoler into signing the

---

[23] *See supra* note 18 and accompanying text.

Facility Agreement. *See id.* This is so because Stoler has presented record evidence suggesting that the Facility Agreement may have been a contract of adhesion and thus the product of coercion. *See Holloman v. Circuit City Stores, Inc.*, 391 Md. 580, 602 (2006) ("A contract of adhesion [is] drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it basis' to the weaker party who has no real opportunity to bargain about its terms"). Indeed, Stoler has pointed to admissible evidence indicating that Stoler faced a choice between signing AoA's Facility Agreement or going out of business. For instance, some Stoler representatives testified that if Stoler had failed to sign, Stoler would have become unprofitable, and AoA could have put Stoler's Audi franchise out of business.[24] Moreover, there are factual disputes regarding how the parties' negotiations proceeded and how much, if any, genuine input Stoler's representatives had in drafting the Facility Agreement. Thus, AoA's motion for summary judgment on Stoler's Coercion Claim must be denied.

To be sure, the result reached here is consonant with the analysis in Part IV.C, *supra*, which observes that MTC § 15-207(h)(1)(i) permits distributors to offer incentive programs. For example, if a dealer can accept a distributor's incentive offer only by signing an adhesion contract, a § 15-207(b) claim of coercion might lie. As stated above, the offering of an incentive program does not immunize a distributor from a potential coercion claim.

In sum, AoA's motion for summary judgment on the Coercion Claim must be denied, as there remain triable, material factual disputes that must be resolved.

### F.  The Covenant Not to Sue

Analysis now turns to AoA's affirmative defense and counterclaim arising from a covenant not to sue in the Facility Agreement. To begin with, the parties agree that the covenant

---

[24] *See, e.g.*, P. Supp. Stmt. of Facts (Doc. 65) ¶¶ 24-25.

relates only to Stoler's Benefit Claim arising under MTC § 15-207(h)(2)(ii). Specifically, Stoler covenanted in the Facility Agreement not to sue AoA "with respect to any alleged damages [Stoler] may suffer as a result of [Stoler]'s loss of the right to receive any Standards Bonus . . . arising out of [Stoler]'s failure to perform its obligations under the [Facility] Agreement."[25] In its answer to the instant lawsuit, AoA invoked this covenant both as an affirmative defense to bar Stoler's Benefit Claim, and as a counterclaim to recover damages. At issue here is Stoler's motion for summary judgment on both the affirmative defense and counterclaim; for the following reasons, both the affirmative defense and counterclaim fail.

First, the affirmative defense is moot because summary judgment on Stoler's Benefit Claim is awarded to AoA. *See supra* Part IV.C. Second, the counterclaim fails for lack of damages. *See Kumar v. Dhanda*, 198 Md. App. 337, 345 (2011) (damages are a necessary element of a breach of contract claim). Indeed, AoA, having prevailed on summary judgment on the Benefit Claim, cannot be subject to a money judgment on that cause of action. And neither AoA's attorney's fees nor its expert fees comprise recoverable damages here. Indeed, it is well-settled "as a matter of substantive law" in Maryland that "damages do not include counsel fees[.]" *Caffrey v. Dept. of Liquor Control*, 370 Md. 272, 292 (2002).[26] This rule also applies to

---

[25] *See* JS ¶ 49.

[26] Of course, there are some "quite rare" exceptions to this general rule. *Caffrey*, 370 Md. at 293. Specifically, attorney's fees may be awarded as an element of damages or costs if:

> (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution.

*Thomas v. Gladstone*, 386 Md. 693, 699 (2005). None of these exceptions applies here. *See also* MTC § 15-207(f) (prohibiting any "contract offered to a dealer by a . . . distributor" from "contain[ing] any provision requiring a dealer to pay the attorney's fees of the . . . distributor . . . related to disputes involving the franchise").

expert fees. *See, e.g.*, *Burdette v. Lascola*, 40 Md. App. 720, 736 (1978) ("[E]xpert witness fees . . . ordinarily are not recoverable from the unsuccessful party").[27]

In sum, AoA's affirmative defense arising under the covenant not to sue must be dismissed as moot, and summary judgment on AoA's related counterclaim must be awarded to Stoler.

## G. Unclean Hands and *In Pari Delicto*

Finally, it remains to determine whether Stoler is entitled to summary judgment on AoA's affirmative defenses of unclean hands and *in pari delicto*.[28] The unclean hands doctrine bars claims raised by a party who engaged in "fraudulent, illegal, or inequitable conduct in the matter with relation to which he seeks assistance." *Wells Fargo Home Mortg. v. Neal*, 398 Md. 705, 729-30 (2007). Similarly, the doctrine of *in pari delicto* generally provides that "where fault is mutual, the law will leave the case as it finds it." *Schneider v. Schneider*, 335 Md. 500, 515 (1994).[29]

---

[27] Nor are expert fees recoverable "costs." *Bahena v. Foster*, 164 Md. App. 275, 292 (2005).

[28] There is a question whether the equitable doctrine of unclean hands applies exclusively to actions in equity. Although Maryland courts have not reached a consensus, the greater weight of authority appears to conclude that the defense of unclean hands also obtains in cases at law. *See, e.g.*, *Manown v. Adams*, 89 Md. App. 503, 513 (1991) ("It is settled in this State . . . that the [unclean hands] doctrine may be invoked to bar suits at law[.]"), *vacated on other grounds*, 328 Md. 463 (1992); *Smith v. Cessna Aircraft Co*, 124 F.R.D. 103, 106 (D. Md. 1989) (collecting cases and concluding that the unclean hands doctrine "extends to actions at law, such as [a] suit for damages"); *Stratton v. Sacks*, 99 B.R. 686, 694 (D. Md. 1989) ("Although the clean hands doctrine is an equitable principle, it has been applied . . . to defeat an action at law." (citation omitted)). This is a sensible result, as the doctrine of unclean hands "is intended to protect the courts from having to endorse or reward inequitable conduct[.]" *Adams*, 328 Md. at 475. This institutional goal is served if the doctrine is available in suits in equity and at law.

[29] *See also Messick v. Smith*, 193 Md. 659, 669 (1949) ("[W]hen plaintiff and defendant have participated in fraudulent or illegal conduct . . . and are in pari delicto, plaintiff cannot maintain suit—at law or in equity—directly arising out of the misconduct.").

AoA argues that both doctrines bar Stoler's § 15-207 claims because Stoler allegedly engaged in the following misconduct: (i) Stoler knowingly entered into the Facility Agreement—which contract Stoler now claims was illegal, (ii) Stoler fraudulently represented in the Facility Agreement to having been fully advised about the contract's legal nature, and (iii) Stoler falsely stated in the Facility Agreement that Stoler's representatives and legal counsel had reviewed applicable laws before signing the contract.

In response, Stoler contends that the affirmative defenses of unclean hands and *in pari delicto* fail as a matter of law (i) because Stoler cannot be at equal fault with AoA considering AoA's grossly unequal bargaining power, (ii) because a plaintiff cannot be *in pari delicto* when he is part of a class for whose protection or benefit the statute was enacted,[30] and (iii) because the provisions in a contract cannot provide the basis of an unclean hands or *in pari delicto* defense.

Neither party is entitled to summary judgment on either affirmative defense. This is so because there is a genuine dispute of material fact whether AoA had coercive or grossly unequal bargaining power when the parties negotiated the Facility Agreement.[31] Thus, even if MTC § 15-207(h) is intended to protect Maryland dealers from a distributor's "discriminatory or coercive business practices," it is unclear whether AoA's affirmative defenses would operate to hinder or thwart the legislative purpose underpinning the MTC. *See Messick v. Smith*, 193 Md. 659, 669 (1949) (unclean hands doctrine should not be applied where such application would hinder or

---

[30] *See Messick*, 193 Md. at 669 ("When a transaction involves violation of a statute the clean hands maxim . . . is not applied if, by application of the maxim, the legislative purpose would . . . be hindered or thwarted. When the plaintiff is one of a class for whose protection or benefit the statute was enacted, he may be regarded as not in pari delicto."). Here, Stoler asserts that AoA's affirmative defenses would operate to thwart § 15-207(h)'s purpose, because a legislative report reflects that § 15-207(h) was enacted to protect dealers "from discriminatory or coercive business practices by . . .distributors . . . and otherwise strengthen[] various dealership franchise rights." Md. 90 Day Report, 2009 Sess., Part G.

[31] *See supra* Part IV.E.

thwart legislative purpose). Moreover, Stoler's contention—that Stoler's alleged misrepresentations in the Facility Agreement cannot support a defense of unclean hands or *in pari delicto*—misses the mark. Maryland law is clear that a contract may, in some circumstances, support such affirmative defenses. *See, e.g.*, *Shirks Motor Express Corp. v. Forster Transfer & Rigging Co.*, 214 Md. 18, 29 (1957) (holding that a party "having entered into [an] illegal contract with the [opposing party] was in *pari delicto* . . . and must take the consequences").

Accordingly, Stoler's motion for summary judgment on AoA's affirmative defenses of unclean hands and *in pari delicto* must be denied.

## V.

In sum, the parties' cross motions for summary judgment must be granted in part and denied in part.

First, summary judgment must be awarded to AoA on:

- o Stoler's Offer Claim, MTC § 15-207(h)(1)(i);

- o Stoler's Require Claim, MTC § 15-207(h)(2)(i); and

- o Stoler's Benefit Claim, MTC § 15-207(h)(2)(ii).

Second, summary judgment must be awarded to Stoler on:

- o AoA's counterclaim arising under the covenant not to sue.

Third, summary judgment must be denied with respect to:

- o Stoler's Price Reduction Claim, MTC §§ 15-207(h)(3)(i) & (ii);

- o Stoler's Coercion Claim, MTC § 15-207(b); and

- o AoA's affirmative defenses of unclean hands and *in pari delicto*.

Finally, AoA's affirmative defense arising under the covenant not to sue must be dismissed as moot.

25

An appropriate Order will issue.

Alexandria, Virginia
January 25, 2017

/s/

_____
T. S. Ellis, III
United States District Judge